**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

LAURETTA ROBERTS,                    )
                                     )
       **Plaintiff,**             )
                                       )
       **v.**                          )
                                       )
                                       ) **No 4:13-CV-541 CAS**
GENERAL MOTORS LLC,          )
                                       )
       **Defendant.**            )

**JURY TRIAL -- VOL 8-B**
**BEFORE THE HONORABLE CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**
**APRIL 6, 2016**

APPEARANCES:

For Plaintiff:         John G. Simon, Esq.
                        Kevin M. Carnie, Esq.
                        THE SIMON LAW FIRM, P.C.
                        800 Market Street, Suite 1700
                        St. Louis, MO  63101

                        Gary K. Burger, Jr., Esq.
                        BURGER LAW, LLC
                        500 N. Broadway, Suite 1350
                        St. Louis, MO  63102

For Defendant:        Kent B. Hanson, Esq.
                        Mickey W. Greene, Esq.
                        HANSON BOLKCOM LAW GROUP, LTD.
                        527 Marquette Avenue, Suite 2300
                        Minneapolis, MN  55402

(Appearances continued on page 2.)

REPORTED BY:          SHANNON L. WHITE, RMR, CRR, CSR, CCR
                        Official Court Reporter
                        United States District Court
                        111 South Tenth Street, Third Floor
                        St. Louis, MO  63102
                        (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

```
For Defendant:        Thomas M. Klein, Esq.
                      BOWMAN AND BROOKE LLP
                      2901 N. Central Avenue, Suite 1600
                      Phoenix, AZ  85012


                      Peter B. Hoffman, Esq.
                      BAKER AND STERCHI, LLC
                      1010 Market Street, Suite 950
                      St. Louis, MO  63101
```

<u>INDEX - VOL 8-B</u>

<u>WITNESSES</u>

<u>JEFFREY CROTEAU</u>
Direct Examination Cont'd by Mr. Klein ................   4
Cross-Examination by Mr. Simon ........................  46
Redirect Examination by Mr. Klein .....................  81
Recross-Examination by Mr. Simon ......................  86

<u>EDDIE COOPER</u>
Direct Examination by Mr. Hanson ......................  87

4

(PROCEEDINGS STARTED AT 1:35 PM.)

1

2          THE COURT:  Good afternoon, ladies and gentlemen of

3   the jury.

4          MR. SIMON:  Thank you, Your Honor.

5                **DIRECT EXAMINATION CONTINUED**

6   **BY MR. KLEIN:**

7   Q    Mr. Croteau, before we broke we were talking about some

8   CRIS testing.  Did you also do a CRIS test of a Volvo XC-90?

9   A    Yes, I did.

10  Q    And are you aware that earlier in the trial last week the

11  jury saw a promotional video done by Volvo showing a Volvo

12  XC-90 rollover?

13  A    That's my understanding, yes.

14  Q    So following that protocol that you've described, did you

15  take a Volvo XC-90, put it in the CRIS fixture, and mimic the

16  hit from the Malibu 7L4?

17  A    Yes.

18  Q    Before we go further, I think a couple times in your

19  prior testimony you used an acronym, ATD.

20  A    Yes.

21  Q    What is that?

22  A    It's a engineer's terminology for the test dummy.  It's

23  anthropomorphic test device, but it's basically a test dummy.

24  Q    So "anthropomorphic" being human-like test device?

25  A    Human-like in terms of the dimensions -- size, weight,

5

1   that kind of thing.

2   Q    Okay.  Did you have an ATD in the Volvo XC-90?

3   A    Yes.

4   Q    All right.  If we can go to the next slide then, please,

5   Kyle.

6          Is that an ATD over on the left in the upper picture?

7   A    It is.  What you're seeing is the dummy head with the

8   target on the back and then the neck.

9   Q    And what are we seeing in the upper photo on the right?

10  A    So that is a trailer-mounted camera that is basically

11  looking right at the roadway and through the driver's side

12  window.  So this here is the driver's side window, and it

13  looks kind of opaque like that because the glass has just

14  fractured.  If we were to back this up about 10 milliseconds,

15  that glass would actually still be intact.

16  Q    So you selected a photo not so that we couldn't see

17  through the glass but to show us the moment where the glass is

18  breaking?

19  A    That's correct.  I had shown a previous image in which

20  the glass was prior to breaking, and this one here shows the

21  glass as it's fracturing.

22  Q    So what does that tell us about the deformation of the

23  Volvo XC-90?

24  A    What it says is that the peak neck load occurred at about

25  18 milliseconds, which is right here, and the peak force there

1  is going to be upwards of about 11,600 newtons or so, and it's

2  before the distortion of the structure was enough to actually

3  fracture the glass.

4  Q    All right.  And earlier, when you were showing us the

5  Blazer CRIS test, you had a picture showing some deformation

6  of the Blazer but the glass hadn't yet broken in those side

7  windows?

8  A    Correct.

9  Q    So this same kind of thing going on with the Volvo XC-90

10  but a few milliseconds forward to where the glass is just

11  breaking?

12  A    Exactly.

13  Q    Now, you already talked about it a little bit, but what

14  does the data down below tell us about what happened or what

15  the test device was recording as the Volvo XC-90 was going

16  through a CRIS test?

17  A    So the vertical axis is the force in newtons.  The white

18  curve actually represents the upper neck load cell.  When you

19  get to times zero, which is where the yellow bar is right

20  here, this actually represents when the roof makes contact

21  with the pavement.

22        There's initially a gap between the top of the

23  dummy's head and the roof at that point.  So this is the dummy

24  making, you know -- basically continuing to fall and move

25  toward the ground, and then once the head reaches the roof

1  panel, you actually start increasing the neck load.  So the

2  head at that point has stopped, and the torso continues to

3  move, compressing the neck.

4  Q    So roof's against the ground, head contacts the roof and

5  stops.  The rest of the torso keeps coming?

6  A    Correct.

7  Q    And the load is being recorded by the neck.  That's what

8  is causing this curve to go up here?

9  A    That's correct.  If you look at these white wires right

10  there coming out of the dummy head, that's the wires for the

11  neck load cell.

12  Q    So what is this?  Tell us about whether a Volvo XC-90

13  roof would prevent a neck injury in a rollover crash.

14  A    It says that this type of torso augmentation could occur

15  in this XC-90 or any other vehicle if the conditions met are

16  correct.  In other words, head is up against the roof against

17  the ground, you have the right alignment, and you have enough

18  velocity for the torso to move towards the stopped head.

19  Q    Okay.

20  A    Creates a force.

21  Q    Next slide, please.  Now, is this the kind of the data of

22  bars like what we've seen earlier for all the tests that

23  you've done or at least as of that point where you're

24  mimicking the Malibu 7L4?

25  A    That's correct.

8

1  Q    So some of these vehicles have roll cages, some of them

2  don't?

3  A    That's right.

4  Q    And we have a Volvo XC-90 on there?

5  A    Right.  To the far right.

6  Q    And we see neck loads well above the amount to cause

7  potential injury being measured by these test dummies?

8  A    Correct.  Not in this data chart but what we've shown

9  already it has, yes.

10 Q    Now, there is -- the vertical axis on this chart is

11 labeled "equivalent drop height."  What is that?

12 A    So what I've done is I've analyzed each and every one of

13 these CRIS tests.  I had said earlier that this neck loading

14 occurs very quickly within contact between the vehicle and the

15 ground.  So if things are happening very quickly, the vehicle

16 motion in terms of its angular rotation is not changing very

17 much during this event, during this impact event.

18        So what this does is it takes a vehicle that is

19 moving down the road and rotating at the same time when it

20 makes contact with the ground and taking it and coming up with

21 a one-dimensional height, a one-dimensional test, in which

22 this drop height represents the height above the impact

23 surface that you would need to raise the vehicle in order to

24 achieve the velocity of the dummy when it makes contact with

25 the ground.

1        So it takes the equations of motions for a vehicle

2    that is moving down the road and rotating and says what is the

3    instantaneous velocity, right, at contact with the ground?

4    Q    All right.  So let me kind of break this down a little

5    bit.  I think Dr. Burton told us last week he thought this

6    injury would occur in -- the injury that Dr. Roberts sustained

7    would occur in 20 to 30 milliseconds.  Your data was showing

8    like 13.8 milliseconds on the chart we were looking at

9    earlier?

10   A    That's right.  Some of the tests have it occurring a

11   little bit sooner.

12   Q    So that's less than a blink of an eye.  During that time

13   when the load is sufficient to cause a neck fracture, is the

14   vehicle rotating much?

15   A    It's not.

16   Q    So are you able to take this data from these CRIS tests

17   and then correlate them into just an inverted drop test?

18   A    That's correct.  So just to back to how much does the

19   vehicle move, right, so let's just say we're moving at or

20   rotating at 200 degrees per second; so we're spinning about an

21   axis at 200 degrees per second.  If we've got a 10-millisecond

22   time from the roof contact up to peak load, then 200 times .01

23   is 2 degrees.

24        So the vehicle is only -- if it were in a

25   three-dimensional kind of rollover where you had a vehicle

1  that was translating, dropping, and rotating, you would only

2  be changing the orientation, the roll angle of that vehicle,

3  by 2 degrees.  So that's not enough to kind of change the

4  dynamics of what's happening with the dummy, which is why the

5  inverted drop test using this drop height is a reasonable

6  thing to do.

7  Q    Okay.  And you then took information from the

8  reconstruction of this crash and did some drop tests?

9  A    Correct.

10  Q    Before we get to that, though, we mentioned earlier you

11  had done a dolly rollover test -- or three, actually -- of the

12  Subaru Forester; right?

13  A    Correct.

14  Q    Did you bring some information to show the jury about

15  what happened with those tests?

16  A    I did.

17  Q    Let's go to the next slide, please.  What are we seeing

18  here?

19  A    This is the 208 dolly that we have at our test facility

20  in Phoenix.  There is a Subaru Forester, 2003 model year, I

21  believe.  It is on the dolly.  The dolly gets accelerated up

22  to the test speed and then is suddenly decelerated, suddenly

23  stopped.  So this white structure right here is connected to

24  these tires here.  You've got a mating structure on the other

25  side.  That gets suddenly decelerated.  And then this vehicle,

1  whatever is mounted onto it, continues to move in the

2  direction that it was heading.

3          You've got the tire up against a trip lip right here.

4  That actually helps to initiate the rollover event.  And so it

5  falls from this dolly down about 8 inches and continues to

6  move in the direction it was going when it -- when the dolly

7  was suddenly stopped.

8  Q    Is this also sometimes referred to as the 208 dolly

9  rollover?

10 A    Yes, it is.

11 Q    Same thing?

12 A    Yes.

13 Q    Before we move on, what is the strength-to-weight ratio

14 of the Subaru Forester?

15 A    4.8.

16 Q    Okay.  Let's go to the next slide then.  There's three

17 photographs.  What are these showing us?

18 A    So these three photographs are taken of the vehicle after

19 each of the three tests.  The first one is after the Forester

20 was rolled over onto concrete, the second one is after we

21 rolled it onto dirt but without dummies, and then the bottom

22 one is rolling it on dirt with ATDs in the vehicle.

23 Q    Let's focus in on the bottom photograph.  Go to the next

24 slide, please.  Is this photograph taken shortly after the

25 test is completed?

1    A    It was.

2    Q    Much like we can see an ATD over in the passenger seat

3    there, is there one also in the driver's seat that's kind of

4    obscured?

5    A    There is.  You can see the arm of that dummy in the

6    driver's side hanging out the window.

7    Q    On the driver's side we see some deformation there.  Did

8    you recall roughly how much deformation is there by

9    measurement?

10    A    I don't recall the residual measurement.  I have the

11    electronic measurements because we measured the data, but I

12    don't recall what that is right now.

13    Q    Okay.  So whatever it is, the jury can see in the

14    photograph that there is some deformation?

15    A    Correct.

16    Q    What happened to the dummies?  Let's talk about the

17    driver dummy first, the one that's in the area where we see

18    more deformation.  Did you record data from that driver test

19    dummy?

20    A    Yes.  The dummies were instrumented.  We recorded the

21    upper neck load cells in this test for both the driver dummy

22    and the right front passenger dummy.  So when you look at the

23    deformation to this vehicle, you know, this is what we would

24    see if we were investigating an accident or if you went to the

25    junkyard.  You know, just looking at this, you would say,

1    well, given the amount of this deformation that we have over

2    the driver A-pillar over here, that particular occupant must

3    have seen a more significant impact than the occupant that was

4    seated over on the passenger side.

5    Q    Is that true?

6    A    The results from this test show that the passenger

7    actually saw a higher neck load than the driver in this test.

8    Q    So just looking at this picture, it looks like there's

9    more roof deformation on the driver's side than on the

10   passenger side, but you're telling the jury there was a higher

11   neck load on the passenger dummy?

12   A    That's correct.

13   Q    The neck loads that were recorded for both the driver and

14   the passenger dummy -- did you note when they occurred with

15   respect to when the roof deformed?

16   A    Yes.  As a matter of fact, we in this test did again --

17   it's probably not going to surprise you -- a synchronized data

18   and video type of analysis where we have the high-speed video

19   captured both offboard and onboard as well as the data that

20   synchronized with it so we can visually get an impression of

21   what the vehicle's doing as it's going through the rollover

22   event.  We can see what the dummy is doing inside the vehicle,

23   and then we can actually see what the test readouts are for

24   the upper neck.

25   Q    Before we look at the data, let me ask you this.  So we

14

1    know strength-to-weight ratio on this vehicle is 4.8.  Are you

2    familiar with the Batzer testimony from last week?  He said

3    you should make the roof at a 4.0 or greater.

4    A    Yes, I am familiar with that testimony.

5    Q    Does this photograph show us what can happen depending on

6    how the vehicle hits to a roof that's designed to 4 or greater

7    strength-to-weight ratio?

8    A    Yes, it does.  What it says is that the deformation that

9    you see to the structure is not necessarily related to the

10   strength-to-weight ratio but is representative of the nature

11   of the impact that the vehicle saw during the rollover event.

12   Q    This is not the only case you've been involved in where

13   there's a claim that the roof should have been stronger;

14   right?

15   A    Correct.

16   Q    Have you been retained in any cases where the roof

17   strength of the vehicle involved in the lawsuit was 4.0 or

18   greater and there's a claim that the roof should have been

19   stronger?

20   A    Yes.

21   Q    Have those cases also involved neck fractures?

22   A    There have been neck injuries, that's correct.

23   Q    Okay.  Let's look at the data then.  Next slide, please.

24   So let's kind of break this down.  First, the upper-left

25   photograph, what are we looking at?

15

1    A    So that is a onboard, high-speed video camera that is

2    looking at the driver dummy.  So it's in the back of the

3    vehicle kind of behind the second row seat in the rear cargo

4    area and angled towards the driver's seat.  So you can kind of

5    see the top of the driver's seat here.  The headrest has been

6    taken off so that we can get a better view.  You can see the

7    dummy head is up here, and then this gray area right here is

8    kind of the shoulders of the dummy.

9    Q    The photograph to the right, it looks like we're looking

10   from the outside.  At what point in time is the photograph on

11   the right?

12   A    So that is actually not a photograph but a frame from the

13   high-speed video, and it's synchronized.  It's at the same

14   time that the image to the left was captured.  So if you look

15   at the shadow that we see kind of right here, that shadow is

16   actually this shadow that you see on the dirt right there.

17          So what you're seeing is an onboard and an offboard

18   that are together.  One is looking at the front of the

19   Forester, offboard, which is the one on the right, and then

20   the one on the left front is an onboard view.

21   Q    All right.  Now, we've got a data plot on the left side

22   that's labeled "vertical upper neck force versus time."  What

23   is that?

24   A    So that is a plot of the compressive neck force for the

25   upper neck on the driver as a function of time.

1  Q    There's a red plus sign there and looks like it's at

2  about 6,000.  That's newtons?

3  A    That's correct.  I believe it's -- the force is minus

4  5,900 newtons.

5  Q    Okay.  On the right there's another data plot labeled

6  "left B-pillar displacement."  What is that?

7  A    During this test we also measured using string

8  potentiometers what the displacement of the roof was actually

9  happening so that we could look at when does the actual neck

10  force occur relative to the deformation?  So we can measure

11  how much this B-pillar, which is going to be right at the top

12  of the roof, up here, in that area, how much does that move

13  during this entire event.  And it's not stationary.  It moves

14  to one side, and then the vehicle goes through another roll,

15  it moves back, it gets compressed, and then it can get moved

16  again.

17        So what we're looking on the right is anything that

18  is below this line is vertical crush, and anything that is to

19  the left of this vertical line is lateral displacement of the

20  roof.  And so the white lines, which starts off at the

21  intersection -- zero, zero -- and then when the first

22  passenger-side roof strikes the ground, the structure actually

23  gets displaced outboard and then comes back to about right

24  there where the current plus sign is.

25        Okay.  So we've synchronized these pluses, all right?

1    So when the roof has been displaced on the B-pillar on the

2    driver's side, it's come down about 1 inch and it's come over

3    about 1.3 inches.  The neck load measured by this dummy is

4    5,900 newtons in compression.

5    Q    All right.  So the plus signs in both data plots are --

6    occur at the same time.  So we know when the dummy has seen

7    the peak compressive neck load, the roof is deformed down 1

8    inch and over 1 inch?

9    A    Correct.

10   Q    Not significant.

11   A    Correct.

12   Q    I totally forgot what the question was.  Oh, I remember.

13   You said you measure the roof displacement with a string

14   potentiometer.  What is that?

15   A    You can think of it as an electronic ruler.  It's --

16   Q    An electronic what?

17   A    An electronic ruler.

18   Q    Okay.

19   A    Or an electronic tape measure.  Maybe that's a better way

20   of saying it.  It essentially has an instrument they call a

21   potentiometer.  The resistance of the potentiometer changes as

22   you pull a string that's on a spool.  So this string is under

23   tension, it gets connected to a point that will move, and then

24   it gets anchored to a place that will not move, which is down

25   in the undercarriage of the vehicle.  We power it up, we

1  balance it, and then it measures what the -- really -- it

2  really records a voltage, and then we convert that into

3  inches.

4  Q    So maybe this is a bad analogy, but I've got a tape

5  measure here.  So if it pulls out to 8 and then it goes back

6  in to 4, there's electronic data recording that it went to 8

7  and then went back to 4?

8  A    Right.  The base that's in your right hand is anchored to

9  the vehicle, and then kind of the zero point or the dummy end

10  of the tape in your left hand is put up on the vehicle

11  B-pillar, that's right.

12  Q    Let's go to the next slide.  This looks like a similar

13  setup except now the exterior vehicle is on -- the

14  photograph's on the left.  So what are we looking at here?

15  A    Again, same type of thing.  We've switched the top images

16  because we're actually looking at the passenger-side dummy on

17  the upper right.  And so this is the dummy head right here.

18  This is the vehicle orientation.  So this is actually in the

19  first roll.  So this is after it's left the dolly, comes in

20  contact on the near side.  So this is the passenger side

21  moving into the ground and stopping.

22       You can see from a displacement perspective if you

23  look at that plus sign and you go down here and you look at

24  the displacements, you can see 1.6 inches to the left and less

25  than 1 inch, so .8 inches downward when this neck load occurs,

1    and that neck load was minus 6,339 newtons.

2            So the passenger-side dummy that had less residual

3    deformation at the end of this event saw the higher neck load

4    in this first roll.

5    Q    All right.  And this plus sign is at that peak

6    compressive neck load that that passenger-side dummy saw?

7    A    Yes.

8    Q    And there's an inch, give or take, of deformation at that

9    point.  Not significant?

10   A    Correct.

11   Q    So what is causing the load from these tests to the dummy

12   neck?

13   A    What's causing the load is the principle that we've been

14   talking about called torso augmentation, which is the head is

15   stopped up against the ground through the roof structure, and

16   the dummy torso wants to continue to move towards the stopped

17   head.  That motion creates a force, and it gets measured by

18   the neck.

19   Q    All right.  Let's talk about this particular van.  Did

20   you go and look at it?

21   A    Yes, I did.

22   Q    Let's get the next slide, please.  So these are

23   photographs.  Are these of Dr. Roberts' van?

24   A    They are.

25   Q    Kind of walk us through starting with the upper-left

20

1   corner.  What are we looking at there?

2   A    So in the upper-left corner we're looking at the

3   passenger side of the van.  Of particular interest here, I

4   think, is the damage that we see to the right rear corner.

5   And in particular this crease that we see in that quarter

6   panel, that's consistent with a van that has basically

7   contacted the ground and been slightly nose-pitched up to

8   create that deformation.

9        I think that will give rise to the subsequent impact,

10  which is a roll that's going to ultimately lead to the impact

11  that we see on the passenger -- excuse me -- on the driver's

12  side, which is the photograph in the upper right.

13  Q    Okay.  Do you understand from Mr. Tandy's reconstruction

14  he, after putting it all together, concluded that that damage

15  on the lower-right rear of the van was at about one and a

16  quarter roll, and then the damage to the driver's side roof

17  was between one and a half -- about 190 degrees?

18  A    Correct.  I do.

19  Q    And then you just have some other information you

20  recorded about the van at the bottom.  Anything of note with

21  respect to the two bottom photographs?

22  A    I think what's important here in the bottom right is that

23  there's kind of a lateral shift, if you will, of the roof

24  structure that's towards the passenger side.  That's

25  consistent with a far-side, kind of roof-to-ground contact

1    that would occur and create -- you got to have some vertical

2    load to get the roof to move downward, but then you also need

3    a lateral component to make it move laterally, towards the

4    passenger side, as it's finishing that second roll and coming

5    to rest upright.

6    Q    Let's talk briefly about the 216 test.  Next slide,

7    please.  The jury's already heard about the two green ones,

8    the one that GM did, the two-sided test NHTSA did, another --

9    which are the two blue ones.  Let's just get to the -- the red

10   one is the one they haven't heard about yet.  That's the test

11   that you did at Exponent of an Explorer conversion van.

12   A    That's right.

13   Q    What did you find when you did the 216 of that vehicle?

14   A    So what we got was a peak roof load of 13,659 pounds.

15   The examplar to the subject vehicle would be about 5,870

16   pounds.  In other words, if we factor in all of the

17   modifications for the conversion van in the up-fitting, that's

18   the weight of that van.

19   Q    So the roof strength-to-weight ratio of an Explorer

20   conversion van with the modifications they make given this

21   weight is what?

22   A    2.3.

23   Q    Okay.  Now let's lead into the inverted drop test.  Let's

24   look at the next slide, please.  I see Mr. Tandy's name.  I

25   see Mr. Green.  He is the person who did the reconstruction

1    for plaintiffs?

2    A    Yes.

3    Q    And so you took some information from their

4    reconstructions and looks like you created this?

5    A    I did.

6    Q    Let's walk through this.  There's two diagrams at the

7    top.  What are those showing us?

8    A    So the diagram in the upper left, right here, what I'm

9    showing right there is this three-dimensional type of event

10   that's occurring.  We've got a vehicle that is rotating.

11   That's the black arrow that's curved.  We have got arrows that

12   represent the translational velocity and the vertical

13   velocity.  So that's the gray arrow here and the orange arrow

14   there.  And that's because there's an elevation change for the

15   CG going from the right rear impact.  It travels through an

16   arc, gets to the top, and then falls to the driver-side

17   A-pillar.

18           That CG height change is represented by that green

19   arrow.  The gray arrow is how fast the vehicle is moving as it

20   comes into contact with the A-pillar but across the ground; so

21   it's the horizontal, or translating, velocity.  And then the

22   purple arrow that we see right here is basically what does the

23   rotational component and the movement of the van do to the

24   velocity of the center of mass of the dummy, or the occupant?

25   So that's basically the center of your chest.

23

1    So we take all of that and run it through a equation

2  model for motion of vehicles, kinematics, and come up with the

3  one-dimensional drop test.  And the objective is to figure out

4  what is the direction and what is the speed of the torso at

5  the time that the roof makes contact with the ground at that

6  one-and-a-half roll position that Mr. Tandy identified as

7  creating the damage to the vehicle.

8  Q    All right.  And you explained the equivalent drop height

9  earlier.  Is that the paper you published taking the CRIS

10 tests and deriving an equivalent drop height from them?

11 A    Yes, that's correct.  And so this is all of the math that

12 goes along with that.

13 Q    So same process was used to -- using the reconstruction

14 of this crash to come up with an equivalent drop height for

15 the impact where Dr. McNish believes Dr. Roberts sustained her

16 injury?

17 A    Yes.

18 Q    Now, you say the CG height.  The CG on the van is roughly

19 where?

20 A    It would be probably behind the first row.  And I don't

21 know.  I didn't actually measure the CG height.  I don't

22 recall what that is, but it would be -- puts it about 30

23 inches of the ground.

24 Q    Okay.

25 A    Something like that.

1    Q     So somewhere in between and a little bit behind the two

2    front seats?

3    A     Yes.

4    Q     And that's if you could balance the van on your -- on a

5    point, that's the point you would want to balance it on --

6    A     Correct.

7    Q     -- is the CG?

8    A     Right, assuming that the distribution was right, yes.

9    That's correct.

10   Q     Got it.  And then you say in between that impact that

11   damaged the right rear quarter panel and coming over and

12   hitting the driver-side roof, the CG of the vehicle was

13   elevated?

14   A     Correct.

15   Q     How much?

16   A     By about 7 1/2 inches.

17   Q     Wait a minute.  Is that tape at 7 1/2 inches?

18   A     You do.

19   Q     The CG was elevated that much?

20   A     Yes.

21   Q     So it looks like you got the row for Mr. Tandy, the row

22   for Mr. Green, and you have an equivalent drop height that's

23   different down on the far right.  Can you take us over there

24   and tell us what that means?

25   A     I think you're talking about this box right over here;

25

1   right?

2   Q     Yes, I am.

3   A     Okay.

4   Q     Thank you.

5   A     So what happens is we calculate what the velocity is; so

6   that's this first column right here.  Using Tandy's numbers,

7   these numbers here, it gives us -- and running them through

8   the equations gives us a velocity for the torso of 7.6 miles

9   per hour.  Doing the same thing with Mr. Green's numbers, it

10  gives us a velocity of 8.1 miles an hour.  If we want to raise

11  an object above the ground and release it such that it

12  achieves that velocity at contact, you would have to drop it

13  from 1.9 feet to get Mr. Tandy's numbers or 2.2 feet to get

14  Mr. Green's numbers.  That's all that is.

15  Q     Okay.  All right.  Let me go back.  You said the CG is

16  roughly 30 inches off the ground.  That's when the van is on

17  its tires on the ground?

18  A     Yes.

19  Q     If we put it over on its roof, the CG is going to be in

20  the same spot; right?

21  A     Well, depends on what the height from the CG is up to the

22  top of the roof, that's right.  That's right.

23  Q     When you say the CG gets up to 7 1/2 inches off the

24  ground, how far off the ground is the van -- the closer part

25  of the van that's to the ground?

1   A     What that means is that -- I think what you're trying to

2   ask is what do you mean by 7 1/2 inches between the two?

3   Q     Yes.

4   A     So the van has to be at some orientation when it leaves

5   the right rear quarter panel.  It goes into the air, and when

6   it gets to that height of that trajectory, it's at some

7   orientation, whatever that highest point is, and you mark

8   digitally in AutoCAD where that CG is; okay?  And then you go

9   down to where the contact occurs at 190 degrees on the

10  passenger A-pillar, and you put -- excuse me, on the driver

11  A-pillar, and you put a mark where that CG is at that

12  orientation.

13           The difference in height between those two points is

14  the 7 1/2 inches.  So it's not a large change in elevation.

15  However, 7 1/2 inches results in a speed of about 4.2 miles

16  per hour.  So that 4.2 is related to the change in height

17  during that second roll.

18  Q     Okay.  But the van is not going way up in the air?

19  A     It's not.

20  Q     Okay.

21  A     Correct.

22  Q     Got it.  1.9 feet, 2.2 feet, that's the equivalent drop

23  height for this impact where Dr. McNish believes the injury

24  occurred.  What drop height did you use for your inverted drop

25  test?

27

1    A    We used 1.5 feet.

2    Q    So that's less.  Why did you choose a number that's less?

3    A    It is.  We basically picked a number that was less to be

4    conservative.  We know that if we drop it at 1.5 feet and we

5    get injurious neck loads, that if we dropped it from a higher

6    height and had a higher velocity that loads would just be

7    higher.

8    Q    Okay.  Let's go to the next slide, please.  So we see one

9    of those ATDs there.  What kind of vehicle is that?

10   A    So this is the production vehicle for our inverted drop

11   test.  This is the ATD position for the production test in the

12   driver's seat.

13   Q    Production GMT 610?

14   A    Correct.  With conversion.

15   Q    All right.  And next slide, please.  Is this a different

16   kind of string potentiometer?

17   A    So it's the same type of string potentiometer.  And I

18   will show you that the picture on the left is taken of the

19   underside of the driver's seat.  And this is -- this black

20   piece right in here, this is actually part of the seat frame.

21   The string potentiometer is actually this device right there,

22   that blue component.  It's bolted to an aluminum plate right

23   here that's then attached to the seat base.

24          Outside of that blue potentiometer is a string that

25   basically goes like that up through the seat, it comes out of

28

1    the top of the seat, right here, and the dummy is actually

2    sitting on the seat.  So this -- on the left, this is the

3    seatback, and on the right, this here is the seat cushion.

4    Q    Okay.  So this little thing here, looking at the buck,

5    it's actually on top of the seat?

6    A    Yes.

7    Q    The seat bottom.  And then that other photograph, if

8    you're looking up underneath here, and the yellow stuff is,

9    like, the foam cushioning that's part of the seat?

10   A    That's right.  That's right.

11   Q    Why did you put the string potentiometer on the seat?

12   A    We wanted to measure what -- we knew we were doing a

13   production drop test; so we wanted to measure what the status

14   of the top cushion of that seat was actually going to do.  If

15   we got significant compression due to roof deformation during

16   this drop test and we had the seat pushing on the dummy while

17   the ATD was up against the deformed roof structure, then we'd

18   be able to measure that with this string potentiometer.

19   Q    So if the roof deformation was such that the weight of

20   the vehicle caught up to the dummy's buttocks, it would be

21   pushing through the seat and you'd be able to measure it here?

22   A    That's right.  So what we do in our test is we put the

23   dummy into the seat.  This potentiometer actually gets

24   displaced.  In other words, the seat moves down, that gives us

25   a positive reading, and it's just about 2 inches or so, just

1    under 2 inches, and then when we turn the vehicle upside down,

2    the seat gets relaxed because the dummy is no longer up

3    against it.  So we're not starting off from zero.

4           So, therefore, if during our test if the string pot

5    measurement never crosses that zero axis, then we know that it

6    never made contact with the dummy.

7    Q    Next photo, please.  Production IDT.  What is the IDT?

8    A    Inverted drop test.  Another acronym.

9    Q    ATD head clearance.  Looks like it's around 6 inches.

10   That's just from the dummy sitting in the seat, measuring to

11   the top of the roof right -- vertically above it?

12   A    That's correct.  And that was consistent with what we had

13   measured and observed with our human surrogate.

14   Q    Okay.  Were you in the courtroom when Mr. White was

15   briefly in the buck?

16   A    I was.

17   Q    Did you see what happened when he sat more upright and

18   leaned his head over toward the roof rail?

19   A    Yes.

20   Q    What happened?

21   A    His head was in contact or in close proximity to the roof

22   rail.

23   Q    Let's go to the next picture.  We got three photographs

24   here.  Let's start with the bottom one, which looks like a

25   human being and not an ATD.  What is that photograph?

1  A    So that is a still picture that shows what the surrogate

2  position would look like in the inverted orientation at 190

3  degrees.  Well, she's upside down and rolled a little bit with

4  the driver's side down.  You can see that her head is in

5  contact with the interior trim at the roof rail.  She's got

6  her seat belt on, and she is in firm contact with the roof

7  rail headliner at that point.

8  Q    And you mentioned surrogate at the very beginning.  This

9  is a woman who's about 5'7" and about 165 pounds, which is

10 about what Dr. Roberts was at the time?

11 A    That's correct.

12 Q    Now, we have two photos at the top that have ATDs.  What

13 are those?

14 A    So those are prepositioned photographs that were taken

15 for each drop test.  The one on the left was the reinforced

16 roof; the one on the right is the production roof.  You can

17 see the roll cage right here in the reinforced roof.  The

18 point of putting this together is to show that the dummy head

19 in both of these tests is in the same position for both of

20 them and similar to what we had for our human surrogate or in

21 the inversion.

22 Q    Was this just by chance that the dummies' heads are in

23 the same spot where the surrogate's head is?

24 A    No, it's not by chance.  We have the seats set in the

25 same condition, and therefore they're going to be in the same

31

1   place.

2   Q    So with the test dummy are you trying to mimmick the

3   position where at least the surrogate was when turned upside

4   down?

5   A    Yes.

6   Q    Next slide.  So what are we seeing here?

7   A    So this is a photograph taken of the -- from the front of

8   both vehicles:  Production roof on the right and then the

9   reinforced roof on the left.  We're basically rolled 10

10  degrees beyond the 180-degree point; so we're slightly driver

11  side down.  In other words, when we release this vehicle with

12  a quick-release hook, the driver's side is going to hit the

13  plywood, three-quarter inch plywood first.

14  Q    Now, this roll angle of 190 degrees and the pitch angle

15  of 5 degrees -- where do you get those?

16  A    That was all part of the reconstruction that Mr. Tandy

17  provided me.

18  Q    So this was the orientation of the vehicle as he

19  described it a couple days ago at the point where the big hit

20  is on the driver's side?

21  A    Basically, yes.  I mean, I think he has contact occurring

22  or just starting to occur at the 180-degree position.  Based

23  on our knowledge of how quickly these events occur and knowing

24  what the roll rate is, about 200 degrees per second, and

25  occurring at around 40 milliseconds, that's going to result in

1    about an 8- to maybe 10-degree change in the vehicle roll

2    angle during the contact.

3          So we set this up at -- I set this up at 190 degrees

4    to accommodate for that because we know that during this

5    impact we're not going to be able to change the roll angle in

6    the test.  We don't have any spin rate in this test.  It's

7    purely a drop test.

8    Q    Let's go to the next slide.  Now, do we have a video in

9    this slide that shows the top drop from 1.5 feet of the

10   production roof vehicle?

11   A    Yes.

12   Q    Kyle, go ahead and start that.

13                        **(VIDEO PLAYING.)**

14   A    So this is, I believe, a real-time video; so there will

15   be audio associated with this.  We can show the drop height

16   here being 18 inches.  This is going to result in a

17   6.7-mile-an-hour velocity when the roof makes contact with the

18   impact surface.

19   Q    Okay.

20   A    And it was done in July of 2014.  This is the production

21   roof test.  The light just turned on interior.  And the

22   vehicle was released with what we call a release hook.  It can

23   hold, obviously, a 7,000-pound van.  I think the test weight

24   in here is about 6,000 pounds, but we can hold up to about

25   7,000 pounds on that crane.

1   Q    All right.  And you did the same thing with the van that

2   was reinforced with a roll cage?

3   A    Correct.

4   Q    Now, did you have cameras inside both vans when they were

5   dropped so we could see what was going on with the dummy?

6   A    Yes.

7   Q    So let's go to the next slide.  This is the dummy we can

8   see in the roll-caged vehicle; right?

9   A    Yes.

10  Q    So tell us what we're going to see here before we start

11  this.

12  A    So what's going to happen is this is a onboard,

13  high-speed video.  And so what's going to happen is you're

14  going to start to see things start to move.  The dummy is

15  going to move slightly upward a little bit because it's going

16  to be in free flight.  Then once the vehicle comes in contact

17  with the test surface, you're going to see the torso of the

18  dummy kind of move toward the stopped head.

19  Q    Okay.  Let's go ahead and run the video.  And this

20  dummy's head is positioned where the surrogate's was; right?

21  A    Yeah.  I wanted to also point out that while you're

22  inverted here, you've got a gap between the dummy thighs and

23  the seat here.

24  Q    That occurs because you're positioning the head the way

25  it was when you turned the surrogate -- someone the height and

34

1   weight of Dr. Roberts -- upside down?

2   A    That's correct.

3   Q    Can we go ahead and run that again.  It's short.

4                    **(VIDEO REPLAYED.)**

5   Q    Is the neck compressing here?

6   A    Not until you start to see the head come in contact with

7   the roof rail and the chest start to move towards the stopped

8   head.  It's a little bit hard to see in that video.

9   Q    Happens fast; right?

10  A    It happens very fast.

11  Q    All right.  Next slide.  Is this the data from the string

12  potentiometer that you had on the seat in that van?

13  A    It is.

14  Q    What is this data telling us?

15  A    So what we know is that it started out -- at zero would

16  be when we were in contact with, you know, the dummy sitting

17  in the seat.  It pushes the string potentiometer or the seat

18  down.  Once you flip it upside down, the seat actually

19  restores to its original, you know, uncompressed state, that's

20  the 1 point -- I guess that's 1.9 inches or so.

21       At zero, at time zero right here, that's when the

22  roof has actually made contact with the ground.  And the seat

23  actually does this little oscillation, and that's not contact

24  between the ATD and the seat cushion.  That's the fact that

25  you've got some mass in that seat that's basically vibrating.

35

1    It's got some springs there, it's got some foam, and it's just

2    oscillating as a result of the impact.  There's no ATD

3    interaction going on there.  That's just the spring response

4    of the seat.

5    Q    Okay.  Next slide, please.  Now, is this the same view of

6    the test dummy that's in the production roof vehicle?

7    A    It is.

8    Q    Let's go ahead and run this video.

9                        **(VIDEO PLAYING.)**

10   A    Again, the time clock -- once that time clock gets to

11   zero-zero, that's roof contact.  You can see that the dummy

12   moves up just a little bit during the free-fall phase.  Then

13   the roof comes in contact with the test surface, dummy head

14   reaches that surface and stops, and then the torso keeps

15   moving downward.

16   Q    Okay.  And you recorded the neck loads on this one as

17   well?

18   A    We did.  And we also recorded what was going on with

19   respect to the seat displacement as well.

20   Q    Now, on this one it looks like the dummy is closer to the

21   seat bottom.  Is it actually compressing the seat bottom right

22   now?

23   A    It is in contact, just barely in contact, with the seat

24   bottom right there, yes.

25   Q    Let's look at the data from the string potentiometer on

1    this.  What is this telling us?

2    A    Again, we started out slightly different, about 1.8

3    inches instead of 1.9, but you can see that the neck load

4    occurs at around 40 milliseconds.  So in here; right?  So you

5    actually have the seat moving up and away as a result of the

6    impact just like we saw in the roll cage test, but then as the

7    roof pillars actually deform, then the seat starts to move

8    closer to the ATD, and you get down to being in contact.  So

9    right around this 150 milliseconds, right there, you actually

10   have the seat cushion kind of in contact with the ATD

11   buttocks.

12   Q    So when the neck load occurs that we'll see in a second,

13   there's no contact?

14   A    Correct.

15   Q    Then at the end is there any significant contact like the

16   weight of the van pushing the dummy into the ground?

17   A    There is a little bit of interference at the end.

18   There's -- you know, if we looked at the neck forces that were

19   on the neck at the end of the test, they were slightly higher

20   than what the weight of the dummy would be.  So that would

21   suggest that the seat cushion itself was in contact with the

22   buttocks of the dummy.  And then we picked the van up, took

23   another data file, and most of that was relieved, but it was

24   still about, I think, 27 pounds, or something like that.

25   Q    So 27 pounds is nowhere near the weight of the van;

37

1   right?

2   A    Correct.  Correct.

3   Q    Now, do you have some slides that show us the data that's

4   going on with the neck in both of these tests?

5   A    I do.

6   Q    Let's go to the next slide.  Photograph on the left --

7   that looks like the roll-caged vehicle?

8   A    It is.

9   Q    Photograph on the right is the production roof vehicle?

10  A    Right.  These are frame captures from the high-speed

11  video.

12  Q    And those are both GMT 610 vans?

13  A    Correct.

14  Q    And now at the bottom, the data plot, what are we going

15  to see there?

16  A    That is force on the vertical axis as a function of time,

17  like we've been doing.  The red bar, vertical bar, tells us

18  what time we're looking at.  So you can go over to the boxes

19  on the bottom where it says "reinforced roof."  That will give

20  you the force in newtons, and then the production roof is over

21  here, also force in newtons.

22  Q    Next slide, please.  The red bar has moved over to the

23  right some.  What's going on?

24  A    So basically we've moved to the start of the neck loading

25  in the reinforced test.

38

1    Q      Okay.

2    A      So if we can advance to the next time, we've now reached

3    the start of the neck loading in the production test.  So this

4    is the start of when the top of this head on the production

5    roof here has made contact with the roof rail.  And they are

6    slightly different with respect to time just because of the

7    way that the -- you know, the variability and in testing with

8    the way that the dummy is restrained into the -- into the

9    vehicle.  We make every attempt to make them exactly the same,

10   but as this retractor locked up, there was about a three

11   quarter of an inch difference between where the webbing was

12   through the D-ring.

13   Q      Okay.  But now we're seeing neck load on the test dummy

14   in the production vehicle.  We know there is no contact with

15   the seat at this point?

16   A      Correct.

17   Q      And how about roof deformation?  Just looking at this

18   picture on the right.

19   A      There is no roof deformation at that point.

20   Q      Okay.  Next slide.  Where are we now?

21   A      So now we should be at peak neck load in the reinforced

22   test.  So what we're seeing here is the top of this chest

23   moving closer to this chin.  This head has stayed in that

24   position, but the torso has continued to move towards the

25   stopped head, compressing the neck.  That's what generates

1    this force that's dictated by that curve right there.  This

2    point right there at the intersection of that white line and

3    that vertical red line is the reinforced roof force, which is

4    9,556 newtons.

5    Q    So now we've seen the peak neck load,

6    9,000-and-whatever-plus newtons that's in the roll-cage van,

7    no significant roof deformation, no contact with the seat.

8    A    Correct.

9    Q    The next slide.  What's going on now with the dummy over

10   in the production roof vehicle?

11   A    So now we've reached the peak neck load for the passenger

12   vehicle.  Windshield is -- excuse me.  The side glass is still

13   intact.  We've moved the top of the chest to the chin,

14   compressed the neck.  This is the reading that we're looking

15   for on the blue curve which is over here at eighty-seven

16   sixty-one newtons.

17   Q    Any significant roof deformation in the production

18   vehicle at the point where we've got the peak neck load?

19   A    Not enough to break the window.

20   Q    Any contact with the seat?

21   A    No.

22   Q    Next slide.  Where are we now?

23   A    We've gotten to the end of the loading sequence.  This is

24   beyond the peak neck loading for both tests.  It gives you an

25   idea what the pulse shapes look like.  They're very similar in

40

1    nature.  They're similar in duration.

2    Q    Then are we starting to see some bending on the B-pillar

3    area of the production roof vehicle?

4    A    Yes.

5    Q    Do we see any corresponding effect in terms of a neck

6    load on the dummy in that vehicle?

7    A    We do not -- if we're illustrating that the neck load

8    occurs before the roof deformation.

9    Q    All right.  Next slide, please.  And what is this?

10   A    So composite comparison.  We've got photograph and data

11   plots on the left for the reinforced roof and then on the

12   right for the production roof.  So you can see there's no roof

13   deformation on the reinforced roof on the left.  On the data

14   plot we're plotting this black line right in here.  That is

15   the compressive neck load.  Then this blue line that basically

16   kind of stays flat all the way across, that is actually on the

17   right-hand side is the displacement of the roof and the

18   vertical direction.

19   Q    Virtually none in the roll caged?

20   A    Correct.  And that's kind of what you'd expect given that

21   we made the reinforced roof so that it didn't deform.

22   Q    And I tell you, those data plots are hard to see.  So

23   that's in the roll-cage vehicle, similar neck load in the

24   production roof vehicle?

25   A    That's correct.

41

1    Q    And what's going on with the roof in the production roof

2    vehicle?

3    A    So you're starting to see the roof get some deformation.

4    Its peak deformation is actually -- at least dynamically -- is

5    over here at about 150 milliseconds.

6    Q    After the peak neck load's all done?

7    A    That's correct.  So even though in this range right here

8    we've got the pillars continuing to deform, the neck load is

9    actually being relieved, which means that the roof deformation

10   is not what's causing the neck load.  It's the torso moving

11   towards the stopped head.

12   Q    And no contact between the dummy buttocks and the seat at

13   the peak neck load?

14   A    Correct.

15   Q    So we know vehicle -- the weight of the vehicle didn't

16   catch up to the dummy and push it into the ground?

17   A    That's right.

18   Q    Next slide, please.  What are we looking at here?

19   A    So these are some comparative photographs that we've got.

20   What we're looking at is the inverted drop test production

21   vehicle on the left and a photograph from the same perspective

22   for the Roberts vehicle on the right.

23   Q    Next slide.  What are we looking at here?

24   A    Same photograph on the right.  This is the 216 test

25   vehicle on the left that I conducted.

42

1   Q    And that's the Explorer conversion van?  That's the

2   Exponent test facility in the background there?

3   A    Yes.

4   Q    Just looking at the amount of damage from a load applied

5   at 13,659 pounds on the left versus the damage to Dr. Roberts'

6   van, does that tell us anything about the loading that the van

7   that Dr. Roberts was in saw in this crash?

8   A    To me, it says that the loading was much more significant

9   in the subject crash.

10  Q    Next slide.  Same thing?  Just from a different angle?

11  A    Correct.

12  Q    Okay.  Now, one other quick area before we conclude.

13  There's been some talk about how both Dr. Roberts and Virginia

14  Stolley were in the same wreck and yet Virginia Stolley didn't

15  have any kind of significant injury.

16  A    Yes.

17  Q    Certainly not to her neck.

18  A    Correct.

19  Q    Did you prepare an exhibit that kind of explains why

20  based on the dynamics of the rollover?

21  A    I did.

22  Q    Okay.  Next slide, please.  Okay.  So if we see Stolley

23  on the top, Roberts on the bottom -- let's talk about the top

24  first, near side.  What's going on?

25  A    So what we're seeing here is a vehicle orientation.

43

1  We're starting on the right-hand side, and we're on the top

2  portion of this exhibit; so basically right up in there.  So

3  this first vehicle position is being denoted at about a

4  45-degree angle.  We go into essentially the quarter-turn

5  position followed by the one-and-a-half position on the left.

6  So that's this position right here.

7        And what we're seeing is that if you are the

8  near-side occupant, when you go through this roll motion

9  you're actually staying fairly close to the ground and away

10 from the ground during the injurious impact for the driver,

11 which is right here.

12 Q    All right.  Then what's going on with the far-side

13 occupant, in this case Dr. Roberts?

14 A    So on the far-side occupant what happens is the occupant

15 is actually going with the vehicle as it rotates, and it's

16 going in an arc.  I'm exaggerating a little bit right there

17 because, obviously, it goes through that position right there

18 that I've drawn in.  But it's basically occupant is projected

19 up due to the dimensions of the vehicle and the fact that

20 you're going through an airborne phase and then coming down in

21 contact with the ground.

22        And what's important is what happens and what's the

23 velocity and the direction of that velocity vector for both

24 this occupant and this occupant when this occurs.  And the

25 point is, is that the far-side occupants see a much more

44

1    significant velocity.

2    Q    All right.  Next slide.  This is the same thing just with

3    the van drawing taken out, but I tell you the van drawing was

4    so light in the last one, I think -- is there anything else

5    you want to cover on this?

6    A    Not really.  I think this does it.

7    Q    So then last slide.  7.6 miles per hour -- that was that

8    same velocity vector that you calculated is the equivalent

9    drop test for Dr. Roberts; right?

10   A    That's correct.

11   Q    Did you do the similar kind of analysis for what was

12   going on with Virginia Stolley at that point?

13   A    I did.

14   Q    Okay.

15   A    And so this is basically taking the three-dimensional

16   kinematics; so the rotating -- the fact that it's rotating and

17   translating over the ground and dropping, taking all of those

18   vectors and coming up with a resultant vector that's aligned

19   with the occupant.  And so we put those vectors scaled to

20   represent what the velocity and direction would be.

21        So for Dr. Roberts you've got a velocity vector

22   that's got a dominant direction that is perpendicular to the

23   ground and towards the ground of 7.6.  There is very little

24   lateral motion going on at the torso, but the passenger seat

25   is a completely different event with respect to velocities.

1        It's, you know, less than a mile an hour in either

2   direction.  There's a gap between the roof and the ground.

3   Therefore, she gets some vehicle attenuation for that impact.

4   So they see -- even though they're in the same wreck, they're

5   on opposite sides of the vehicle, but they see completely

6   different events during this roof-to-ground strike.

7   Q    Mr. Croteau, let me ask you, based on all of the work

8   you've done plus your experience that you've described to the

9   jury, have you formed opinions with respect to the design of

10  the roof on the 2004 GMC Savana?

11  A    I have.

12  Q    Do you hold these opinions to a reasonable degree of

13  engineering certainty?

14  A    Yes.

15  Q    Would you please tell the jury first what is your opinion

16  with respect to the design of the roof on the 2004 GMC Savana?

17  A    I think this roof is a robust and strong roof for the

18  time period in which it was designed and developed.

19  Q    Same questions with respect to whether making the roof on

20  the 2004 GMC Savana even stronger than it was.  Do you have

21  any opinions with respect to that?

22  A    I do.

23  Q    And whether that would have made any difference in the

24  outcome on this crash?

25  A    Yes.

1  Q    And do you hold that opinion to a reasonable degree of

2  engineering certainty?

3  A    I do.

4  Q    What is your opinion?

5  A    Based on all the work that I've done, including the

6  inverted drop tests and the circumstances for this accident,

7  increasing the strength of the roof would not have changed the

8  outcome in this accident.

9         MR. KLEIN:  All right.  Thank you, sir.

10        Pass the witness.

11        THE COURT:  Cross-examination.

12        MR. SIMON:  Thank you, Your Honor.

13                **CROSS-EXAMINATION**

14 **BY MR. SIMON:**

15 Q    Mr. Croteau, this amount of roof crush that we're looking

16 at here, did this cause any injury whatsoever to Dr. Lauretta

17 Roberts?

18 A    Not the catastrophic injury that she sustained.

19 Q    How much have you been paid by General Motors Corporation

20 in this case so far?

21 A    It's upwards of about $260,000.

22 Q    That's what you told me 18 months ago.

23 A    Right.

24 Q    What is it now?

25 A    It's got to be more than that.

1    Q    How much more?

2    A    Probably about $20- or $30,000.

3    Q    Can you access it?  You have to have it on a computer

4    system.  You can email the office and they can get it for us?

5    Is that possible?

6    A    I suppose it could be possible.

7    Q    Could we do that at a break?  Would you mind doing that

8    for me, please?

9    A    I suppose we could.

10   Q    And we could get up-to-date bills as of today; correct?

11   A    I don't know that it's all been billed as of today, but I

12   could tell you what it is.

13   Q    We can figure it out; right?

14   A    Yes.

15   Q    All of the testing that you've been talking about for the

16   last two hours, that's all been bought and paid for by

17   automobile manufacturers; correct?

18   A    Not all of it.

19   Q    Most of it?

20   A    No, not --

21   Q    The CRIS device -- who paid for that?  Ford Motor

22   Company; correct?

23   A    It was cost shared with Exponent and Ford to build the

24   device.

25   Q    Ford kicked in six hundred grand; right?

48

```
 1    A     About that, yes.

 2    Q     The Crown Vic testing that we spent 40 minutes, 20

 3    minutes talking about, who paid for that?

 4    A     In part, that was put together by Exponent and Ford.  And

 5    that $600,000 that we talked about included that Crown Vic

 6    work.

 7    Q     And the Blazer testing that was done with the CRIS

 8    device, who paid for that?

 9    A     That was paid for by GM.

10    Q     General Motors?

11    A     Yes.

12    Q     And the results of all of those tests are written up in

13    the nice articles; right?

14    A     They are.

15    Q     And they're published in journals; right?

16    A     Yes.

17    Q     And you and General Motors bring them into courtrooms and

18    use them to defend General Motors in roof cases; correct?

19    A     They are helpful in demonstrating those principles, yes.

20    Q     We heard about Exponent, the company that you work for.

21    You're a lifer at Exponent; right?  You started there right

22    out of school?

23    A     That's right.

24    Q     Been then since what, '88?

25    A     No.  '94.
```

49

1   Q    '94, okay.  Now, we heard about how they worked on --

2   what did you say they worked on?  What projects?

3   A    They have worked on numerous projects.

4   Q    I'll want to get into that in a little more in depth with

5   you about Exponent what kind of company they are; okay?

6   A    Sure.

7   Q    Let's go to PowerPoint Exponent, please.  First one,

8   please.  That's not the Exponent one.  That would be Mr.

9   Croteau's.  That's it.  Let's go to the first one.  I want to

10  get through it quickly.  Well, let's do it this way.  Do you

11  have one for Exponent?  Shut it off.

12          Exponent's a publicly traded company; correct?

13  A    We are.

14  Q    $300 million a year in revenue; correct?

15  A    Yes.

16  Q    Specializes in defending big companies in lawsuits;

17  right?

18  A    That's one of the things that we do, yes.

19  Q    Most of its revenue is from lawsuits; correct?

20  A    I don't believe so.

21  Q    Is that what you told me in your deposition?

22  A    I think what I told you was most of the revenue that I

23  generated was from lawsuits.

24  Q    Okay.

25  A    Not from Exponent.

50

1    Q    Exponent is involved in defending lawsuits for the

2    automotive industry; correct?

3    A    That's true.

4    Q    Petroleum industry?

5    A    That's true?

6    Q    Tobacco companies?

7    A    We have done some work.  Not me but --

8    Q    Lead industry?

9    A    I believe so.

10   Q    Asbestos industry?

11   A    Yes.

12   Q    Chemical industry?

13   A    Yes.

14   Q    Worked for almost every car company out there; right?

15   A    Correct.

16   Q    Helped defend post-collision fire cases in the Pontiac

17   Fieros; right?

18   A    Yes.

19   Q    Helped defend post-collision fire cases of GM pickup

20   trucks; correct?

21   A    Correct.

22   Q    Helped defend Ford in their Explorer rollover cases;

23   correct?

24   A    Yes.

25   Q    Defending Toyota in their unintended acceleration cases;

1    correct?

2    A    I believe so.

3    Q    Helped defend Firestone in its tread separation cases;

4    correct?

5    A    I don't think so.

6    Q    Isn't that what you told me in your deposition?

7    A    I don't believe that we worked for Firestone.  We worked

8    for Ford during that --

9         COURT REPORTER:  I'm sorry.

10   Q    Oh, I'm sorry.  I apologize.  I'll slow down.  I'm

11   getting a little excited.

12        Ford Motor Company, Mr. Croteau, has paid Exponent

13   more than $100 million to help defend it in lawsuits.  Is that

14   correct, sir?

15   A    Over a ten-year period, that's correct.  It's about $10

16   million a year.  About 3 percent.

17   Q    And how long has Exponent been working with Ford on their

18   lawsuits?

19   A    Oh, I don't know actually.  Probably as long as I've been

20   there.

21   Q    Since '94?  So might be $2- or $300 million they've been

22   paid by Ford; correct?

23   A    Yeah, I don't know.

24   Q    Exponent handles over 6,000 cases a year.  Is that

25   correct, sir?

52

1    A    That's probably about right.  Might have been more than

2    that.

3    Q    That's per year; right?

4    A    Correct.

5    Q    And this isn't the first time Exponent has worked with

6    General Motors in litigation; correct?

7    A    That's right.

8    Q    Exponent has never worked on a single case ever against a

9    car company; is that correct?

10   A    Again, I can't speak for everybody.  I have not.

11   Q    Okay.  And Exponent, you told me in your deposition,

12   would never take a case against a car company; correct?

13   A    That's true.  That would be a business conflict.

14   Q    And Exponent's been in the press; hasn't it?

15   A    Probably.

16   Q    As a matter of fact, Exponent has been the subject matter

17   of books that have been published; correct?

18   A    I don't know about that.

19   Q    Do you know who David Michaels is?

20   A    No.

21   Q    Did you know that David Michaels is the Assistant

22   Secretary of Labor for Occupational Safety and Health?

23   A    No.

24   Q    Did you know that Mr. Michaels wrote a book?

25   A    No.

53

1    Q    In his book Mr. Michaels states "Exponent scientists are

2    prolific writers of scientific reports and papers.  While some

3    may exist, I have yet to see an Exponent study that does not

4    support the conclusion needed by the corporation or trade

5    association that's paying the bill."  Were you aware of that,

6    sir?

7    A    No.

8    Q    This is the book.  Have you seen it before?

9    A    I don't think so.

10   Q    What's the title of it?

11   A    *Doubt is Their Product.*

12   Q    Is that Exponent's product, sir?  "Doubt"?

13   A    No.

14   Q    Let's talk about you, Mr. Croteau.  You spend 90 percent

15   of your time working on lawsuits; right?

16   A    The time that I bill is generally -- that's where it goes

17   to, yes.

18   Q    And you work on over 500 legal cases; right?

19   A    That's probably about right.

20   Q    Almost all of the legal matters involve defending

21   lawsuits against a car company; right?

22   A    Majority of my work, yes.

23   Q    In every case you have testified for the car company

24   without exception.  Is that correct, sir?

25   A    Nope.  That's not true.

54

1    Q    Have you ever testified against -- I'm sorry.  You've

2    never testified against a car company -- correct? -- in a

3    depo?

4    A    Correct.  Correct.

5    Q    You have never rendered an opinion or held an opinion

6    that any vehicle roof was defective in design or manufacture.

7    Is that correct, sir?

8    A    True.

9    Q    So you've been involved in 500 cases and you never saw

10   one -- one -- roof that you thought was defective; is that

11   right?

12   A    Correct.

13   Q    500 for 500; right?

14   A    Correct.

15   Q    Okay.  You've never held an opinion that any vehicle seat

16   system was defective in any way.  Is that correct, sir?

17   A    True.

18   Q    And you don't believe that roof strength is in any way

19   connected with head or neck injuries in a rollover.  Is that

20   correct, sir?

21   A    It depends on the circumstances.

22   Q    You've testified under oath before, sir, have you not,

23   that you do not believe that the strength of a roof is in any

24   way connected with head or neck injuries in a rollover?

25   A    Sir, I believe that it depends on the circumstances of

55

1    that particular impact.

2    Q    Okay.  Let's go to *Lucky*.  Page 82, please.  Let's go to

3    the first page.  Have you got the first page of this document?

4    Can we blow it up?  This is a deposition that you gave, sir.

5    It was on August 5, 2009, in a case GM *Lucky v. Land Rover*

6    *North*, and so on.  Do you remember testifying in that case?

7    A    I do.

8    Q    Let's please go back to page 82.  Blow that up, please.

9         "QUESTION:  You don't believe that the strength of a

10   roof is in any way connected with head or neck injuries in a

11   rollover, though, do you?

12        "ANSWER:  Correct."

13        Do you remember being asked that question and giving

14   that answer under oath in that deposition?

15   A    I do.  And the context of that was surrounding the

16   circumstances that we've just talked about.

17   Q    Can you name one automobile that you think has a

18   defective roof in terms of occupant protection in a rollover?

19   A    No.

20   Q    Have you ever discussed ways to improve roof structure

21   with any vehicle engineers or designers of any vehicles?

22   A    I've certainly had those discussions.  I'm not sure that

23   it's been in a production phase.

24   Q    In your entire career as an expert, have you ever

25   concluded that any component of any vehicle anywhere, any

1   place, any time was defective?

2   A    I have not.

3   Q    Now, let's talk about your qualifications.  General

4   Motors is putting you forth here as a roof strength expert;

5   correct?

6   A    Yes.

7   Q    You have a B.S. in mechanical engineering; right?

8   A    I do.

9   Q    You have an M.S. in mechanical engineering from '93?

10  A    Correct.

11  Q    And your master's thesis was on what?  Automotive

12  related?  What was your master's thesis on?

13  A    It was the control algorithm for a four-wheel drive steer

14  wheelchair.

15  Q    Was any of your course work that you took in your

16  undergraduate or your master's related to automotive design?

17  A    There was certainly some course work that was related to

18  materials and mechanics and the basics of physics but not

19  necessarily specifically automotive design.

20  Q    You hold no professional license.  Is that correct, sir?

21  A    Correct.

22  Q    You're not a licensed engineer in any state in the entire

23  country; is that correct?

24  A    Correct.

25  Q    You have never designed a vehicle roof; right?

57

```
1    A     Correct.

2    Q     Have you ever suggested any improvements or changes to an

3    automobile manufacturer about roof design?

4    A     No.  I don't believe I have.

5    Q     Have you ever been involved in the design of any

6    component of any automobile?

7    A     No.

8    Q     Any time, any place, anywhere?

9    A     No, sir.

10   Q     Now, your CV.  Do any of the papers on your CV have

11   anything to do with roof design?

12   A     They do not.

13   Q     None of them?  Not a one?

14   A     They are occupant and vehicle dynamics and kinematics in

15   rollovers.

16   Q     You got presentations on your CV too; right?

17   A     I do.

18   Q     Any presentation on your CV have anything to do with roof

19   strength or roof design?

20   A     Certainly the role of roof strength in rollover accidents

21   but not with respect to the design of the roof components.

22   Q     Have you ever given any presentations anywhere on roof

23   design?

24   A     No.

25   Q     And you're the roof design expert here for General
```

58

1  Motors; correct?

2  A    Well, I believe I'm talking about the testing that I've

3  done and the effect of roof strength in the circumstances of

4  this accident.

5  Q    Right.  And you gave the opinion this roof here in this

6  vehicle is robust; right?

7  A    I did.

8  Q    Is that what you're telling us?  It's robust?

9  A    Yes.

10  Q    Is that right?

11  A    Yes, I believe so.

12  Q    Now, let me have you take a look at something here, Mr.

13  Croteau.  Let's pop up Exhibit 355-28, please.  This is a copy

14  of your CV, sir.  Do you see that?

15  A    I do.

16  Q    Let's go down to the bottom.  I want to go down to the

17  bottom first, please.  Let's pop up that date.  See that date?

18  That's March of '07; correct?

19  A    Yes.

20  Q    Let's go back up to the top.  It says "professional

21  profile."  Is that correct, Mr. Croteau?

22  A    It is.

23  Q    And it says "He specializes in the analysis and

24  reconstruction of motor vehicle accidents."  Correct?

25  A    Yes.

59

1   Q    Does it say anywhere on this CV anything about designing

2   roofs for automobiles?

3   A    It does not.

4   Q    Let's go to Exhibit 355-29.  This is another one of your

5   CVs.  And let's pop down on the date, please, Jason.

6        This is about 14 months later; right?

7   A    Yes.

8   Q    May of '08; correct?

9   A    Yes.

10  Q    Let's pop up to the top.  So your 2007 CV didn't say you

11  specialize in roof design.  The next year, 14 months later, it

12  says "He joined Exponent in 1994 and specializes in

13  reconstructing motor vehicle accidents and evaluating the

14  performance of roof structures in a rollover."  Have I read

15  that correctly?

16  A    You did.

17  Q    Now, between 2007 and 2008 did you receive any additional

18  degrees?

19  A    No.  Usually, these get updated.  These CVs get updated

20  as a result of publications that get put out, and at this

21  point we had been working on the CRIS Crown Vic for a number

22  of years, and I started to writing roof strength reports and

23  I've started to do some of the analysis with the Subaru

24  Forester research.  That's the reason why that --

25  Q    Okay.  And so what you're telling us is you became a roof

60

1   expert through working on litigation cases.  Is that what
2   you're telling us?
3   A    No.  It was really related to all of the research work
4   that was done.
5   Q    And between that time, between '07 and '08, did you go to
6   school to study roof design anywhere?
7   A    No.  It was on-the-job training and the analysis that I
8   was doing while I was working at Exponent doing my independent
9   research.
10  Q    Okay.  And I'm not going to go through all of this, but
11  let's pop up 355-1, please.  The CRIS test on your CV -- we
12  don't need the CV.  You can take it down, Jason.
13       The CRIS testing was -- you told us was paid in part
14  by Ford; correct?
15  A    It was.
16  Q    Crown Victoria testing paid for by Ford; right?
17  A    Yes.
18  Q    Was that testing ever used to design vehicles?  Help make
19  them stronger, better, or safer; do you know?
20  A    I don't think so.  That wasn't the intent of the testing.
21  Q    All right.  What about the Chevy Blazer testing that you
22  did that's on your CV?  General Motors paid for that; right?
23  A    They did.
24  Q    Any of that testing used to make safer cars?  Safer
25  vehicles?  Help the belts?  Roofs?  Anything like that?

1  A    It was helped to understand what was going on with

2  respect to the occupant kinematics and neck loads and the

3  effect of roof strength in those impacts.

4  Q    To your knowledge, none of that work and the testing and

5  all of that work you did was ever used -- any part of it -- to

6  make one part of any vehicle a little bit safer; is that

7  right?

8  A    Not to my knowledge, it has not.

9  Q    Okay.  Now, this CRIS test that you showed us that --

10  it's the only one in the world; right?

11  A    Correct.

12  Q    And it can do things that you couldn't do before; right?

13  You're pretty proud of that; right?

14  A    I am.

15  Q    Did General Motors ever give you the call, pick up the

16  phone and say, hey, we're going to -- we're putting -- the new

17  van's coming out.  We'd like you to take a couple of them and

18  do some testing for us so we can make the roof stronger?

19  A    They have not done that, no.

20  Q    And if they had done that, certainly you would be

21  available to take their money and help them do that; right?

22  A    If it would benefit them, yes, we would.

23  Q    Right?  You'd be happy to do it; right?

24  A    Sure.

25  Q    And you're still waiting for that call; right?

62

1   A    I've not had the call.

2   Q    Okay.  Isn't it true, Mr. Croteau, that in all of the

3   years you've been doing this you've never seen a case where

4   somebody has suffered a neck injury resulting from roof

5   deformation as opposed to diving; right?

6   A    Correct.

7   Q    Let me just tell you this.  So, you know, in this case, I

8   mean, certainly if somebody dives into the roof with no

9   restraint at a high enough speed, they can get injured?

10  A    Yes.

11  Q    Certainly if the -- what you're saying is that happens

12  all the time.  Every time there's roof crush, that's what

13  happens; correct?

14  A    No, sir.  It's not when there is roof crush.  It's when

15  there is the alignment, the impact, and contact.

16  Q    Let me ask you this, Mr. Croteau.  The opinion that you

17  formed in this case that roof crush had nothing to do with the

18  injury, when did you form that opinion?  When did you come up

19  with that?

20  A    It's an opinion that I have had when the circumstances

21  all line up for the actual impact that we're looking at for

22  the event of interest.

23  Q    The opinion in this case, the opinion that roof crush had

24  nothing to do with Dr. Roberts' injury, when did you formulate

25  the opinion in -- that opinion in this case?

```
1    A    I would say it would probably be after the two drop tests
2    were conducted.
3    Q    As a matter of fact, you held that opinion before you
4    even started working on this case.  Isn't that right?
5    A    I had given that opinion in other cases, but I needed to
6    prove that out for this particular case.
7    Q    Right.  So in other words, when General Motors hired you,
8    they knew already what your opinion was on roof strength;
9    correct?
10   A    Well, they knew what my past opinions were, yes.
11   Q    Sure.  You had a long, consistent history of testifying
12   under oath that roof strength has no -- nothing to do with
13   getting people hurt in rollovers; correct?
14   A    That's not my opinion.
15   Q    Well, let me ask you this.  If -- and I'm just thinking
16   about this.  You're talking about robust or how strong a roof
17   is or if it's strong enough.  If you believe that roof
18   crush -- if there's no causal connection between roof crush
19   and injury, seems to me like any roof would be safe enough.
20   Right?
21   A    No.  I mean, obviously, you can have a catastrophic
22   amount of roof crush that occurs that will create injuries.
23   What I'm saying is that given the circumstances for this
24   particular crash, given the dynamics and the kinematics of the
25   vehicle, if you have an occupant whose head is near the roof,
```

64

1    belted, and an impact that allows the torso to continue to

2    move towards the stopped head, you can get torso augmentation

3    and you can break the neck.

4    Q    Now, Mr. Croteau, I'm not going to get into this.  The

5    jury's heard it four or five times.  There's a whole lot of

6    people out there that don't agree with you; right?

7    A    There are, that's right.

8    Q    And as a matter of fact, can you think of any researchers

9    who publish on torso augmentation who don't either work for or

10   consult with automobile manufacturers?

11   A    I mean, I'm sure that there are many of them.

12   Q    I'm asking you if you can think of any, because you've

13   been asked that question under oath in your deposition.

14   A    That's right.

15   Q    And you've had time to think about it.  Can you think of

16   any?  Can you give us any researchers not affiliated with the

17   automobile industry who publish on torso augmentation?

18   A    No, I can't.

19   Q    Okay.  Can you point to any textbooks or articles from

20   any independent researchers who have looked at the issue and

21   concluded that there is not a causal relation between roof

22   strength and neck injuries in rollovers?

23   A    To a textbook?  No, I cannot.

24   Q    Textbook.  Nothing?  You can't point to that?

25   A    That's right.

1  Q    Now, let me ask you this before I forget this.  You know

2  you had that nice diagram up.  You had this nice diagram where

3  everybody talked about how the fact that the only person who

4  got hurt in this vehicle was the one under where the roof was

5  crushed; right?  Isn't that right?

6  A    That's right.

7  Q    And you did a diagram right at the end here trying to

8  explain why Virginia Stolley didn't get hurt -- right? --

9  because of the motions and vectors and all that kind of stuff;

10 right?

11 A    That's right.

12 Q    Well, there were dogs in this van; right?

13 A    That's right.

14 Q    And they were in the back seat, sitting on the seats;

15 right?

16 A    I'm not sure where they were.

17 Q    They weren't restrained at all; right?

18 A    They were in the van.  That's all I know.

19 Q    And they're not restrained at all.  They're certainly

20 subject to the same forces that Dr. Roberts and Ms. Stolley

21 were subject to; right?

22 A    They would be, but they wouldn't necessarily have the

23 same alignment.

24 Q    But you tell us -- you just said that alignment is always

25 present in every case.  You've never seen it not present.

66

1   A    No.

2   Q    It's torso augmentation every time; right?

3   A    When you have a neck fracture, you have to have those

4   three things.  You have to have the torso velocity, you have

5   to have the contact -- head contact with the roof, and you

6   have to have the alignment.

7   Q    So you're saying that somebody with a belt on is going to

8   fly into the roof quicker in the same rollover than somebody

9   who's unrestrained?  Is that what you're telling us?

10  A    I think the belt can, in some instances, keep you in that

11  position so that you will maintain that alignment if you're a

12  far-side occupant.

13  Q    So in other words, the belt keeps you there so when the

14  roof crush comes down you're in trouble; right?

15  A    No.  It's not when the roof crush comes down.  It's the

16  opposite.  It's before the roof crush.

17  Q    Back to the dogs.  They're certainly subject to forces in

18  this rollover; correct?

19  A    They are.

20  Q    And they are unrestrained; right?

21  A    They are.

22  Q    And one's on the passenger side; right?

23  A    Yes.

24  Q    And they'd be subjected to the same forces that Virginia

25  Stolley's subjected to; correct?

67

```
1    A    Not exactly the same.

2    Q    Pretty much, though; right?

3    A    I wouldn't say --

4    Q    Same side of the van?

5    A    I wouldn't say that.  They're unrestrained.

6    Q    Okay.  And as far as your diagram when you showed right

7    side, left side, certainly you didn't say back seat or front

8    seat; right?  You showed us diagrams talking about the forces

9    that are different on the passenger side and driver side in a

10   passenger-side leading roll; correct?

11   A    They're not forces.  Those are vectors for velocity.

12   Q    In any event, neither of the dogs were injured in the

13   rollover; correct?

14   A    Correct.

15   Q    Everybody survived.  The only person that sustained a

16   serious injury was the person who was sitting in the front

17   passenger seat where the roof crush is; right?

18   A    That's coincidence.  That's correct.

19   Q    That's a coincidence.  Is that what you're telling us?

20   A    That's right.

21   Q    Again, I'm not going to show this again.  The jury's seen

22   it.  You know, you said it's robust, the roof.  Did you see

23   the exhibit from NHTSA where this roof was last on both lists?

24   One-sided test and two-sided test, dead last out of all the

25   vehicles that were tested by the government.  Did you see
```

1   that?

2   A    I've heard that, yes.

3   Q    So 26 out of 25 on one, 29 out of 29 on the other.

4   Right?

5   A    Well, if you can show it to me if you'd like but --

6   Q    I don't want to show it to you.  We've seen it.  The

7   worst rating we've seen out of any of them, and you call it

8   robust?

9   A    I believe that's true, yes.

10  Q    All right.  I'm going to give this a shot.  Maybe I can

11  get this question answered for you.  I haven't been successful

12  so far in this case.  Do you believe a car company should test

13  their vehicles' roofs for how they perform in rollovers?

14  A    I believe they do, and I think they do that with the 216

15  standard.

16  Q    My question is do you believe they should?

17  A    I believe they do.

18  Q    My question is do you believe they should?  There's a

19  dispute in here whether they do.  We're going to get to that

20  next.  My first question is, as an expert, as a roof design

21  expert on behalf of General Motors, do you believe that's the

22  prudent and reasonable thing to do for a car manufacturer to

23  test their roofs to see how they perform in a rollover?  Do

24  you think that is the reasonable and prudent thing to do for a

25  car company?

69

1   A    Yes, I do.

2   Q    Did General Motors do any rollover testing ever to look

3   at how their roof performed on the 610 van?

4   A    They did not do dolly rollover testing.  They did their

5   testing with the 216.

6   Q    And the 216 does not replicate what happens in a

7   rollover.  Is that correct, sir?

8   A    No, but it's a structural test on the roof.

9   Q    And GM wrote the standard; right?

10  A    They were part of it, yes.

11  Q    Yeah.  They wrote it back in 1971; correct?

12  A    They were part of it, that's correct.

13  Q    And you saw the documents where the proposal came out,

14  they tested some of their vehicles, all of them failed but

15  one -- right? -- and then they made a proposal, watering it

16  down.  Do you understand that, sir?

17  A    That's not how I recall it, no.

18  Q    Has General Motors ever told any juries anywhere in the

19  country that 216 doesn't matter?  Roof strength -- the

20  standard is of no effect?  It doesn't help?

21  A    No.  I think they say the opposite.

22  Q    Right.  They say the opposite, don't they?

23  A    That's correct.

24  Q    And that's not what they told the federal government, is

25  it?

1   A    I'm not sure what you're getting at.

2   Q    They told the federal government "We don't need the

3   standard"; right?

4   A    No, I don't think that's true.

5   Q    Let's talk about these drop tests that you did.  Let's

6   not make a mistake about this.  You did the drop tests in this

7   case to show stronger roof -- a stronger roof wouldn't have

8   mattered; correct?

9   A    In the circumstances for this accident, that's correct.

10  Q    Right?  Okay.  So you are relying on upside-down drop

11  tests to tell the jury that a stronger roof wouldn't have

12  mattered in a rollover test; correct?

13  A    Correct.  I mean, I think I've covered the basis for that

14  ad nauseam this afternoon.

15  Q    Okay.  And in a drop test it's easier for the neck to be

16  aligned, isn't it?

17  A    I'm not sure what you mean.

18  Q    Well, if you want alignment and you want contact --

19  right? -- that's what you need for a torso augmentation

20  injury; right?

21  A    That's correct.

22  Q    And easier to get an alignment in contact if you turn the

23  vehicle upside down and drop it a foot and a half; right?

24  A    We got the exact same thing happening in the CRIS, which

25  was spinning, rotating, and translating while it was dropping

1 in a 3D environment.

2 Q    You need alignment, right?  You need alignment for a

3 torso augmentation injury.  You agree with that; right?

4 A    I do.

5 Q    Lateral motion, Mr. Croteau, lateral motion does not lend

6 itself to torso augmentation.  Do you agree with that?

7 A    You need to be a little more specific.

8 Q    I'll be really specific.  Let's pull up Volume 7-B, page

9 44.  Do you remember last year in a case testifying, being

10 asked this question, and giving an answer?  I'll tell you it

11 was in the Bavlsik trial.

12        "QUESTION:  And you could, but, of course, if you are

13 in the seat and you are by the door, you have got the ability

14 to move laterally and get in contact with the structure of the

15 vehicle in the roll too, don't you?

16        "ANSWER:  That is true.  And I will say that lateral

17 motion doesn't necessarily lend itself to the torso

18 augmentation concept because the forces aren't in the right

19 direction."

20        Do you remember being asked that question and giving

21 that answer in a trial involving roof crush in a 610 vehicle

22 when you were under oath?

23 A    Yes, I do.

24 Q    It's not in the right direction, is it?

25 A    The lateral motion is not going to create the force on

72

1    the head.

2    Q    And if you wanted to show us how this vehicle would

3    have -- how the forces on occupants in a rollover, you

4    certainly could have done that; right?

5    A    I think we did.

6    Q    You could have done a rollover is my point; right?

7    A    Oh, it could have been done, yes.

8    Q    Exponent has the CRIS device you're telling us about;

9    right?

10   A    That's right.

11   Q    And you didn't?

12   A    Correct.  And if we did, it would be the same result as

13   we got in our drop test.

14   Q    Now, you know, one of the things that you talked about

15   was the timing; right?  The timing of all of this, the timing

16   of the force, and when the roof crush starts crushing in;

17   right?

18   A    Yes.

19   Q    And that's important for you for your opinions in this

20   case; is that right?

21   A    It is.

22   Q    I want to talk to you.  Let's put up Exhibit 117-1.  And

23   I think we saw this, Mr. Croteau.  What is this?

24   A    This is a data plot that comes from the reinforced roof

25   structure test.  This is the compressive --

1    Q    I'm not sure everybody can see this here, this part.

2    Okay.

3           So, Mr. Croteau, what we've got here -- what are the

4    two lines we're looking at, the blue and the --

5    A    This the same plot that I showed with Mr. Klein earlier.

6    This is a cross plot.  It has the upper neck force, which is

7    this black line right here.

8    Q    Okay.

9    A    And the units for that are on the left for --

10   Q    Okay.

11   A    Do you mind if I --

12   Q    Not at all.

13   A    -- clear that?  Then the blue line that we see right here

14   that basically stays flat through here, that is essentially

15   the roof displacement in the vertical direction, and this is

16   the vertical axis that gives you those measurements.  It goes

17   from zero to minus 12 inches.

18   Q    And so what we're looking at is we see a compression on

19   the neck increasing to about 9- or 10,000 newtons; right?

20   A    Yes.

21   Q    And we don't see any roof crush across here; right?

22   A    That's right.

23   Q    We only see one dip; right?  Just one dip?

24   A    That's right.

25   Q    And this is on the reinforced roof, the one with the roll

74

1   bars; right?

2   A    Correct.

3   Q    Let's go to Exhibit 117-2, please.  Now, this is the same

4   chart for the vehicle whose roof you didn't reinforce; is that

5   right?

6   A    Right.  This is the production roof.  Same chart that Mr.

7   Klein and I were talking about.

8   Q    All right.  And the difference here is we see the roof

9   crushing -- right? -- because the reinforced roof wasn't going

10  to crush; right?

11  A    Yeah, but you drew that line in the wrong place.  Draw it

12  over the blue line.

13  Q    Okay.  I'll do that.  So let's go --

14  A    You want me to do it?

15  Q    I'll do it.  This is the better way to do it.  This is

16  the roof crush; right?

17  A    That's right.  And the vertical direction.

18  Q    And then let's look at this other line.  That's the force

19  on the head; right?

20  A    You bet.

21  Q    And it goes down just like with the production -- I mean

22  with the reinforced roof.  Right?

23  A    Yes, sir.

24  Q    And it goes back up, but the difference is it goes back

25  down, doesn't it?  It goes back down, right?

1   A    Yes, it does.

2   Q    In other words, in the roof that's not reinforced, in the

3   production roof where the roof crushes, we see two force --

4   two different impacts of force on the neck; correct?

5   A    Well, you see a bimodal loading of the neck, and this is

6   very clearly explained when you look at the neck moments.

7   There's inertial loading that occurs on the seatback in this

8   test, and the seatback is actually -- after the big peak has

9   occurred, the seatback has also continued and wants to

10  continue to move towards the ground.  It's loaded the back of

11  the dummy shoulders and actually put the neck into a complex

12  bending moment.  So it actually increases the neck load that's

13  measured in the vertical direction.  And you'll notice that

14  that's below the IARV of 4,000 newtons.

15  Q    My point is, you don't see that second increase in force

16  on the neck in the reinforced vehicle; is that correct?

17  A    That's correct.

18  Q    And we know what's happening at the same time, and that

19  is right when the roof crush is almost at its lowest right

20  here -- right?

21  A    Yes.

22  Q    We see the force on the neck right there.  And it's up

23  to -- you said not -- it's at 3,000 newtons; right?  Is that

24  right?  3,000 newtons.

25  A    Yes.

```
 1   Q    About?

 2   A    That's right.

 3   Q    So in the test that you did with the roof that wasn't

 4   reinforced we see that as the roof begins to crush in, the

 5   force on the neck also increases back to about 3,000 newtons;

 6   right?

 7   A    Yes.

 8   Q    About 750 pounds; is that about right?  Or 700 pounds?

 9   A    3,000 divided by 4.45.

10   Q    600.

11   A    About 600.

12   Q    600.  So what we're looking at on your testing is the

13   production roof without -- the production vehicle without the

14   reinforced roof.  We see force on the neck of about 600 pounds

15   at the same time the roof is at its maximum -- almost at its

16   maximum crush; correct?

17   A    No question.

18   Q    Now, the time in seconds down here, this is a tenth of a

19   second; right?  From zero when the impact occurs right here?

20   A    That's happening at about 130 milliseconds, .13 seconds.

21   Q    So in other words, about 130 milliseconds right here;

22   right?  Is that about 130?

23   A    No.  I mean, I'd move it over a little bit but --

24   Q    To the left or right?

25   A    To the right.
```

1  Q    Okay.  About right here, okay.  In other words, it's

2  about a little longer than it takes to blink an eye; right?

3  A    Correct.

4  Q    So all of this is happening in a little more time than it

5  takes to blink an eye; correct?

6  A    Yes.

7        THE COURT:  Mr. Simon, as people more famous than me

8  said, how long?

9        MR. SIMON:  Little bit, Your Honor.  Probably good to

10  take a break.

11        THE COURT:  Very well.  We will take our afternoon

12  break at this time, ladies and gentlemen of the jury.  Recall

13  the admonition.  Come back at 3:35.

14        **(COURT RECESSED FROM 3:10 PM UNTIL 3:35 PM.)**

15        THE COURT:  Good afternoon, ladies and gentlemen of

16  the jury.

17  Q    (BY MR. SIMON) Thank you, Your Honor.

18        Mr. Croteau, I've only got a couple more things.  I

19  want to wrap this up.

20        Jason, could you please pop up 11-2 back up there for

21  just one quick item?  I'm sorry.  117-2.

22        We were talking about this before we left, Mr.

23  Croteau?

24  A    Yes.

25  Q    Let me ask you this.  This right here, this dip here is

1    what you're talking about that could cause torso augmentation

2    if everything lined -- if they got proper alignment and head

3    at the roof and all of that; correct?

4    A    Correct.

5    Q    And if there's not proper alignment, okay, the occupant's

6    not going to get an injury at that point; correct?

7    A    Correct.

8    Q    So if there's not proper alignment, the occupant's still

9    in the vehicle, but they're going to be subjected to this

10   force of 3,000 newtons right here; right?

11   A    Yeah.  I think that's a reasonable thing to say.  I mean,

12   I don't know it would look exactly like that, but yes.

13   Q    Okay.  So in other words -- and that's from the roof

14   crushing in; right?

15   A    That would be from the deformation, yes.

16   Q    So if they don't get torso augmentation here, they're

17   going to get a lot of force, possibly an injury, from the roof

18   hitting them over here; right?

19   A    Well, the roof's not hitting them.  They're being --

20   they're still moving towards the roof, and the undercarriage

21   is moving towards the roof as well.

22   Q    One other item.  Could we go to Exhibit 355-4, please?

23   Blow it up at the top, please, Jason.

24          So, Mr. Croteau, as I understand this, the total

25   velocity here that you calculated is 7.6; right?  And that's

1    the total torso velocity; correct?

2    A    Correct.  It is.

3    Q    And then there are two parts.  This part here, the 4.2,

4    has to do with the velocity from the free fall of the center

5    of mass of the vehicle; correct?

6    A    Right, leading into the one-and-a-half roll position.

7    Q    Got it.  So what do you call that velocity?  What's the

8    proper name for that?  Velocity from the change in the center

9    of gravity?  Vertical change in the center of gravity?

10   A    Sure.  Yes.  Yes.  Fall velocity.

11   Q    This is the fall velocity from it falling, and this part

12   here is from the rotational velocity; correct?

13   A    Yes.

14   Q    So if we didn't have a free fall, we'd take this out;

15   right?

16   A    That's right.

17   Q    So if the van didn't free fall, if it stayed on the

18   ground and it stayed on the ground through the roll and didn't

19   vault into the air as you described earlier, this would be

20   only the velocity right here; right?

21   A    Well, it's got to have some change in elevation from the

22   CG.

23   Q    But --

24   A    So it's not necessarily free fall.

25   Q    But most of it's out, though, if it didn't free fall;

1  correct?

2  A    Well, you can still have it rotating above the rear with

3  the nose up and then coming down, and that's not necessarily

4  in free fall.  In other words, there still could be contact on

5  the vehicle.

6  Q    But as I understand it from reading your report, you got

7  this from the vaulting information that Mr. Tandy gave you;

8  right?

9  A    Right.  Seven inches.

10  Q    That was this; right?

11  A    Correct.

12  Q    Okay.  And then if that didn't vault, you take that out;

13  right?

14  A    Yes.

15  Q    That leaves us with 3.4 miles per hour.  What kind of

16  drop height would we expect with a velocity of -- a total

17  velocity of 3.4 miles per hour?

18  A    It would be something less than 18 inches.  I haven't

19  calculated that.

20  Q    If --

21  A    I'm sorry.  I was thinking out loud.

22  Q    Can you give us a ballpark?

23  A    It would be about 10, 11 inches.

24  Q    Okay.  About 10 inches instead of 18; right?

25  A    Yes, I think that's right.

```
1   Q    Okay.  And you also mentioned that you had some numbers

2   from Mr. Green.  Mr. Green did not conclude that the van

3   vaulted; correct?

4   A    Correct.

5   Q    Mr. Green -- what you did, you took Mr. Green's -- hang

6   on one second.  Let me look at my note here.  Okay.  You took

7   Green's 3.9 miles an hour and added it to the 4.2 that you

8   calculated from the information from Mr. Tandy; right?

9   A    Well, what I did was I left the vault analysis the same.

10  Q    Okay.

11  A    Okay.  All I did was update the rotational components for

12  his roll rate and horizontal velocity.

13  Q    Just so everybody's clear, Mr. Green did not testify or

14  conclude that the van vaulted; correct?

15  A    That's right.  That's my understanding.

16       MR. SIMON:  Thank you very much.

17       THE COURT:  Redirect?

18       MR. KLEIN:  Yes, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MR. KLEIN:

21  Q    I just want to first follow up on that last area counsel

22  was asking you about.  In between after the first full roll --

23  we're talking about Dr. Roberts' -- let me back up.  You're

24  familiar with Mr. Tandy's reconstruction; correct?

25  A    I am.
```

82

1   Q     And you talked to him about it?

2   A     I did.

3   Q     And you also reviewed Mr. Green's reconstruction?

4   A     I have.

5   Q     Okay.  Now, after the first full roll comes around and we

6   have that impact on the right rear -- that damage you also

7   showed the jury; right?

8   A     Yes.

9   Q     Then it goes over and hits the driver's side of the roof?

10  A     Correct.  Far-side roof.

11  Q     Now, did this part, the passenger side of roof, contact

12  the ground as it was going over?

13  A     No, I don't believe it did.

14  Q     Now, Kyle, if we can show Exhibit 120-13.  Go to page 3.

15  There we go.

16        So do you recognize this as the scratch diagrams that

17  were prepared by Mr. Green?

18  A     I do.

19  Q     Now, there is a mark right here.  Do you see that?

20  A     I do.

21  Q     Do you think that is a scratch made by the roof

22  contacting the ground during this rollover on the passenger

23  corner?

24  A     I do not.

25  Q     Why not?

83

1    A    That scratch is not a part of a family or a pattern of

2    scratches.  It's a single, isolated scratch in that area.  If

3    that were from this rollover, it would indicate it's a

4    rear-leading orientation during this roll sequence, which we

5    don't have, and it would also suggest that there is possibly

6    another roll, and neither reconstructionist has more than two

7    rolls.

8    Q    Okay.  When you say it's not a family, we see these

9    others where five dash line and some -- like down here,

10   there's several lines.  Are those families?

11   A    Yes, that's what I would say.

12   Q    And this one is kind of an orphan all by itself?

13   A    Yeah, all by itself.

14   Q    And looks like it's going different direction than all

15   the other scratches that are on Mr. Green's diagram.

16   A    Correct.

17   Q    And what does that tell us?

18   A    I mean, it's possible that it's a scratch that gets made

19   from post-accident handling, but I don't know.  I don't think

20   it's from this rollover accident.

21   Q    It's going the wrong direction?

22   A    And it's going the wrong direction, that's right.

23   Q    Okay.  You can take that down.  Now, I don't want to

24   belabor this, but at the very beginning there was some things

25   said about the company you work for, and I just want to spend

84

1  a brief moment about some of the other things that Exponent

2  does.  Can you put up that first picture?  What is this?

3  A    So this is part of the work that Technology Development

4  Group does for the armed forces.  This is part of the -- one

5  of the machines -- I think it's a Traxxas E-Maxx that's been

6  reconverted.  So it's an electric-powered vehicle.  They

7  control it wirelessly and send this with a camera and lights

8  down into kind of holes in Afghanistan and Iraq to search for

9  people and weapons and other things.

10 Q    IEDs?

11 A    I'm not -- I don't know about IEDs, but I think this

12 one's more for kind of going into the tunnels and holes where

13 people hide out and store weapons.

14 Q    Okay.  Next picture, please.  What is this?

15 A    Again, this is also part of the Technology Development

16 Group's work.  It's essentially a backpack.  It's got some

17 battery power in there.  It allows you to control multiple

18 things.  This little PDA that they have right here is kind of

19 a common device.  You can program that with different

20 applications, and you can put it into a -- kind of a hand-held

21 game controller so that everything will be controlled with one

22 device rather than having multiple devices.  So it's a way to

23 simplify the life of the soldiers when they're in battle or in

24 theater.

25 Q    Who paid for that?

85

1  A     This was -- both of those projects were funded by the

2  Department of Defense.

3  Q     Department of Defense.  And Army is using it; right?

4  A     Yes.

5  Q     Today in Afghanistan and Iraq, places like that?

6  A     I'm not sure if they're still using them now, but they

7  were for a long time.

8  Q     These are examples of other projects that Exponent has

9  done; right?

10 A     Yes.

11 Q     Has Exponent ever been certified by the National Highway

12 Traffic Safety Administration for doing testing, for example?

13 A     Yes.  In the late '90s, early 2000s, the NHTSA had

14 contracted us.  We were certified by them to -- and lab

15 approved -- to do FMVSS 201P type of testing.

16 Q     201P --

17 A     That's head impact testing into the interior of a

18 vehicle.

19 Q     What about the Federal Aviation Administration, has

20 Exponent done work for them?

21 A     Yes.  I think this was before my time, but we were the

22 only outside laboratory outside of the FAA that was certified

23 to do the seat testing for aircraft seats for the triple 7.

24 Q     And these are some examples of some of the work that

25 Exponent has done for the United States Government?

```
1    A    Correct.

2    Q    All right.  So it's a big company.  $300 million, I think

3    you said, was revenue per year?

4    A    Correct, firm-wide.

5    Q    And then I'm not sure why, but counsel talked to you

6    about how much Ford Motor Company has paid to Exponent.  What

7    percentage of that, of the amount of money Ford Motor Company

8    has paid to Exponent, is it of the total amount of money that

9    Exponent has received for services rendered to the government

10   and lots of other people?

11   A    I think I said it was about 3 percent per year.

12   Q    Three percent?

13   A    Yes.

14        MR. KLEIN:  Okay.  Thank you, sir.  That's all the

15   questions I have.

16        MR. SIMON:  If I can just follow up with the scratch,

17   Judge?  Two questions.  I just want to show him the picture

18   and see --

19        THE COURT:  You've been -- okay.

20        MR. SIMON:  Thank you, Your Honor.

21        THE COURT:  This is your second time now, right?

22        MR. SIMON:  It is.  It is.

23        THE COURT:  All you get is two bites at the apple.

24        MR. SIMON:  That's right.  Thank you, Your Honor.
```

25                              **RECROSS-EXAMINATION**

87

BY MR. SIMON:

Q    Now, Mr. Croteau, you're aware Mr. Tandy did the accident

reconstruction for General Motors; correct?

A    Yes.

Q    And he took a whole bunch of pictures, I think 488.  Do

you recall that?

A    I don't remember how many he took, but he took a lot.

Q    And if Mr. Tandy testified that he saw three scratches

from a photo that he took, would you disagree with him?

A    No.

        MR. SIMON:  Okay.  Thank you.

        THE COURT:  Okay.  Thank you, Mr. Croteau.  You may

step down.

        Call your next witness.

        MR. HANSON:  Eddie Cooper.

        THE COURT:  Eddie Cooper, come on down.

                    **(WITNESS SWORN BY THE CLERK.)**

                         **EDDIE COOPER,**

**HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS**

**FOLLOWS:**

                         **DIRECT EXAMINATION**

BY MR. HANSON:

Q    Good afternoon.  Would you please state your name and

your professional address, sir?

A    My name is Eddie Ray Cooper.  My professional address is

88

```
1   8277 East Remuda, R-E-M-U-D-A, Drive, Scottsdale, Arizona.
2   Q    What do you do for a living?
3   A    I'm a consulting engineer.
4   Q    How long have you done that sort of thing?
5   A    Since about 1985.
6   Q    Who do you work for?
7   A    Currently work for B33 Consulting, which is a company
8   that I run with my wife.
9   Q    And what kinds of work does B33 Consulting do?
10  A    We primarily consult for automobile manufacturers or law
11  firms that represent automobile manufacturers in the analysis
12  of accidents.
13  Q    Now, I'm going to talk to you in a little bit about the
14  specific focus that you have in that work, but before I do,
15  I'd like you to give the jury briefly, if you would, your
16  educational background.
17  A    Sure.  I have a Bachelor's and Master's of Engineering,
18  in mechanical engineering, from Arizona State University.
19  Q    When did you receive the master's?
20  A    I finished my master's degree in roughly 1985.
21  Q    Now, how long have you had your own company, the B33
22  Consulting?
23  A    We started in October of 2003; so since then.
24  Q    Now, has there been any particular focus
25  subject-matter-wise of the kinds of projects you've worked on
```

89

1    since you started B33?

2    A    Yes.

3    Q    What is that?

4    A    Primarily, I study use and performance of seat belt

5    systems.  I also do a variety of roof strength-type cases,

6    which you've just heard a lot about, and also general

7    consulting on automotive safety, crash testing, test

8    programs -- that type of thing.

9    Q    Now, have you actually in your history conducted Federal

10   Motor Vehicle Safety Standard compliance tests for seat belts?

11   A    Yes.  Not only seat belts but roof structures.  That was

12   my first job at Exponent or Failure Analysis, was to develop

13   the FMVSS 216 test followed by some of the seat belt tests,

14   specifically what's called 210, which is an anchorage strength

15   test for seat belts.

16   Q    Now, you mentioned Exponent, which is a company for which

17   Mr. Croteau works now.  Correct?

18   A    Correct.

19   Q    Did you used to work there?

20   A    Yes.  I started there in 1985.  When I finished my

21   master's degree, two of my professors recruited me to go from

22   Garrett Turbine Engine Company to what was then Failure

23   Analysis Associates.  That then became Exponent.

24   Q    So you continued to work at Exponent for how long?

25   A    About 18 years.  I worked till 2003.  Started as a staff

1    engineer and worked my way through the ranks.

2    Q    So the last 13 years or so since -- it's been 13 or so

3    years since you last worked there?

4    A    Yes.

5    Q    Now, I want to touch upon this briefly.  When you were at

6    Exponent, was there a particular area for which you were

7    responsible?

8    A    Yes.  There was a variety of areas.

9    Q    Would you tell the jury what they are, please, without

10   making it an overly long description?

11   A    Sure.  I started out as a staff engineer.  And then I was

12   given responsibility for the data processing facility, which

13   was then a state-of-the-art mini computer.  And then the

14   photographic systems, high-speed film, things of that nature,

15   came under my responsibility along with instrumentation.

16          Ultimately, I was in charge of the facility.  And

17   then added to that responsibility was the responsibility for

18   the entire vehicle practice.  So I was responsible for all the

19   engineers in all the offices that were doing work associated

20   with the automotive practice.

21   Q    Now, when you say the "automotive practice," what do you

22   mean?

23   A    Anything to do with transportation, failure analysis of

24   transportation systems, problems that manufacturers have with

25   their equipment in the field, and, of course, automotive

1    litigation.

2    Q    And when you say that you were responsible for the

3    facility, what did you mean?  What facility were you referring

4    to?

5    A    The Test and Engineering Center is roughly a 150-acre

6    facility that's in Phoenix, Arizona, that we took over from

7    another company in 1983.  And that's really why I was hired,

8    was to help them bring that facility up to spec, up to speed,

9    and start running tests.

10        So it's a large -- relatively large private proving

11   ground.  Two-mile oval track, 1,200-foot crash rail.  One of

12   the most versatile automotive crash test facilities in the

13   country.  Able to do a wide variety of automotive crash

14   scenarios unlike and different from the standardized tests the

15   auto manufacturers do.  So it allowed us to really have a

16   unique system to investigate actual vehicle performance in

17   more realistic crash scenarios.

18   Q    While you were in charge of that test facility, can you

19   tell the jury whether, so far as you know, was there another

20   facility anywhere in the country that had the same

21   capabilities you did?

22   A    No.  We were unique in the breadth of our capabilities,

23   the detail of our instrumentation and photographic

24   capabilities, and our ability to take on large and

25   one-of-a-kind projects.

92

1  Q    So is it only car companies who wanted to get out of

2  litigation responsibility that were coming to you for testing?

3  A    No.

4  Q    What are some of the other kind of entities that came to

5  your group when you ran that safety laboratory, safety test

6  facility for scientific and engineering testing?

7  A    One of the more interesting projects was one for NASA.

8  Actually, the materials people in the Menlo Park office

9  developed a theory, what's called crack propagation theory,

10 that would help explain some of the anomalies they were seeing

11 during the reentry of the space shuttle external tank.

12 Sometimes it would come in and make a big footprint.

13 Sometimes it would make a small footprint.

14       The engineers and scientists at Menlo Park developed

15 a theory.  We built a test system and an instrumentation

16 package and literally exploded a miniature version of the

17 external tank on our site to help feed data into that theory.

18 So that's an example of something we did for NASA that was

19 unusual.

20 Q    Sounds like the space shuttle *Challenger* you're

21 describing there?

22 A    Different.  That was -- this was actually an operational

23 problem that they were having.  We were trying to allow them

24 to literally remove explosives from the external tank so that

25 they could reduce the mass of the tank and therefore put up

1    more payload.  So it was really an operational efficiency-type

2    problem.

3    Q    When that project was done for NASA, was your company

4    paid by NASA?

5    A    Yes.  There are many examples like that.

6    Q    Yeah.  We won't get into all of them, but let me just ask

7    you this.  Would it be accurate to suggest that the primary

8    focus, the bread and butter of your work, was doing the

9    bidding of the auto industry?

10   A    Of Exponent's or my work --

11   Q    Yes, Exponent.

12   A    Exponent's work, no.  It was certainly -- it's a very

13   broad organization.  That was its strength:  Covering lots of

14   different technical disciplines, handling lots of different

15   technical problems.

16   Q    During the time that you ran the test facility while you

17   were an employee of Exponent, did you have capabilities that

18   even the auto manufacturers didn't have with respect to

19   testing?

20   A    Yes.  Again, we were -- he had a lot of different

21   expertise in the company, a lot of different areas of

22   expertise, and therefore we could bring a lot of different

23   disciplines to bear on a particular problem and solve it more

24   quickly than an organization that's primarily designed to

25   build and sell cars.  So they came to us at times with various

1  issues they were having and allowed us to solve them fairly

2  quickly.

3  Q    Mr. Cooper, how many full-scale crash tests have you

4  personally participated in?

5  A    My estimate was in excess of 3,000 crash tests, sled

6  tests, and tests of that nature.

7  Q    I don't think anybody has been told what a sled test is;

8  so very briefly if you can describe what you're referring to.

9  A    Sure.  What you think of as a crash test that you see a

10  lot on television, that consumes an entire vehicle, and that's

11  kind of the end of the test program because you're consuming

12  in some cases a prototype vehicle.

13        A sled is a device that allows us to simulate a crash

14  test without consuming that vehicle.  So we put a buck -- much

15  like you have right here -- on a device that accelerates it or

16  decelerates it to simulate the forces that are involved in a

17  crash.  The beauty is we can do it repeatedly; we don't

18  consume a vehicle each time; we can test specific components

19  and see what changes to those specific components, how those

20  changes affect the occupant protection system, for example.

21  So it's a laboratory version of a automotive crash test.

22  Q    Is it expensive to do even a single full-scale vehicle

23  crash?

24  A    Yes.  It's very expensive.

25  Q    Is it a lot more expensive to do a series of crashes like

95

1    what you were doing for Ford in the Crown Victoria study?

2    A    Yes.

3    Q    In the course of -- and you participated in that project,

4    too, did you not?  The Crown Victoria project?

5    A    I was the primary engineer on the Controlled Rollover

6    Impact System.  I'm the co-patent holder on that machine.

7    Q    How many Ford Crown Victoria cars got destroyed in the

8    course of doing that one project?

9    A    There were the six primaries, and then we used others for

10   the prototype development testing.  In fact, we even used one

11   of my own vehicles on the machine.

12   Q    Now, are there costs in addition to the cost of the car

13   that you're going to destroy when you run a full-scale crash

14   test?

15   A    Certainly.  The vehicle has to be prepared in a very

16   specific way, has to be made safe yet functional, has to be

17   configured to be put on the machine that you're going to use

18   to test it.  On the crash rail it has to be set up with the

19   tow fixtures.

20         On the Controlled Rollover Impact System, it has to

21   go through a very elaborate balancing process before it can be

22   run on a test.  So it's literally many, many mandates to get

23   ready for a test.

24         Then you're using lots of very expensive equipment --

25   high-speed cameras, high-speed video cameras, lots of

96

1  expensive instrumentation.  And, of course, the

2  anthropomorphic test device, the ATDs or dummies, they are

3  also very expensive machines.  Very expensive to maintain and

4  calibrate.

5  Q    Do you recall approximately what it cost just to buy one

6  Hybrid III dummy?

7  A    When I was having to do it, a single dummy without

8  instrumentation was in the $40-, $50,000 range.  By the time

9  you put moderate instrumentation in it, it was in excess of

10 $100,000.  And then you had to calibrate it both before and

11 after every certification test.  So the calibration lab was a

12 major part of the expense of operating our family of dummies.

13 Q    Now, you mentioned earlier that you've estimated personal

14 participation in something on the order of 3,000 full-scale

15 vehicle crash tests; correct?

16 A    Yes.

17 Q    How many of those involved rollover tests?

18 A    I don't have an exact count, but many.  We did as many as

19 50 in one particular year.

20 Q    Have you published papers, technical papers, specifically

21 related to rollover performance?

22 A    Yes.

23 Q    Have you published technical papers specifically related

24 to the role of seat belts in rollovers?

25 A    Yes.

97

1   Q    Have you published technical papers on other topics that

2   relate to seat belts, not necessarily rollover?

3   A    Yes.

4   Q    How many technical papers have you published?  And by

5   "technical papers," I mean where they are presented to a group

6   which peer reviews them before they are published.

7   A    I think the count is over ten.  I don't have an exact

8   count.

9   Q    Now, have you written specifically papers that seek to

10   address what happens with occupants during rollovers in terms

11   of where their heads move, what excursions they make --

12   A    Yes.

13   Q    Now, if we need to talk specifically about some of those

14   papers, we will, but I don't want to belabor the point now if

15   we don't need to.

16         Tell the jury, if you could -- help to give them some

17   understanding just of the extent of the seat belt testing you

18   have done over the course of your career, you personally.

19   A    Well, I was fortunate enough to work on a particular

20   problem with seat belts in the late '80s, and so I kind of

21   focused on seat belts.  And being involved with a crash test

22   facility, I had a very unique opportunity to see seat belts

23   that were exposed to known crash conditions.  Rather than

24   having to go out in the field and look at evidence and try to

25   figure out how to interpret it, I had the crash, the known

1   event, in front of me.  I could look at the results and study

2   them and educate myself about what I should be looking for.

3   So that was on my primary education.

4           We then went on to do some additional testing.  Head

5   excursion testing, which is how much your head moves up and

6   out during a roll sequence, for example, we did a paper in

7   1997 on that, looking at variability of the geometry of the

8   belt systems and whether or not that had any effect on head

9   excursion.

10          We later did studies that involved human subjects

11  where we put them on a -- in a vehicle on the ground-based

12  CRIS fixture and spun them up to see how they compared to

13  dummies.  We've then done analytical work to model that.  I

14  built machines specifically to test seat belt components,

15  specifically three sets of shock tables.  I personally run,

16  own one of the only seat belt load simulators in existence in

17  the country that allows me to do very specific yet economical

18  sensitivity tests on components so I can better interpret

19  field data.  I built machines to test retractors, built

20  machines to test buckles.  Lots of different exposure.

21  Q    And what you've been describing there, is that the kind

22  of work that you've been doing for the last many, many years?

23  A    Yes.

24  Q    Through today?

25  A    Correct.

1   Q    Now, you mentioned a shock table. Hasn't come up before.

2   So just tell us very quickly what you're talking about.

3   A    Well, in most of the automotive arena you want to know

4   what happens to your components when they get hit. So a shock

5   table is a very controlled version of an impact. So I've got

6   a table that I mount a test component on, drop it into a

7   particular elastomeric device that gives me an acceleration

8   pulse, and then I look at the response of the object, usually

9   a buckle, to that pulse. And I did that last Saturday.

10  Q    Now, and since you mentioned an acceleration pulse and

11  the term "pulse" has been used before -- and I'm not sure

12  anybody's explained what they mean by that -- would you give

13  it a shot?

14  A    Sure. Basically an acceleration is created on an object

15  when a force is applied to it. The duration of that force and

16  the shape of that force is the pulse. So if I put a certain

17  load on a device, it accelerates that load, varies with time.

18  I get literally a time change of acceleration. That's what's

19  referred to as a pulse. Any time an object hits another

20  object it generates an acceleration pulse.

21  Q    Now, with that background that you have summarized for

22  us, did there come a time when my law partner, Mary Bolkcom,

23  contacted you and asked if you would be willing to assist in

24  evaluating the claims in this lawsuit?

25  A    Yes.

1   Q    And what were you asked to do?  What were you asked to
2   look at?
3   A    This was a pretty typical retention.  I was asked to look
4   at the vehicle, look at the seat belt, and basically determine
5   use and performance of the restraint system in this accident.
6   Q    So use and performance in this crash.  That's a part of
7   what your task was?
8   A    Correct.
9   Q    Now, in order to do that, did you take into consideration
10  for your work the claim that was being made, that is, what was
11  being asserted by the people that Mr. Simon had hired in this
12  lawsuit?
13  A    Certainly in later work.  The first part of the process
14  is always to go out and collect data, collect information,
15  formulate your ideas about what happened.  And then you apply
16  all of that information to the claims that are made and
17  whether or not they're correct or not.
18  Q    Now, before you in any matter begin your analysis, do you
19  want and need to have some understanding of the basic crash
20  event?
21  A    Yes.
22  Q    And have you prepared a presentation that helps to walk
23  the jury through it to help explain to them what the steps in
24  your analysis were and how you got to the conclusions that
25  you've reached?

1    A    Yes.  It's really a series of slides that document my

2    process.

3    Q    This is Exhibit 4000, if you can put that up, please.

4         Now, the jury's seen this before, but tell them what

5    it is.

6    A    This is one of the quartering shots that I typically take

7    at the start of my inspection, just documentation of the

8    vehicle that I'm looking at.

9    Q    Is this a personal -- a photograph that you personally

10   took?  You looked at this vehicle yourself?

11   A    Absolutely.  Yes.

12   Q    Well, if other people have already looked at it and taken

13   pictures, why do you need to look at it?

14   A    I'm looking for different details.  The seat belt is kind

15   of a specialty area.  A lot of work goes into understanding

16   what you're looking for.  So I look at the vehicle itself,

17   understand the collision, and then really focus in on the seat

18   belt system.

19   Q    So you mentioned that first you look at the seat belt

20   before you start getting into the facts of the incident -- or

21   something to that effect?

22   A    I'm collecting data.

23   Q    Is that something that you do as a part of your regular

24   protocol?

25   A    Yes.

1    Q    So if we could, we have a few slides that you put in here

2    that help explain what kind of process you went through.  Is

3    that true?

4    A    Sure.  Yes.

5    Q    Would you give us the next slide, please.  What is this

6    photograph, and why did you take it?

7    A    This is jumping directly into it.  This is the

8    latchplate.  And I know you've already heard descriptions of

9    the seat belt system, and you know that it has a retractor and

10   it has a buckle and it has a latchplate.  The latchplate is

11   the part that fits in the buckle, and it's part of the

12   restraint system that reacts load.  It's specifically of

13   interest to me because the research that I've done in the past

14   and observations I've made in the crash test environment tell

15   me that this surface is one of the most sensitive surfaces in

16   the restraint system.  It's where I go first to answer the

17   question "Was it loaded?"  "Was it loaded by an occupant?"

18   This is a steel structure that is coated by a polymer,

19   typically nylon 66.  The surface that -- can I point at this?

20   Q    Sure, yes.  And you can annotate as long as we remember

21   to take them off before we go to the next picture.

22   A    Okay.  That, what I've done there, is I've got the

23   latchplate, I'm holding it in my hand, and I've folded the

24   webbing back down over the tongue, the part that goes in in

25   the buckle.  And what you're seeing is the load-bearing

1    surface.  That's the part of the latchplate that the webbing

2    actually wraps through and comes around.  So part of it comes

3    across your pelvis, goes through one side of this out and up

4    to the D-ring.

5         This is about a tenth of an inch or so in diameter.

6    It's a small polymer surface.  Therefore, it has lots of

7    energy concentrated on that plastic surface.  That makes it

8    the most sensitive element in the system for detection of

9    load.

10   Q    Now, can I have the next slide, please.  So what have we

11   got now?  This is a different photograph of what?

12   A    This is the same surface, but now I've come in more

13   closely.  This is the top surface.  This is the surface that's

14   away from the occupant.  It is, of the two surfaces, the least

15   sensitive.  What you can see -- start to see here is evidence

16   of the interaction of the webbing with that surface.

17        And below you can actually see the structure of the

18   webbing.  The webbing is made up of fibers that are twisted

19   into bundles that are woven into the weave of the fabric, and

20   you can see those fibers, and you can see the bundles below.

21   And then you can look closely at the interaction with that

22   surface and literally see the fibers imprinted in that

23   surface, and that's what occurs during a loading event.  The

24   polymer surface is heated under a frictional loading, softened

25   slightly, and you get an imprint of the webbing.  So this is a

1    very subtle example of it.  Go on to see more.

2    Q    Let me just stop you for one moment because we're looking

3    at things -- we're looking at them up very close.  The part

4    that we're looking at here, that's what you're calling the

5    elastomer or the polymer?

6    A    The latchplate load-bearing surface.  It is a polymer

7    material.

8    Q    So one might think of that as plastic?

9    A    It's plastic.  Plastic is a polymer.

10   Q    The part that I'm circling here, the load-bearing

11   surface, is that also plastic?

12   A    Yes.

13   Q    And then this here, what is that, and what's it made of?

14   A    That is the webbing itself that I was describing made up

15   of fibers and bundles woven together.  It's made out of

16   polyester.

17   Q    So we're in tight enough that we can actually see the

18   contour of the seat belt webbing fabric?

19   A    You can see the individual fibers in the bundle, yes.

20   Q    Next slide, please.

21   A    What I'm doing here is I'm simply taking a photographic

22   survey across this sensitive area; so the next couple of

23   slides here are me moving with a macro lens obviously across

24   that surface to document and record the condition of the

25   surface.  So this is approximately halfway across the surface.

1    The next one will be to the other end, or the full picture of

2    it.

3    Q    Let me stop you for just a moment.  We'll come back to

4    this.  Do you see the number "10" right here?

5    A    Yes.

6    Q    Is that something that's going to be of interest to you

7    in your explanations further to the jury in what you were

8    looking for and why?

9    A    It is.

10   Q    Can you briefly tell us why you're interested in that?

11   A    Sure.  And this image we've basically flipped it over.

12   Now we're on the bottom side.  And this is, in my experience,

13   the most sensitive side.  And what I'm looking for here is any

14   kind of disruption to the polymer, because it's almost like a

15   fingerprint.  Everything that you see there tells you

16   something about how the webbing interacted with that part.

17        The reason that the "10" is of interest is because

18   it's a raised section of that plastic, and so it sticks up

19   above the surface.  And as you might imagine, if something

20   rubs on it hard, you're going to see the effect of that.

21   Q    All right.  Now, next slide, please.  Now, we're looking

22   up closer at this number 10 on the -- which side is this again

23   now?

24   A    This is on the bottom surface.  This is on the side

25   that's closest to the occupant and is most sensitive.  So

1    first of all what you're seeing here is a much more

2    aggressive-type interaction between the webbing and that

3    plastic surface.  You can see many, many occurrences of that

4    fiber imprint on the surface.  You can even see up on the 10.

5    You see right at the bottom -- in fact, how do I erase that

6    red?

7    Q    Like that.

8    A    Okay.

9    Q    Lower-left corner.

10   A    If you look right at the bottom of that "1" and right at

11   the bottom of that the zero, you see the same kind of fiber

12   marks.  So the webbing was in fact loaded and was in contact

13   with the surface.

14           And what you don't see is what's important.  What you

15   don't see is that melted and wiped away, as if I took -- I was

16   polishing my shoes and I ran the webbing rapidly under load

17   and one direction.  If that happens -- and I've run tests

18   specifically to document this effect.  If that happens, you

19   see evidence of the magnitude and the direction of that

20   webbing transfer.

21   Q    All right.  Now, if we can have the next slide, please.

22   Now, what have we done?  We've moved over to the other side of

23   that same surface?

24   A    This is the --

25   Q    Other end --

1    A    This is the other end of that, and you can again see the

2    same kind of damage to the surface created by the webbing.

3    And what you don't see is a bunch of that material wiped

4    across it due to webbing transfer.  So what this tells me is

5    that, yes, this latchplate saw occupant loading through the

6    webbing during the accident; it reacted load; the webbing

7    interacted with the surface, left the imprint in it; but it

8    didn't translate rapidly across that surface.

9    Q    We'll talk a little more later on about why that's

10   important to you.  Next slide, please.  For now, while we're

11   still in your initial inspection, are we not?

12   A    Yes.  So basically what I'm doing is working around the

13   vehicle, looking at different components that have different

14   levels of sensitivity to allow me to establish without a doubt

15   that the belt was used was loaded.  This is a very hard

16   photograph to take.  It's actually under the inboard side of

17   the seat.  This is the inboard anchorage.  This is the part of

18   the assembly where the buckle actually mounts to the side of

19   the seat.  This bar that you see there, that's the inboard

20   anchorage.  So I have to crawl under the seat, take this

21   picture, and what you see there is that it's slightly

22   deformed.  That tells me again that's consistent with pretty

23   significant occupant loading.

24   Q    Now, Mr. Cooper, let me just -- to orient the jury to

25   where this is, am I in the neighborhood here?

1    A    Yes.  That's exactly what it is.  It's a lot easier to do

2    it in that buck than it is in the vehicle, but that's what

3    we're looking at.

4    Q    We are looking at the surface to which the inboard part

5    of the seat belt -- that's where it attaches to the seat?

6    A    Correct.

7    Q    So from this finding were you able to make the

8    determination whether there was a force placed upon that

9    anchorage that was enough actually to bend it a little?

10   A    Yes.

11   Q    Is that true?

12   A    Yes, it is.

13   Q    All right.  Now, you went through, did you not, in the

14   course of your examination -- also you looked at the webbing.

15   Is that true?

16   A    Correct.

17   Q    Why did you do that?

18   A    Well, as I said, it's a two-part process.  We're looking

19   at use and performance.  Once you establish use, then you

20   start going off to look for evidence of how it was used and

21   how did it perform.  The webbing is obviously a critical part

22   of that story.

23   Q    Could I have the next slide, please?  Can we rotate this

24   or shrink it, make it smaller?  We'll do it this way.

25   A    That works.

1   Q     You have to turn sideways to see what you've written.

2   Would you just explain to the jury what you're doing here?

3   Why do you make a diagram like this?

4   A     This is what I call my belt map.  This, as you can see in

5   the corner here, is for Position 1.  It's the outboard webbing

6   diagram.  Obviously, a piece of webbing has two sides, the

7   inboard and the outboard, and that's something that I have

8   defined for years.  And to this day, most people use the

9   definition of inboard and outboard being outboard at the

10  outboard anchor, outside, pointing outside of the vehicle;

11  inboard pointing inside of the vehicle.

12  Q     Let me stop you there.  And I think I outsmarted myself

13  having you turn this sideways because it's --

14  A     It's tough.

15  Q     It's hard to tell what's there.  Can we put it back

16  right side up?  There we go.  Thank you.

17  A     So what I'm looking for -- I take -- I put a tape measure

18  next to the webbing.  I reference it at the loop at the

19  outboard anchor so we've got a consistent point of zero.  And

20  then I go across the webbing.  I do a high-definition video

21  pass of the webbing, and then I take specific photographs with

22  lighting techniques to highlight all the different information

23  that is available on the webbing.

24        I look for dirt marks, I look for damage on the

25  webbing, I look for burnish marks, I look for scuffing --

1    anything that I might use later to help put together how the

2    belt was loaded, how it was used in this accident.  This is

3    really just my data collection of the evidence that's on the

4    webbing.

5    Q    And did you include a few slides to show the jury how you

6    used this procedure?

7    A    Sure.

8    Q    Next slide, please.  Explain what we're looking at here

9    in case it's not evident.

10   A    This is my reference shot.  You can see that I've got my

11   tape measure attached to the webbing, and I've very carefully

12   aligned the zero point to the loop at the outboard anchor.

13   This is the outboard anchor.  The outboard anchor is about

14   right there.  That's where it attaches to the vehicle on

15   the -- if you're the driver, it's on the left-hand side.  So

16   what I've done is establish a reference, run the tape, and now

17   I'll do a survey of all the articles that are on the webbing.

18   Q    Next slide, please.

19   A    So this shows you the latchplate.  It shows what's called

20   the stop button.  This is the button that stops the latchplate

21   from falling too low on the webbing so that it's easy for you

22   to reach out and get it.  You don't have to go hunting for it.

23   The other thing that's shown here are a couple of diagonal

24   folds.  Sometimes things like this can tell me a lot about how

25   the belt was loaded.

1   Q    Next slide, please.

2   A    Again, we have got documentation of diagonal folds.  But

3   these are folds that in the final analysis really don't tell

4   me much about how it was used.

5   Q    Okay.  Next slide.  And, again, we're just continuing

6   along to look at --

7   A    Just methodically, tediously go along the full length of

8   the webbing and document everything I see.  These are diagonal

9   folds.  They're a little bit sharper in nature, and that's

10  very consistent with webbing that is interacting with an

11  occupant.  The webbing tends to bunch up a little bit as it

12  goes across an occupant, and that creates those longitudinal

13  folds.  So that's other indication that the webbing was loaded

14  and loaded around an object like a person.

15  Q    Next slide, please.

16  A    Another indication of longitudinal fold.

17  Q    Now, we're not going to spend a lot of time on the

18  details, but when you're doing this, are you looking for

19  particular kinds of prints? marks? artifacts?  That kind of

20  thing?

21  A    Yes.  I'm looking for -- I'm really collecting data that

22  I will use later in usually what's called a surrogate study to

23  try to help me understand how the belt was used during the

24  crash.  And in many cases I can determine exactly where the

25  D-ring is and exactly where the latchplate is and from those

1    dimensions how it was routed.

2    Q    Now, what about this.  There's a mark of some kind in

3    this photograph.

4    A    It's another localized fold.  It just really is

5    documenting the detail that I try to take in each and every

6    belt inspection.

7    Q    Next slide.  There's just continuing along?

8    A    More and more.

9    Q    Giving the next one.  And one more, please.  Okay.

10            Now, you've gone through -- we've gone through.

11   You've inspected the entire length of the belt, haven't you?

12   A    Yes.

13   Q    And this was on the inboard or the outboard side?

14   A    Outboard side.  I also did the inboard side.  But in a

15   three-point system like this if there's not something out of

16   position, that is usually what happens is the latchplate gets

17   turned over 180 degrees or the belt gets twisted going through

18   the D-ring, if that doesn't occur, the surface of the webbing

19   that interacts with the restraint hardware -- the latchplate,

20   D-ring -- is that outboard surface.  So the outboard surface

21   is usually the most important surface.  I do document the

22   inboard surface just for completeness.  In this case there was

23   no rotation of any of those components; so all the evidence of

24   interest should be on the outboard side.

25   Q    And, consequently, we're not going to take the time to go

113

1    through the photographs that show the inboard side.

2    A    Correct.

3    Q    Now, the photograph that we have up, this is the one that

4    has -- it's identified as Photograph 17.  It's showing

5    something a different color than what we have been looking at.

6    Would you please help to orient the jury to what it is that

7    this photograph shows and why you included it in your

8    presentation?

9    A    This is an example of a sled test that I ran to look at a

10   specific effect of a retractor having a problem and not

11   locking quickly.  So this is an intentionally disabled

12   retractor test that I ran on the sled simulating an

13   up-and-out-type impact just like you would get with a

14   roof-to-ground contact in a rollover.

15        So it's designed, in fact patterned from, an actual

16   rollover test.  So we're taking that one component of an

17   actual rollover, and we're simulating it on our laboratory

18   sled, and I'm disabling the retractor so that the webbing

19   actually moves by the latchplate very quickly.

20        So what you're looking at is that same latchplate

21   load-bearing surface, different color, different manufacturer,

22   still nylon 66.  And what you see is how we start to see that

23   wiping that I was talking about of the polymer.  It's heated.

24   It gets moved in the direction of transfer.  So this is a very

25   subtle example of the kind of thing that I'm looking at --

1    looking for when I look for webbing transfer.

2    Q    All right.  Now, why were you interested in looking to

3    see whether there was any sign that there had been webbing

4    transfer in the Roberts rollover crash?

5    A    It's a basic piece of data that you should look for when

6    you're trying to understand use and performance of the belt

7    system.  The motion of the webbing relative to the latchplate

8    and the D-ring and any other component it comes in contact

9    with is -- tells you something about how it was used and how

10   it performed.

11   Q    Now, with the backdrop that you've given the jury,

12   including the explanation of the illustration of the kinds of

13   marks that you can find when webbing does transfer --

14   A    And this is very subtle.  In some cases with lots of

15   webbing transfer the polymer actually flows over that open

16   hole; so it will actually flow into that hole.

17   Q    But now that we have the explanation of what you were

18   looking for, let's go back and take a look at what you found

19   on the Roberts vehicle.  Can I have the next slide, please?

20   Okay.  Again, please, if you could quickly orient the jury to

21   which way we're looking at this.

22   A    This is the same photo you saw before.  We're looking at

23   the top surface, the latchplate load-bearing surface, the most

24   sensitive element in the restraint.

25   Q    Is there anything in this photograph of what you've

1   described as the "most sensitive element of the restraint"

2   that gives you information that you're using to draw any

3   conclusions?

4   A    Yes.  What you don't see is any melting and transfer of

5   that material.

6   Q    And if we can with the next slide, please.

7   A    Again, this is the underside, same thing you've seen

8   before, and now you probably better understand why I'm

9   interested in raised features like that "10."  If that's a

10  very small bit of plastic that protrudes up above the surface,

11  if the webbing transfers across that surface rapidly, it's

12  going to melt it and move it in the direction that the webbing

13  is moving.  It's not damaged.  It's not deformed.

14  Q    Then the next one, please.  Now we're getting even

15  closer.

16  A    Closer.  Same photos we showed before.  Same type of

17  analysis.  No evidence of webbing transfer.

18  Q    Okay.  So by the time you've gotten this far in your

19  examination of the seat belt that Dr. Roberts was using, what

20  are you able to conclude?

21  A    I know that she was wearing the belt.  I know that the

22  belt locked and reacted load.  I know that there was no

23  transfer of webbing across this particular surface.  I know

24  that the loads were relatively high because we did see

25  deformation of the inboard anchorage.

1   Q    Now, to put this together with the claims in this case,

2   did you have an understanding -- do you have an understanding,

3   both from having read the report written by Larry Sicher and

4   from having read his deposition testimony, what claims he was

5   advancing with respect to the latchplate in the Roberts

6   vehicle?

7   A    He was suggesting that this latchplate, which is called a

8   single-slot sliding or free-falling type of latchplate, should

9   be replaced with a cinching latchplate.

10  Q    Let me touch upon that briefly.  Was cinching latchplate

11  the term that he used?

12  A    Yes, I believe so.

13  Q    Is that the same thing as what he has described in court

14  as a cinching/sliding latchplate?

15  A    No.  It was a classic cinching latchplate which actually

16  grabs the webbing and reacts a substantial amount of load.

17  What he refers to as a cinching/sliding is what's more

18  typically referred to as a semi-cinching.  That is a device

19  that does provide some resistance, less than 50 pounds, is not

20  exclusively but is typically used in installations where a car

21  seat might be involved to aid in the installation, proper

22  installation of the car seat in the vehicle.

23  Q    When you're talking about a child safety seat, can people

24  unwittingly do that wrong and as a result be not properly

25  protecting their child?

1  A    Yes.  It's one of those challenges.  Having numerous

2  grandchildren now and daughters trying to install car seats,

3  it can be daunting to get the car seat in there correctly and

4  make sure that it's tied down properly.

5  Q    What is it about this semi-cinching or what Mr. Sicher

6  called cinching/sliding latchplate that is conducive to

7  helping you get the child seat in right?

8  A    It gives you some assistance in maintaining the lap belt

9  tension while you're setting the routing and tension on the

10  torso belt.  With an automatic adjusting sliding latchplate

11  system, if you don't hold the webbing just right, you might

12  not have the right compression on the car seat.

13        This assists in that operation, in that you can pull

14  on it and it will hold some load to keep the car seat base

15  positioned properly while you set the ALR feature, or

16  automatic retractor locking system, to secure the rest of the

17  webbing.  So it's for assistance.

18  Q    Now, the jury has heard the term "ALR."  We haven't

19  explained what they are.  But do they have a relationship to

20  fixing child seats in place?

21  A    Yes.

22  Q    Would you try to explain that in as simple terms as you

23  can so the jury can understand why, if you using an ALR, you

24  might want to have this semi-cinching or cinching/sliding

25  latchplate with it?

1    A    The ALR is simply a mechanism that you've probably all

2    experienced.  You pull the webbing all the way out, you hear a

3    click, and from that point on it only clicks in.  It ratchets

4    in.  It won't come back out -- until you go almost all the way

5    in and cancel the ALR.  Then it will come back out again.

6    That is specifically designed to allow you to put the belt

7    around a car seat, set the ALR, let it go all the way in, and

8    then ratchet the belt tighter and tighter until you get it the

9    way you want it.  So the ALR actually eliminates the free

10   movement of the retractor or the webbing on the retractor.

11        This simply assists you in tying down the base before

12   you set that ALR, because if you don't have that feature or

13   something like that, you have to be a little bit better with

14   your hands to keep the tension in the lap while you set the

15   ALR and transfer that tension to the retractor.

16   Q    All right.  Now, Mr. Cooper, are there circumstances

17   under which a true cinching latchplate will behave differently

18   than a free-siding latchplate?

19   A    Yes.

20   Q    Would you explain that, please?

21   A    As I said, a cinching latchplate is -- has a mechanical

22   device that actually locks onto the webbing and reacts

23   substantial amounts of load, thousands of pounds of load.

24   It's designed to provide -- it was originally, in my

25   experience, generated in a time when people didn't want to

1    wear their seat belts.  There were comfort issues.  So there

2    was a system called the comfort feature which was added to

3    belt systems which allowed you to pull the torso belt out, put

4    a little slack in the torso belt so that it didn't rub on your

5    neck.  People didn't like the feel of that across their chest.

6    And so that cinching latchplate was installed to effectively

7    give you a lap belt with a loose torso belt.

8         And over time people became familiar with and more

9    comfortable with belt systems, and that was phased out.  So

10   the classic cinching latchplate has kind of gone away, been

11   replaced by the sliding latchplate which allows for automatic

12   adjustment, more free movement within the vehicle, and a

13   return to an automatic adjusted position.

14   Q    Now, we touched a little earlier upon the part of

15   Mr. Sicher's claims, his theory that it would be better to

16   have a different kind of latchplate in this van.  Okay.  I

17   want to explore that with you for a moment.

18        Bearing in mind that that's one of the questions, one

19   of the issues to be addressed in this lawsuit, and your

20   finding that there wasn't any evidence of webbing transfer, is

21   that important to you in evaluating whether it makes any

22   difference what kind of latchplate was in this vehicle?

23   A    Yes.  Given that there's no evidence that there was

24   webbing transfer across the sliding latchplate surface, that

25   means that there was no webbing motion to try to resist with

1    the cinching latchplate.

2    Q    To put it another way, if the cinching latchplate is

3    going to cinch something, what's it cinching?

4    A    The webbing did not move without it; so it wouldn't be

5    any different with it.

6    Q    So if it didn't move anyway, you don't need to cinch it

7    to stop it from moving?

8    A    It would have had no effect.

9    Q    Now, in part because I suspect that Mr. Simon may be

10   interested in exploring with you the topic of how much you

11   have billed for your work on this case, I would like to have

12   the jury have an understanding of the full scope and scale of

13   the work that you did on this case for which you sent us the

14   bill.  All right?

15   A    Okay.

16   Q    Now, you've mentioned already that when you started your

17   work -- that you understood both from reading the report of

18   Mr. Sicher and his deposition that he was talking about a

19   cinching latchplate?

20   A    Correct.

21   Q    So knowing that the claim was that we should be using a

22   cinching latchplate, was there something that you then did to

23   evaluate, to analyze, whether that would be a good idea?

24   A    Yes.

25   Q    Would you explain to the jury, please, how you went about

1    doing that analysis and responding to Mr. Sicher's claim?

2    A    We were able to perform what's called a naive subject

3    study where we put nine occupants in vehicles and vans and

4    were very careful to construct the program so that they had no

5    knowledge of what we were actually testing for; thus they were

6    naive.

7         We put them into conditions that were situations that

8    were like city driving and that were like highway driving, all

9    of that done at the Test and Engineering Center in Phoenix by

10   two Ph.D. biomechanical engineers that I worked with to get

11   that done.  So that basically looked at how people really used

12   belts, how people really used belts with sliding latchplates,

13   and then how does that change when you put a cinching

14   latchplate in it.

15   Q    I'm going to come back to that in a moment because I

16   realize I skipped a slide.  My fault.  I want to back up and

17   deal with this one and then we'll come back to where we are.

18   Would you put the next slide up, please?

19        We talked earlier about the fact that you had done

20   some studies, some publication about head excursion?

21   A    Yes.

22   Q    Is this one of the papers that you wrote on that topic

23   that we have up here now?

24   A    Yes.  This is actually a paper that was written in

25   conjunction with Dr. Ed Moffatt at Biomech.  This was a

1    research project that we did in 1997 -- '96, published in '97.

2    And you see that Dr. Moffatt's there, I'm there, Mr. Croteau

3    that you just heard from is there, and a couple other

4    engineers that are actually no longer with Failure Analysis.

5              This was one of the very first studies that was done

6    to look at restraint geometry variations with the use of a

7    cadaver.  So we were actually using human subjects to within

8    limits, ATDs, or anthropomorphic test devices, dummies, and

9    then comparing them with human cadavers.  It was done at the

10   same time as some other research, published at the same time

11   as other research, but it was really kind of at the forefront

12   of its -- of the science at the time.  And as a small part of

13   this, we actually did look at the effect of cinching

14   latchplates, sliding latchplates on head excursion.

15   Q    So that was part of the background that you had before

16   you came to the question in this case?

17   A    Yes.

18   Q    Then if we would -- coming back then to what you call the

19   naive subject study you did, what do you mean by a "naive

20   subject"?

21   A    Naive means in this context that they don't know what --

22   they know they're at a test facility.  They know that we're

23   looking for something.  They don't know what we're looking

24   for.  And that's really the art of the science of naive

25   subject study.  You have to configure the study so that they

1    don't know what you're actually measuring; otherwise, that

2    knowledge contaminates what they do.

3         So it's a very systematic, very careful process to

4    put them into a situation, in some cases actually misleading

5    them as to what you're looking for so that they don't

6    contaminate the results.

7    Q    Now, does it take a little doing to construct a naive

8    study so you can figure out how you're going to do this to get

9    the information you want without contaminating the subjects?

10   A    Yes.  In this particular case, it was very challenging.

11   Q    Before we describe what your procedure was, if I can give

12   you a contrast, you are familiar -- you've read Mr. Sicher's

13   deposition and report, have you not?

14   A    Yes.

15   Q    Do you recall his description of what his company did

16   where they told their own employees to read an owner's manual

17   and then adjust the seat belt that way before they started

18   testing?

19   A    Yes.  Obviously, they know that they're testing a seat

20   belt, and that spoils the naivety of that subject right there.

21   Q    What are you trying to find out when you do a naive --

22   what question were you trying to ask -- answer when you did

23   that naive study?

24   A    Well, I have obviously observed people using seat belts

25   for most of my professional career -- on the highways, when

1    I'm in cabs in particular, and on airplanes.  So what we were

2    really trying to answer was, we were trying to collect data

3    that either supported or refuted my feeling that people when

4    they're using cinching latchplates tend to adjust them for

5    comfort.  They don't tend to cinch them up.

6         You see this on airplanes all the time.  When there's

7    some turbulence, people cinch up their latchplate, and then

8    when it's quiet they get comfortable.  They relieve that

9    tension a little bit.

10        So my experience has been that people with cinching

11   latchplates in automobile environments that are traveling will

12   tend to wear it more loosely.  The cinching latchplate is an

13   active device, that is, it requires user input.  It does not

14   auto adjust.  So if I want my lap belt to be slack, all I have

15   to do is tip the latchplate, move a little webbing in, and it

16   stays slack.  The sliding latchplate does not allow that.  So

17   if I pull slack into the lap belt, the retractor simply, over

18   a few seconds, works it back out and puts it back to where it

19   should be.

20        So I was interested in understanding, first of all,

21   is that true -- do people generally adjust it less than

22   optimally? -- and how does it compare to the usefulness of

23   single-slot sliding latchplate?

24   Q    Now, in order to conduct this study, did you collaborate

25   with your former colleagues at Exponent?

125

1   A    Yes.

2   Q    Did you use their test facilities?

3   A    Yes.  It was done at the Test and Engineering Center in

4   Phoenix.

5   Q    Could you describe -- actually not the video but the next

6   slide.  Thank you.

7        Before we get into what you found here, describe for

8   the jury, if you would, what the procedure was.  How did you

9   set this test up?

10  A    Basically, we had nine people come in.  This lists the

11  nine people.  We had both males and females, different age

12  groups, different heights and weights.  And you can see on the

13  right side of the screen there the BMI percentage.  So we

14  tried to cover a wide range of body types and operators.

15  Q    And why?

16  A    Because we're interested in how people at large would use

17  the system, not just a specific type of person, specific size

18  of person -- because, remember, restraint systems are designed

19  not only for a variety of crash scenarios, but they also have

20  to fit a wide range of people, from fifth females, 110-pound,

21  five-foot females, up to 95th males, 227 pounds, 6-foot.  So

22  we wanted to cover the range over which -- to the best of our

23  ability over which these restraint systems would be applied

24  normally.

25  Q    Mr. Cooper, then you've got your test subjects.  They

1    cover a range of sizes and shapes.  Then what else did you do

2    in constructing the study?

3    A    We basically developed a questionnaire that more or less

4    kind of distracted them from the actual activity.  They were

5    put through a series of driving scenarios and different

6    vehicles with different latchplate configurations,

7    specifically sliding and cinching.  The challenge in the study

8    was to be able to measure the location of the latchplate

9    without the guy that's wearing it knowing that you were doing

10   that.  You simply couldn't jump in there with a tape measure

11   and say, "Look the other way; I'm going to make this

12   measurement."  That would have spoiled the subjects.

13          So the engineers at Exponent came up with a very

14   clever use of invisible ink.  We marked the belt every inch

15   with this fluorescent ink.  And you can see on the bottom

16   that's the same belt under a black light versus nonblack

17   light.  So we have a UV flashlight that we're using.

18   Q    All right.  We've zoomed in on this now.  This is an

19   actual seat belt?

20   A    Yes.  This is the test seat belt.

21   Q    We can see that you've put inch and a half-inch marks

22   along the length of the fabric?

23   A    Correct.

24   Q    And we can read some handwritten numbers that go with

25   them?  Measurements?

1   A    Yes.

2   Q    Why are we able to see this?

3   A    Because it's being illuminated with a black light,

4   effectively.  You can see the clamp -- the example here is

5   this clamp.  That's one of your typical spring clamps.  It's

6   glowing; so it's fluorescing.  So this is effectively

7   fluorescent ink.  When we light it up, we can see it on the

8   camera, and we can see it with our eyes, but when we take the

9   black light away from it, you can't see any of it.

10  Q    All right.  And so we've got a seat belt that you've got

11  these hidden inch marks on?

12  A    Correct.

13  Q    And then what else did you do to set up this test so that

14  you could document how people were actually using a cinching

15  latchplate?

16  A    We've got a number of cameras.  There are two cameras

17  mounted to the dash.  So the subjects know that they are being

18  watched, they know this is being recorded, but they don't know

19  what we're looking for.  So these are more or less

20  distractions for them.  One of the researchers is in the back

21  seat behind them.

22  Q    Next slide, please.  I say that because you've got a

23  picture of her here.

24  A    Yeah.  Yeah.  That's one of the researchers, Sara.  She

25  has the black light in her hand, and she has a little camera

1    that she's using.  And you notice our subject here is looking

2    out through the window.  We did this in a way that we would

3    stop and have somebody interviewing them through the window

4    while we were documenting where the belt was so that they

5    never knew that Sara was over there with a camera and her

6    flashlight getting the data that we needed.

7    Q    Now, if we could -- can we go to the video and then come

8    back to this page in a minute?  We have a video clip.  Let

9    me -- don't run it yet.  Was there video recording going on

10   through the cameras throughout this process?

11   A    Yes, continuous.

12   Q    And we're not going to go through all of these.  We're

13   not going to go through most of them.  We're going to go one

14   example.

15   A    It's a lot of footage.

16   Q    Just one example of what one of these subjects did in

17   this procedure, all right?

18   A    Yes.

19   Q    And that's what's on this video.  All right.  So before

20   we actually go any further, if we can pause that, this would

21   be the researcher we saw?

22   A    Yes.

23   Q    And this is going to be the person who is going to get in

24   this vehicle without having been told the purpose of what

25   you're doing?

1   A    Correct.

2   Q    Would you roll it, please?

3                    **(VIDEO PLAYED.)**

4   Q    Stop it there.  No.  She's just buckling it in at that

5   point.

6            And, Mr. Cooper, can you see the lap belt portion?

7   A    Yes.

8   Q    Does that look properly adjusted to you?

9   A    Not at this point.

10  Q    Then let's watch and see what she does.  Pause it there.

11  Whoops.  Arm got in the way.  There, pause it there.

12           Does that look like a properly adjusted lap belt

13  portion to you?

14  A    No.  And as you saw when she put it on, she kind of

15  struggled with it a little bit.  She tipped it and brought

16  webbing into the lap portion, and then she plugged it in and

17  then didn't go back and cinch it.  In fact, she has the habit

18  of wearing the torso belt under her outboard arm, which is

19  completely separate from this case but just an interesting

20  observation.

21  Q    Now, if she doesn't come along and do something to change

22  it -- this is our cinching latchplate right here; correct?

23  A    Correct.

24  Q    So is that cinching latchplate then going to keep all

25  that slack in that lap belt?

1    A    Yes.  It will allow for -- there will be over time some

2    movement, but unlike the sliding latchplate which would

3    immediately start trying to take this extra webbing out

4    through the retractor force, it pretty much stays there.

5    Q    Let's just roll through the rest of this, then.

6                        **(PLAYING VIDEO.)**

7    Q    We're going to be -- if we pay attention to our

8    researcher here, see what she does.

9    A    He's currently being interviewed through the window.

10   Takes a picture, illuminates it.  And obviously in this type

11   of study you have to be very careful about contamination.  So

12   part of this is to verify that we don't contaminate them.

13   Otherwise, it's not a valid data point.

14   Q    Now, she's gotten the measurement; right?

15   A    Correct.

16   Q    And it doesn't appear that the driver was even aware of

17   it?

18   A    Yes.  None of -- also this process goes through an

19   internal review board to look for safety issues, and then

20   there's an exit interview that's done to where we try to

21   understand whether or not they had a clue of what we were

22   doing.  I think generally in this -- well, in this case none

23   of them knew what we were doing.

24   Q    So you do this with a bunch of people.  And you did the

25   same thing with the production seat belt, one like this.

1    That's the way it came with this --

2    A    Correct.  Correct.

3    Q    And then did you compare them?

4    A    Yes.

5    Q    And was that, in fact, the point of doing this?

6    A    The point was to understand what people do and how they

7    would use it in as close to a real world environment as we can

8    get.

9    Q    And back to the slide that we were on before, if you

10   would, please.  Next slide.  Okay.

11         So what did you find?

12   A    So we collected, as you can see, an awful lot of

13   measurements here.  So we've got a city driving test.  We've

14   got road-tripped driving task.  We've got cinching and sliding

15   latchplates before and after.  So we're looking at how they

16   initially configured it, how it was configured after they

17   finished the task.  Lots of numbers.  The bottom line is what

18   we found was that, on average, the cinching latchplate was 1.7

19   inches looser than the sliding latchplate.

20   Q    All right.  Would you give us the next slide, please?

21         And is that expressed on the bar chart?  And this is

22   a report that you prepared, isn't it?

23   A    Yes.  This was prepared at my direction by Exponent

24   engineers.  So what you see is that there's substantially more

25   webbing out for the cinching latchplate than for the sliding

132

1    latchplate.  I think a fellow had as much as 3 1/2 inches of

2    extra webbing.  But on average it was 1.7.

3    Q    Let me ask you this, Mr. Cooper.  If it turns out that

4    you have a cinching latchplate but you don't have it properly

5    adjusted so you've got extra lap belt length, can that provide

6    you any even theoretical benefit in a rollover over the

7    sliding latchplate that came with the vehicle?

8    A    No.  In fact, this was -- I mentioned earlier that in the

9    1997 research we had studied this, and we studied in fact this

10   exact phenomenon because that was the general thought at that

11   time; that the active nature of having to adjust that cinching

12   latchplate would be a detriment to its performance.

13   Q    As between the two, the cinching latchplate and the

14   free-sliding latchplate like we have in the production

15   vehicle, which one is more conducive to being properly

16   adjusted more of the time?

17   A    In my opinion, it's clearly the sliding latchplate

18   because it allows for motion, it allows you to slide up in the

19   seat, and then when you get back into the proper position it

20   automatically adapts to that.  If you manually change that

21   cinching latchplate, you have to manually change it back.  And

22   if you don't do that, you don't have the benefit.

23   Q    Now, Mr. Cooper, with this information in hand, did you

24   use the information that you had obtained from this naive

25   subject study for any further analysis or work on the case?

1    A    Yes.

2    Q    Would you explain that, please?

3    A    We then did a surrogate study and inversion study, and

4    part of that was to investigate the effect of the cinching

5    latchplate, and we utilized this average comfort adjustment,

6    if you will, in that study.

7    Q    All right.  Now, let's touch upon that.  Surrogate study?

8    You mean what by that?

9    A    A surrogate study is a basic study in this area where we

10   take a vehicle that's as similar as we can find and we try to

11   find a person that's as close to the actual person of interest

12   as we can.  That's the surrogate.  We put them in the vehicle

13   with everything about the vehicle adjusted per our

14   inspections, and we try to figure out what the data on the

15   webbing means and try to understand that "how was it being

16   used?" question.  And then in addition to that, we can put it

17   into a spit, invert it, and we can look at the effectiveness

18   of these proposed countermeasures.

19   Q    Now, up through the time when you were looking at the

20   effectiveness of Mr. Sicher's proposed countermeasures, was it

21   still your understanding that the countermeasure with respect

22   to the latchplate that he had proposed was a cinching

23   latchplate, not the so-called cinching/sliding?

24   A    Correct.

25   Q    When did you first hear the claim that what he really

1    meant was cinching/sliding?  Before or after you had done all

2    of your analysis and testing?

3    A    I think it was after.  It wasn't until trial.

4    Q    Okay.  You get a surrogate.  You want them to be at least

5    hopefully as close in size to Dr. Roberts as you can get?

6    A    Correct.

7    Q    Then once you got your surrogate, what did you do?

8    A    Put them in the vehicle.  I looked at normally seated

9    with the original equipment restraint system in place.  I

10   tried to -- I looked at all that data, all those folds, all

11   that stuff that I documented on the webbing to see if that

12   told me anything, and I concluded that it did not.

13        While there is clear evidence of use, there is clear

14   evidence of interaction with the occupant, there is nothing

15   that I can rely on in terms of an alignment mark.  And an

16   alignment mark is something that tells me where the webbing

17   was either at the latchplate or at the D-ring when it was

18   loaded.  I just didn't find that.

19        So next step is then all of our follow-on work has to

20   be done in a normally seated condition.  Sometimes I see

21   evidence that suggests that people were surprised, they sat up

22   in the vehicle before the accident occurred, or they're out of

23   position, they're reaching down or doing something.  Sometimes

24   I can determine that.  In this case I could not.  So we

25   assumed that she was in a properly seated position for

135

1    everything going forward.

2    Q    I want to make sure that this point is clear.  Did you

3    find evidence that she actually was in a properly seated

4    position, or did you simply not find evidence that allowed you

5    to draw a conclusion?

6    A    There was no evidence to suggest one way or the other.

7    So the follow-on work was done with the assumption that she

8    was properly seated.

9    Q    All right.  Then if we can just -- on the just the

10   surrogate information so we can see who was being used.  We

11   have a 29-year-old female, 65.2 inches tall, 177 pounds.

12   A    Correct.  Within our 10 percent target.

13   Q    So she might have been a little heavier than what we

14   understand for Dr. Roberts?

15   A    Little heavier, slightly shorter, I think.

16   Q    And her seated height was 35.2.

17   A    Correct.

18   Q    And by "her,"" I mean your surrogate, not Dr. Roberts?

19   A    Yes, sir.

20   Q    Because we don't know.

21   A    We don't know.

22   Q    If you would go to the next slide, please.  What are we

23   looking at here?  Let's get just -- yeah, thank you.

24   A    This is our surrogate van, and we've got it configured so

25   that it's going to go into what's called the roll spit.  This

1    is a very large fixture.  It's basically two jacks, one at

2    each end, that lifts the platform up, and then we can

3    literally rotate the entire vehicle upside down.  It's

4    chained.  It moves relatively slowly.  The vehicle is chained

5    to the structure.

6         It allows us to turn an occupant, a human, upside

7    down safely.  So it's very robust, very well-engineered.

8    We've done this literally hundreds of times.  But that's the

9    basic configuration.  We're going to pick it up, and we're

10   going to turn it over in a controlled fashion.

11   Q    All right.  Can we have the next slide, please?  There we

12   go.  Now, what are we looking at here?

13   A    So this is our surrogate that we found.  She's in the

14   vehicle, and I believe this is probably the OE configuration.

15   So we've got her in the vehicle with the seat adjusted per the

16   measurements that were taken at the various inspections.  We

17   asked her questions like "Would you drive the vehicle from

18   this position?"  "Is it comfortable?"  "Is it reasonable?"

19   When the answer is "yes," we move forward.

20   Q    Now, Mr. Cooper, let me stop you.  You referred to the OE

21   configuration.  What is that?

22   A    Sorry.  Original equipment.  That's what comes with the

23   vehicle.

24        Also notice that she's got a blue swimmer's cap on.

25   She had a fairly nice hairdo, and sometimes that interferes

1    with our ability to take pictures and show you how her head

2    might interact with the roof.  So this is kind of typical of

3    certain hair styles; that we'll ask them to put a swim cap on,

4    and we use the swim cap to contain the hair.

5    Q    Looking at these four photographs that are included in

6    this slide, we see this young woman from a variety of

7    different perspectives?

8    A    Yes.

9    Q    All right.  Next slide, please.  What have we got here in

10   the upper-left corner of the next slide?

11   A    Okay.  As part of the study what we're going to do is

12   we're going to look at these proposed countermeasures.  So

13   we're going to need to take the same van which comes with a --

14   what's called a body-mounted system, and we're going to need

15   to put in it a seat that incorporates a seat-integrated

16   restraint or all-belts-to-seat type of configuration.  You

17   can't just take a seat from another vehicle and stick it into

18   a vehicle and assume that it's in the right place.

19           There is a very specific technique defined by the

20   Society of Automotive Engineers for establishing the seating

21   reference point.  This machine that you see is a very

22   expensive piece of equipment that is designed to standardize

23   seating locations in the vehicle.  It's called an H-point

24   machine, and what you do with it is measure the standard

25   seating reference point.

1   Q    Is that machine used for Federal Motor Vehicle Safety

2   compliance?

3   A    Yes.  It is part of the process of documenting the

4   vehicle, the occupant compartment, and the geometry of the

5   restraint system relative to that occupant compartment.

6   Q    Then just one thing very quickly before I forget.  You

7   mentioned that you have to put the seat in the right place.

8   You can't just stick it in to another vehicle?

9   A    Correct.

10  Q    For example, are all seats the same height off the floor?

11  A    No.

12  Q    And in a van do seats tend to be in the same geometric

13  orientation as they are in a convertible?

14  A    No.

15  Q    What's the difference?

16  A    Typically, it's a taller vehicle.  People like to sit up

17  higher; so it's typically a little higher.  Cars or passenger

18  cars are typically a little more reclined, a little lower in

19  the vehicle.

20       MR. HANSON:  All right.  Is this as good a time as

21  any, Your Honor?

22       THE COURT:  Yes.  Absolutely.

23       Ladies and gentlemen of the jury, we'll take our

24  evening recess at this time.  Recall the admonition.  See you

25  tomorrow morning at 9:30 in your jury room.

1                    **(VOLUME 8-B CONCLUDED AT 5:00 PM.)**

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 139 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 6th day of April, 2016.


_____
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter