UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAURETTA ROBERTS,               )
                                )
            Plaintiff,          )
                                )
      vs.                       )   No. 4:13-CV-541 CAS
                                )
GENERAL MOTORS, LLC,            )
                                )
            Defendant.          )


TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE CHARLES A. SHAW
UNITED STATES DISTRICT JUDGE

Volume 4B
March 31, 2016


APPEARANCES:

For Plaintiff:        Mr. John G. Simon
                      Mr. Kevin M. Carnie
                      THE SIMON LAW FIRM, P.C.
                      800 Market Street
                      Suite 1700
                      St. Louis, MO  63101

                      Mr. Gary K. Burger, Jr.
                      BURGER LAW, LLC
                      500 North Broadway
                      Suite 1350
                      St. Louis, MO  63102


For Defendant:        Mr. Kent B. Hanson
                      Mr. Mickey W. Greene
                      HANSON BOLKCOM LAW GROUP, LTD.
                      527 Marquette Avenue
                      Suite 2300
                      Minneapolis, MN  55402

For Defendant:          Mr. Thomas M. Klein
                        BOWMAN AND BROOKE, LLP
                        2901 North Central Avenue
                        Suite 1600
                        Phoenix, AZ  85012


REPORTED BY:            SUSAN R. MORAN, RMR, FCRR
                        Official Court Reporter
                        111 South 10th Street
                        St. Louis, MO  63102
                        (314) 244-7983


Proceedings recorded by mechanical stenography, produced by computer-aided transcription.

                        I N D E X

PLAINTIFF'S WITNESSES


STEPHEN BATZER

        Redirect Examination by Mr. Simon (Cont'd)........8
        Recross-Examination by Mr. Klein.................14


JAMES P. WHITE

        Videotaped deposition played....................18


LARRY SICHER

        Direct Examination by Mr. Simon.................19

                    E X H I B I T S

                        Offered      Received
PLAINTIFF'S EXHIBITS

    320, 330, 331           13            14

(The following proceedings were held outside the hearing of the jury on March 31, 2016 at 1:43 p.m.:)

MR. HANSON: May I make a brief record here, Your Honor?

THE COURT: Sure.

MR. HANSON: The direct examination that Mr. Simon just did was a direct violation of a motion in limine and agreement made during the pretrial, confirmed on the record, in which it was explicitly agreed that there would be no discussion of rollover propensity, and that's exactly what he got into with all of that 15 passenger van business that he just did. That claim was explicitly withdrawn.

We not only object to that line of questioning, but I move to strike it and ask the jury to be told to disregard it. And I can show the Court where in the record from the pretrial conference this was stated very clearly.

MR. SIMON: Your Honor, we are not making a claim that the vehicle was, you know, defective and the defect caused it to roll over. That's been made clear to the jury. We're making a claim about the seat belt and the roof. That's been abundantly clear --

THE COURT: I don't think that last portion of the direct testimony was -- even though it was redirect -- you're talking about the redirect testimony?

MR. HANSON: Yes.

THE COURT: I don't think that was about rollover propensity. I think it was talking about the degree of harm that could come to a passenger in a rollover in terms of the strength of the roof and the severity of the rollover. I didn't see it as you see it talking about the propensity of the vehicle to roll over.

MR. HANSON: If that was all he had done. There was absolutely no reason for the page after page after page of talking about how difficult it was to control these vehicles and how hard they are to steer, and urging the industry to adopt education so that people would be better at driving. That was all about the rollover propensity.

THE COURT: Well, that portion was -- seemed to me to be about, you know, how to handle these vehicles.

MR. HANSON: Which is not relevant, and that's my point.

THE COURT: Please. You all have put more stuff in that's not relevant. You all seem to think more is better.

MR. HANSON: Judge, I just want to make my record clear that that is a claim that's not relevant to the claims advanced in this case. It's not about quantity, it's about the subject matter. And my record is made.

THE COURT: Well, it's not relevant about what other cars that this witness testified about and what he testified

to about those cars. That got so severe I had to stop it because as I told you up here, talking about specific cars. You know, like I said, my father owned a Buick. You said anything bad about a Buick, that was bad news, you know. And that may be what some of these jurors feel about specific cars, so I thought that was over the top.

I don't see this as being over the top. Anything else?

MR. HANSON: Not right now.

MR. SIMON: No, Your Honor.

THE COURT: Yeah, we are not going to try any cases about other cars in terms of this witness that he testified about this. We aren't going to have a trial about whether or not he was right or wrong and all that stuff in some other trial about some specific defect or alleged defect on an automobile.

(The following proceedings continued within the hearing of the jury:)

THE COURT: Good afternoon, ladies and gentlemen of the jury.

THE JURORS: Good afternoon.

THE COURT: I understand you all want to know about how we're doing in terms of time with this case and completing it, so I'm going to ask these lawyers right now because it seems to me they think more is better,

maybe it's cumulative, you know, beating a dead horse sometimes.

So where are we in terms of time, Counsel?

MR. SIMON:  Your Honor, Plaintiff anticipates calling our last witness on Monday.  Monday would be our last witness in the case.

MR. HANSON:  And I would only ask to be given a little bit of notice when we need to be prepared to have our first witness ready and available to go.

MR. SIMON:  Sure.

THE COURT:  You can't get to your last witness before Monday?

MR. SIMON:  Monday we have -- we'll be filling it up until Monday, but Monday we'll be finished.  Tomorrow, Friday, and Monday.

THE COURT:  That's what I'm talking about, all of you all seems to be filling it up.  It's overflowing.  My cup runneth over.

MR. SIMON:  We'll move it along as quickly as we can.

THE COURT:  See if you all can move better.

MR. SIMON:  Thank you.

THE COURT:  Okay.  You want to finish with Dr. Batzer?

MR. SIMON:  A couple more, Your Honor.

REDIRECT EXAMINATION (Cont'd)

BY MR. SIMON:

Q.    Dr. Batzer, the document that we were looking at, Exhibit 330, that was the document that the National Transportation Safety Board mailed to General Motors back in August of '03.  Does that document support your opinions in this case that roof crush does cause and contribute to cause injury in rollovers?

A.    Yes, sir, it does.

Q.    And does it support your opinion that Federal Motor Vehicle Safety Standard 216 is not sufficient as far as protecting occupants in rollovers?

A.    For the 1.5 standard, yes.

Q.    And, sir, you heard, or you remember the provision in the document where the Safety Board was asking General Motors to voluntarily redesign its vans to minimize the extent which survival space is compromised.  Let me ask you this, that was August 4th of 2003.  Have you seen any evidence that General Motors made any changes to the roof structure in the 610 van?

A.    No, I have not.

Q.    Okay.  And one other -- Dr. Batzer, I want to clarify something on my calculations, okay.  And we did this calculation of the two-sided test.  And we calculated the strength-to-weight ratio.  Do you recall that?

A.    Yes.

Q.    Okay.  I'm going to see if you can see part of it also so everybody can see it.

MR. SIMON:  Can everybody see it okay?  Okay.

Q.    And the right side -- I'm sorry, side one was 2.27, right?

A.    Right.

Q.    And then we calculated side two with -- at 1.5, okay. And then we calculated -- and that was with the unloaded vehicle weight, right?

A.    Yes.

Q.    And then we calculated the second side crush using the gross vehicle weight of 8,600 pounds, correct?

A.    Yes.

Q.    And the report that we did that with, we did it from, was it 4.2 inches?

A.    Yes.  4.1 I think.

Q.    And that was the information I pulled off the graph on the document, right?

A.    Yeah, from the table.

Q.    Okay.  And you pointed out to me over the break there's actually a curve that shows, you know, how much the force is at each point in terms of the deformation, correct?

A.    Yes.

Q.    So, in other words, we could go back and actually be more accurate and show what it was at five inches, correct?

A.    Yes.

Q.    And we did that, I did that with you over the break, right?

A.    Yes.

Q.    And so let me flip -- I can save some time, I got it up here.  This is the revised calculations, correct?

A.    Yes.

Q.    Okay.  And so, and so we're clear, the other one is accurate, but it's accurate at 4.2 inches, right?

A.    Yes.

Q.    And this is accurate at the exact five inch deformation, correct?

A.    Yes.

Q.    And so the May 8th, 2007 test, side one, strength-to-weight ratio is still 2.27, right?

A.    Yes.

Q.    But then side two, if we go out to five inches, the force was a little higher, correct?

A.    Yes.

Q.    Okay.  And specifically I think you said that the force at five inches, it was about 40,000 newtons, it would be about 8,992 pounds, right?

A.    Yes, exactly.

Q.    So, in other words, if we -- this is at 4.2, the first set of calculations, this is at five inches.  The

strength-to-weight ratio would be 1.65 using the unloaded weight of the vehicle at five inches, correct?

A. Correct.

Q. And then it would be 1.05 using the gross weight of the vehicle; is that correct?

A. The fully loaded weight, yes.

Q. The fully loaded weight. And then if we apply the General Motors margin of safety of 20 percent, would either of those -- this certainly wouldn't be -- this is below one, right?

A. Correct.

Q. And this would not be above 1.5, correct?

A. Well, if you added the 20 percent to the 1.5, you get 1.8. And since on the second side it's 1.65, it's less, and so they don't meet their own internal criteria.

Q. Very good. Okay. And then finally I want to ask you briefly about what we've marked as Exhibit 331.

MR. SIMON: And 331, if we could put that up, please, Jason.

Q. This is from August 23rd, 2005. And this is from the Federal Register, right?

A. Yes, sir.

Q. And it's the proposed rule for the new 216, correct?

A. Yes.

Q. Okay. So this is what -- this is what the government

was proposing for the new 216 in August of '05, correct?

A.   Right.

Q.   Okay.  And down on the bottom right-hand corner, I just want to go over what their proposal was at this time.  Okay. It says, "A part of a comprehensive plan for reducing serious risk of rollover crashes and a risk of death and serious injury in those crashes, this document proposes to upgrade the agency's safety standard on roof crush in several ways. First, we're proposing to the extend the application of" -- next page, please -- "the standard to vehicles with a gross weight rating of 10,000 pounds or less."  Is that right?

A.   Yes.

Q.   So, in other words, in '05 the federal government is proposing to extend the standard to vehicles up to 10,000 pounds?

A.   Yes, sir.

Q.   Which would include the van in this case?

A.   Yes.

Q.   Okay.  And then it goes on to say, "We are proposing to increase the applied force to 2.5 times each vehicle's unloaded weight, and to eliminate existing limit on the force applied to passenger cars."  Correct?

A.   Yes.

Q.   And is it your understanding at least at this time it was NHTSA's proposal to apply 2.5 to -- as a minimum standard

to the vans up to 10,000 pounds?

A.    Yes.

Q.    Okay.

MR. SIMON:  Your Honor, Plaintiff would move for admission of Exhibits 329, 330, and 331.

THE COURT:  Well, let me say this first.  I've kind of rethought that request by Mr. Hanson there, and I'm inclined to instruct the jury, because there is no claim about handling.

MR. SIMON:  Sure.  Absolutely, Your Honor.

THE COURT:  And I'm also going to instruct them about the questioning of this witness about specific cars.

Ladies and gentlemen of the jury, there is no claim in this case about the handling of the vehicle in question and its likelihood that one needed training as to how it might not handle well and so forth.  And I know there was some testimony about that.  That is not part of this case so disregard that.  Put it out of your minds.

Also earlier on yesterday during this witness' testimony, and I had the lawyers up to the bench about that, there were questions of this witness about him testifying in specific cases about specific cars.  We're not going to try those other cases about those other cars.  The fact that he testified in other cases, you know, for whatever car companies, fine, but as to specific cars and the specific

problems that he may have testified to about those cars, that is not relevant in this case, so disregard that also.

So with that understanding, if you're introducing exhibits with that language in them about the --

MR. SIMON: We'll redact that, Your Honor.

THE COURT: -- maneuverability of those vehicles, redact that, okay?

MR. SIMON: Yes, sir. So Plaintiffs move for admission of Exhibit 329, 330, and 331 with the redaction of the information as Your Honor has indicated.

MR. KLEIN: They are all hearsay, and I'd object based on Rule 803(18).

THE COURT: Very well. They will be received.

MR. SIMON: No further questions, Your Honor.

RECROSS-EXAMINATION

BY MR. KLEIN:

Q. Mr. Batzer, all the math that was on the easel --

MR. SIMON: You still need that?

Q. All the math that was on the easel, does the GMT 610 still comply with the FMVSS 216 as it is written in 2016?

A. Yes.

Q. And the stuff about in 2005 they were looking at something different, the safety standard they actually implemented for a van, a vehicle over 6,000 GVW is 1.5 times the vehicle weight, right?

A.    Yes.

Q.    And the math you did with counsel where he increases the number to the GVWR, you could do that with any of those vehicles on the list and it would lower the number, right?

A.    That's true.

Q.    The test, you looked at the interior view, the passenger demi of the dolly rollover, the 30 miler per hour dolly rollover that GM did of the GMT 610.  Do you recall that?

A.    Yes.

Q.    Can we look at driver dummy just briefly, the interior view.  This is Exhibit -- part of Exhibit 46-1.  I think that is looking at the driver dummy.  I'm sorry.

MR. KLEIN:  I'll tell you what, Kyle, forget it.

Q.    The seat belt does not slip on the driver dummy, does it?

A.    No, the driver goes towards the wall where it's anchored and so he does not slip.

Q.    Right.  And do you know what the testimony is with respect to whether Dr. Roberts stayed inside her shoulder belt?

A.    I believe she did.

Q.    She did.  So all that stuff showing that the shoulder belt comes off the passenger dummy in that one test isn't what the testimony is happened to Dr. Roberts, right?

A. Correct.

Q. Okay. Last thing, if you have the version of that where we turned it upside down. What's going on, the jury recalls this test, it goes on its side and then goes on its roof and stays on its roof and slides to a stop, right?

A. Yes.

Q. So all of this is happening upside down, and this is how we've got the video oriented now. So counsel asked you, the roof comes down and hits the dummy on the head. The roof is on the ground, but the ground didn't come up, right?

A. Well, it's all a matter of perspective. If you are in the vehicle it comes in and down. If you're on the outside it stays in one place.

Q. So the dummy is moving down. We see it in the video now, it's properly oriented. That's what's going on at the time, right?

A. It's not sure it's properly oriented, but it's oriented level with the people from the outside of the vehicle.

Q. We can kind of count the rings on the dummy's neck again and see compression. What we would then do is look at the data to see where exactly the compression occurred of the neck with respect to anything that's going on with the roof, right?

A. Yes.

Q. And there's the compression, and now it's back into

extension, right?

A.    I saw lateral bending, I think I saw some compression, I'm not sure I saw it's bending there.  I haven't looked at the injury data on this dummy so I couldn't give you a good answer.

Q.    All right.

MR. KLEIN:  And, Kyle, if we can go back to 7512-3.

Q.    This is the still photograph.  This is the van back up on its side.  So this is looking at the passenger side.

A.    Yes.

Q.    So the dummy is inside that white netting that's right here, right?

A.    Yes.

Q.    The dummy we were just looking at.  So can we agree, sir, that at no point in this test did the roof deform to the point where it was pushing the dummy into the ground?

A.    Correct.

Q.    All right.  Thank you, sir.

MR. KLEIN:  That's all the questions I've got.

MR. SIMON:  Nothing further, Your Honor.

THE COURT:  Thank you, Dr. Batzer.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. SIMON:  Your Honor, at this time Plaintiff would present the videotaped deposition of Mr. James White.  This

deposition was taken on December 10th of 2015. And Mr. White is the corporate representative for General Motors on seat belts.

(The videotaped deposition of James P. White taken on December 10, 2015 was played at this time.)

THE COURT: Ladies and gentlemen of the jury, we'll take our afternoon recess at this time. Recall the admonition. Return to your jury room at 20 minutes to four. Recall the admonition.

(Court in recess from 3:17 p.m. until 3:46 p.m.)

(The following proceedings were held outside the hearing of the jury:)

THE COURT: When do you all expect to bring that exhibit in of the van?

MR. HANSON: I don't mean to equivocate, but I do need to know when we're going to start our case. But right now I expect it to be maybe Wednesday probably is my best guess right now, Wednesday next week.

THE COURT: Well, because various people in this building got to be coordinated to get things in.

MR. GREENE: They are talking and e-mailing directly so they don't need my help with that.

THE COURT: I want it to flow smoothly. You know, I just look at this deposition. You know, you ask these questions about three times. You know, by that time the jury

is forget it.  I know.  He says he doesn't know the answer, okay.  Whatever.

MR. HANSON:  If anything shifts on that timing we'll be letting people know.  That's as close as we can get now is to say probably Wednesday.

THE COURT:  Okay.  Well, the show must go on.

(The following proceedings continued within the hearing of the jury:)

THE COURT:  Good afternoon again, ladies and gentlemen of the jury.  Shall we continue?

MR. SIMON:  Thank you, Your Honor.  Your Honor, there's about 15 minutes left of this deposition and then we'll be calling Mr. Larry Sicher.

(The videotaped deposition of James P. White taken on December 10, 2015 continued to be played at this time.)

MR. SIMON:  Your Honor, that completes the deposition of Mr. White.

THE COURT:  Very well.

MR. SIMON:  Your Honor, at this time Plaintiff would call Mr. Larry Sicher to the stand.

THE COURT:  Very well.  Go ahead.

MR. SIMON:  Thank you, Your Honor.

LARRY SICHER,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SIMON:

Q.   Mr. Sicher, would you state your full name, please.

A.   Larry Andrew Sicher.

Q.   And what do you do for a living?

A.   I'm a forensic engineer with a company called ARCCA.

Q.   Okay.  And I asked you to get involved in this case, my office, correct?

A.   Yes.

Q.   To address some seat belt issues, right?

A.   Yes.

Q.   And I want to sort of narrow down what you've been asked to do in this case so the jury understands it at the get-go before we get started, okay?

A.   Okay.

Q.   You're aware in this case that it's General Motors' position that the belt, the belt system in the 610 allowed Dr. Roberts to dive into the roof and caused her cervical injury.  You're aware of that?

MR. HANSON:  Objection, misstates our position. That is not our case.

THE COURT:  I think you need to rephrase that.

BY MR. SIMON:

Q.   You're aware of torso augmentation or diving, correct?

A.   Yes.

Q.   Okay.  And you're aware that's what General Motors says happened in this case to Dr. Roberts, correct?

A.   Yes.

Q.   Even though she had the belt on in the van?

A.   Correct.

Q.   Okay.  And are you also aware -- let me tell you this, in opening statement in this case the jury heard from counsel for General Motors that there was no belt system that -- there is nothing that General Motors could have done.  There was no magic belt system was the word that was used in opening.  Do you agree with that?

A.   I do not.

Q.   Okay.  As a matter of fact you think there are many things that could have been done to reduce or mitigate or lessen the excursion or the diving, correct?

        MR. HANSON:  Objection, it's leading.

        THE COURT:  Sustained.

Q.   Is that correct, sir?

A.   That's correct.

        THE COURT:  Ask him a question.

        MR. SIMON:  Yes, sir.

        THE COURT:  See, you all have been testifying. There are things -- ask him, is there.

        MR. SIMON:  Yes, sir.

BY MR. SIMON:

Q.    And, Mr. Sicher, what were you asked to do?

A.    In this case I was asked to look at the seat belt system that was installed in Dr. Roberts' vehicle and then look if there was any alternatives available that would have changed or reduced the excursions that were provided with the production seat belt that was in the 2004 van.

Q.    And you've done that, correct?

A.    Yes.

Q.    Okay.  And you're ready to talk about what you've done and your opinions with the jury, correct?

A.    Yes.

Q.    Before we get into that I want to get into your background, your training and education.  Is that okay?

A.    Yes.

Q.    Okay.  Why don't you tell the jury what your formal education has been, Mr. Sicher.

A.    I have a bachelor's of science in mechanical engineering from Penn State.  And then I have a couple of master's degree courses, but I do not have a master's degree.

Q.    And the graduate studies, what did those involve?

A.    They were primarily numerical computations and reliability and statistics.

Q.    Okay.  And now you worked at the Naval, was it the Naval Air Warfare Center from May of '91 to February of '96?

MR. HANSON: Objection, leading.

Q.   Did you work at the Naval Air Warfare Center, sir?

A.   After graduating college I worked for five years as a civilian employee to the Navy.  The facility was called originally Naval Air Development Center, and then halfway through my time there it changed to Naval Air Warfare Center, so I spent five years working there.

Q.   Okay.  And can you tell the jury, please, what kind of projects did you work on while you were at the Naval Air Warfare Center.

A.   I worked on primarily ejection seats for tactical aircraft, so F-14, F-18, the old A-4, basically any of what we call fighter jets, the tactical aircraft.  If it took on and off of a carrier platform, I worked on the ejection seats, the restraint systems, the emergency systems that go along with the -- that the air crew has with them.

And I also worked or as part of that work we did a number of different types of tests, tests that wind blast, what we called sled tests, what we call ejection tower tests where we basically have an ejection seat on a simulated -- put on a set of rails essentially, and we would do a controlled blast to see how the seats would perform under different ejection scenarios with different size test dummies.

Q.   And what's "excursion"?

A.    "Excursion" is -- we just heard it a little bit earlier, is essentially it's looking at the relative motion from where you start out to where you move to.  So if you start out here and move to there, you've had an excursion of that four inches.  "Excursion" is the movement you've had from a starting point to an ending point.

Q.    So movement is another word for excursion?

A.    Correct.

Q.    Okay.  And so if -- let me ask you this.  Did any of the work that you did at the Naval Air Warfare Center have to do with evaluating excursion in various belt systems or restraint systems?

A.    Yes.

Q.    Tell us about that, please.

A.    Okay.  One of the unique things about a fighter aircraft is it's going to be going up, down, left, right.  And at the carrier landings it comes to a hard stop.  On takeoff it goes to a very accelerated takeoff.  So during all of those crash modes you're wanting to keep the pilot or the air crew, if it's an air crew, the pilot in their position as best you can.  You want to restrain them.  And you want to do that because in an ejection scenario, and you never know when the ejection scenario is going to happen, you want to keep that pilot in a position where you have a pretty good idea of where they are at.  That way they are in that position for

the ejection sequence.

So we're looking at on ejection seats restraints from the human body perspective basically up, if they are pulling what we call negative Gs, left and right if they are turning hard left or right. Front if they are landing. And to the rear you have a seat back. So that's not a factor for the restraint harness itself.

Q. Did any of your work look at reducing excursion, like lateral or vertical excursion?

A. Yes, we concentrated heavily on all three directions, up as well as -- left and right I call one direction -- and then forward.

Q. And generally how did you do that? What were you looking at to reduce excursion, what kind of things?

A. Okay. Well, what we look at is how the restraints perform on the body. One of the projects I worked on, we were looking at 12 or 13 different restraint systems because the Navy pilots wear what we call it's a man mounted system. They walk out in a harness. So if you ever see a guy walking out to an aircraft, he's kind of walking a little funny because he's wearing a vest. Essentially it goes around his legs. It's also his parachute harness.

But we were looking at is there a way to have a system sitting in the cockpit so they just go out there, hop in, strap in that way. And as part of that we, of course,

were measuring left right, forward, and what we have call negative Gs.

And that is we would take ejection seats and we'd put them on a huge wheel, and then we would rotate live subjects and we would measure. For this project I was actually one of the test subjects. We would just measure how far the head started out here, turn upside down and where did it move on the board behind you. And we were evaluating the various restraint systems in that regard.

Q. Okay. Now, you heard the term -- you were here for part of Mr. White's depo, right?

A. Yes.

Q. And you heard the term an "inversion test," right?

A. Yes.

Q. What's that?

A. Inversion tests are normally what we call a 1G test. It's a condition where you turn a system -- you know, for us we're dealing a lot more with people in seats and restraints. You turn the seating and restraint system upside down. And you can measure it at 180, which is perfectly upside down. You can also at times measure other angles off of -- you know, if you want to do 90, so completely sideways, you test at 90. You want to do different degrees from 190. But that's the inversion test. It's a test where you've rotated something to an inverted position.

Q.    Okay.  And did you -- when you were with the Naval Air Warfare Center, did you test any other vehicles other than the jets?

A.    When I was with the Navy we primarily tested -- well, I also did some work with helicopters, but most of my work was with ejection seats.

Q.    All right.  Now, what years again were you there?  You were there from when to when?

A.    '91 to '96.

Q.    Okay.  And what did you do after that?

A.    For one year I worked with an engineering consulting company called Information Network Systems.  And I was doing a lot of contract work back with the Navy.  And in that case I was doing some oxygen system work, but I was also doing -- the Navy had developed for ground troops a safety, a combat vest essentially where they could either mount armor to it -- well, they mounted armor and they mounted their gear to it. But it also allowed them to be hoisted out if they needed to be extracted.  We had set it up so there was a D-ring we called it, a big metal loop here, like a carabiner, if you're familiar with climbing terms.  And that allowed the -- and the harness was set up and the whole vest was set up so that they could be extracted without having to wear a special vest.  This vest also accommodated them from being hoisted in that regard.

Q.    And what did you do after that?

A.    Following that I started work with another engineering consulting company called ARCCA, which is where I'm still working.

Q.    Okay.  And can you tell the jury what kind of company is ARCCA?

A.    ARCCA is an engineering forensic company.  We primarily do work involving automobile crashes, some airplane crashes still.  Initially did some more work, continued working with the Navy on some contract work.  We also do a number of other government contracts with the Army.  We've had contracts with the Army, with a group called NIOSH, which is a branch of OSHA.  So OSHA is Occupational Safety and Health.  NIOSH is a subgroup called -- what is NIOSH --

Q.    National Institute of Occupational Safety and Health maybe?

A.    That's it.  Thank you.  They are essentially looking at how to prevent injuries in the workplace.  Whereas OSHA is dealing more with standards and codes and investigating things after the fact, NIOSH is a branch that's being a little more proactive.

Q.    You mentioned work for the Army.  Did you do some testing and work for the Army?

A.    Yes, we've done a number of -- a couple of different contracts with the Army.

Q.    Let me ask you this, where were you at when you did the Army work?

A.    Where was I at?

Q.    Were you at ARCCA or were you --

A.    I was working with ARCCA, yes.

Q.    Okay.  And what time period did you do the Army testing?

A.    I believe we got the first contract soon after I started, so 1997.  And we've had a followup contract I think to that one, which ended in the 1999, 2000 time frame.  There was another subsequent contract, and then we've had a more recent contract maybe five years ago with the Army.

Q.    Okay.  And what kind of vehicles -- or what kind of work were you doing with the Army?  What kind of vehicles, what kind of things were you doing?

A.    The initial work came in as the Humvee.  I think you guys are probably familiar with the Humvee, the replacement for the Jeep.  They were finding a lot of injuries and fatalities were occurring in accidents so they asked us to come in and look at their mishap data and see if we could pinpoint why they were seemingly getting a lot of injuries.

And so we went into their databases and we were collecting the data, and we provided recommendations to them. And built a mockup restraint system and did some testing with the newly designed seating and restraint system to look at

how to reduce injuries.

Q. Okay. Now, you said everybody knows what a Humvee is. Maybe we all don't.

A. Okay.

Q. What's a Humvee?

A. It's a four-wheel drive -- in its basic form it's a four-wheel drive, four passenger -- like I said, it's a Jeep replacement. Kind of a go-anywhere vehicle. The Army uses them as, you know, their get around the town if they are on base vehicles, they use them in combat. Some versions have a machine gun mounted to them. Some versions have an ambulance body mounted to them. So it's kind of their all utility vehicle truck platform, if you will, for the small vehicles.

Q. Now, the work that you did for the Army, the Humvee, as a result of that work was anything published?

A. Yes, there were a number of papers published from that work?

Q. What do you mean by that, technical papers and stuff like that?

A. A number of technical papers, yes.

Q. Okay. All right. And it had to do with the work that you did for the Army on the Humvee?

A. Correct.

Q. Now, let me have you take a look.

MR. SIMON: Jason, could we please go to

Exhibit 130-22.

Q.    And what is this, Mr. Sicher?

A.    This is actually the final report written back to the Army following that contract.

Q.    Okay.  This was a report having to do with the work you did on the Humvee?

A.    Correct.

Q.    Okay.  All right.  And then you also got a patent as a result of that work, correct?

A.    Yes.

Q.    Okay.  And generally what did the patent involve?  What's it about?

A.    The restraint system that we talked to the Army about was what we call an integrated seat belt to the seat system.  So the seat belt is actually mounted onto the seat system and we added a second shoulder belt for them.  And we recommended they put a seat ramp in place to help control your buttocks movement.

Q.    Okay.

    MR. SIMON:  And could we go to, please, Exhibit 130-20.

Q.    Okay.  And what is this, Mr. Sicher?

A.    That's the patent from the Army work, yes.

Q.    Okay.  The Humvee work?

A.    Yes.

Q. Okay. And let me ask you this, other than Army vehicles, have you evaluated restraint systems in cars, passenger cars and so forth?

A. Yes. A lot of the work I do with ARCCA and a lot of ARCCA's work involves investigating everyday crashes that people are involved in.

Q. Okay. And what's your experience in that? Tell us how much of that you've done and how much of it involved belts?

A. I've probably been involved in a couple hundred crash investigations. I've been there for 18, 19 years now. So over the years I think I've done a couple hundred investigations. The majority of them would have to do with either aspects of restraint systems and/or rollover components.

Q. Okay. And could we put up exhibit -- before we get off the Humvee, Exhibit 281, please. Okay. And, Mr. Sicher, can you please tell us what this is?

A. This is one of the technical papers that came out of some of the work we've done with the Army.

Q. Okay. Now, one of the other things you mentioned, you mentioned NIOSH, right?

A. Yes.

Q. And what kind of work did you do for NIOSH?

A. NIOSH, like I said, they are looking at trying to prevent workplace injuries. And one of the things they found

is that the back of ambulances, there are no -- well, some have no restraints, some have lap belt only restraints we call them. But that's the workplace for EMTs. And EMTs are every day in the back of ambulances and being not provided a restraint system, especially when they are standing up or kneeling to treat a patient.

So NIOSH was getting some feedback from some different ambulance manufacturers and other people in the field saying, hey, we really need to look at some restraints in the back of ambulances. So they contracted with ARCCA to evaluate a number of different possible restraint systems that could be used in an ambulance back, but also to allow the EMTs to kneel or stand up to reach and treat patients while the vehicle is in motion.

Q. And what was your involvement in that project?

A. I was one of the co-test engineers in that project.

Q. Okay.

MR. SIMON: And could we put up, please, Exhibit 219.

Q. And what is this?

A. This is a technical paper that came out of that that was written with some of the other NIOSH and ARCCA employees.

Q. Okay. Do you have any other patents that relate to occupant crash protection?

A. I know I have a couple other patents. I believe one of

them is more dealing with mine blasts, so it's occupant

protection, but not -- unless you had a really bad pot hole.

It's not what we're going to encounter.  And I can't remember

what the third patent is dealing with right now.

Q.    And have you published any articles related to occupant

protection in crashes?

A.    Yeah, in total I have about 20 technical articles

published.

Q.    Okay.  And, Mr. Sicher, are you a member of any

professional organizations that relate to what you do, your

area of practice?

A.    I'm a member of the Society of Automotive Engineers,

SAE, as well as the American Society of Mechanical Engineers.

Q.    Okay.  And what's the SAE?

A.    SAE is the Society of Automotive Engineers.  It's a

large body of individuals who basically try and share and

compare information related to automotive issues.

Q.    Now, they have a journal, right?

A.    They publish yearly journals, but they also have

different like conferences where you're invited to bring

papers of different topics, specific topics.

Q.    The reason I ask is some of the articles we're going to

be talking about are SAE articles, they would be Society of

Automotive Engineer publications?

A.    Correct.

Q.    Okay.  All right.  So let's switch gears a little bit. We've talked about your background.  Can you take the jury through what you've done in this case.  In other words, how have you approached this?  When you first got involved, what did you do and kind of take us through what you did, okay?

A.    Okay.  In this case the first thing I did was I reviewed some of the file materials that were provided by Mr. Simon's office.  And then I went and examined Dr. Roberts' van, did an inspection of the van.  And from there I basically compared what happened and what was being said happened to Dr. Roberts with the available information and with what else was technically available compared to the restraint system found in her van.

Q.    And you've got examples of restraint systems and latch plates and stuff like that, correct?

A.    Correct.

Q.    And we're going to have you show them to the jury and explain them to them, correct?

A.    Hopefully.

Q.    Okay.  All right.  So you prepared a report in this case, right?

A.    Yes.

Q.    Okay.  And if we could put up the first page of Exhibit 130-3.  And, Mr. Sicher, this is your report; is that right?

A.    Yes.

Q.    Okay.  And also could we put up Exhibit 130-1.  And this is a copy of your CV, right?

A.    Yes.

Q.    Okay.  So, Mr. Sicher, I want to talk to you about, you know, rollovers.  And have you worked on restraint systems and rollovers?

A.    Yes.

Q.    Okay.  And so the jury has heard a little bit about accelerations in rollovers, and I want to ask you, I don't want to duplicate it, but I want to ask you from the perspective of belt systems, okay.  And what kind of accelerations as far as looking at it from a belt system analysis or a belt engineer, how do accelerations in rollovers compare to other types of accidents?

A.    Okay.  Well, in general the -- in a rollover the accelerations you experience are a lot less than you'll experience like in a frontal crash or a side impact.  However, you will usually get more of them.  So you will have -- like in a frontal impact, you drive into a brick wall, you have one crash, it's over and done with.  It's at an acceleration what we call a lot higher than -- typically it's going to be a lot higher than -- probably the best way to use this as an example.  If you drive 30 miles an hour into a brick wall your accelerations are going to be depending on your vehicle on the order of 30 to 40Gs.  When

you do -- if you do 30 miles an hour in a rollover, you're going to have a number of individual impacts that are going to be all on the order of four, five, or six Gs, but you're going to have a number of them.  And that is one of the reasons why rollovers -- some people say a rollover is less severe because your acceleration is a lot less.  The frontal crash is at 30 or 40Gs.  It goes back a little bit to -- not a little bit.  It goes back to F=ma, force equals mass times acceleration.

Your body, your mass is going to be restrained by the belt system.  In a 30G acceleration event, it's going to be your mass times 30Gs is the force the belt has to restrain.

Well, your mass is going to be the same in a rollover, but now you're only multiplying it by five or six.  So the belt actually has to do less work on you in a rollover, but it has to do it a little different way.

Q.   Okay.  And you've got a couple -- you've got a video here showing the differences between the forces generated in a frontal collision versus a rollover; is that correct?

A.   I believe I've shown you some videos of, an example of driving into a brick wall at 30 --

Q.   A frontal collision?

A.   A frontal collision.

Q.   Could we take a look, please, at Exhibit 130-4.  And

before we look at it, was this some of the testing you were involved in?  Is it the one with the ambulance on it?

A.    Oh, the ambulance testing, yeah, this is the ambulance video.  This is testing I was involved with, yes.

Q.    And it's the ambulance video.  Can you explain to the jury what it shows?

A.    Okay.  Sure.

MR. SIMON:  Hold on a second, Jason.  There we go.  Never mind.

Q.    Why don't you tell them what we're going to see and then we'll show it, okay?

A.    Okay.  As part of the NIOSH work we ran 20, I believe it was 29 what we call sled tests, and then -- and I'll explain sled test in a minute if we need to.  And then we ran four full vehicle crash tests.  We ran three different ambulances into a brick wall and then we ran a truck into the side of an ambulance.  And what we were doing in the back of each ambulance was we had the different restraint systems that we were evaluating with test dummies in the back compartment in different positions, some standing, some sitting, one on the stretcher or the gurney, to evaluate restraint system performance and video and document this scenario.

So we ran three frontals because we had a number of different ambulance body types.  So we ran a number of

frontals and then we ran one side impact. This is a video showing one of -- an exterior view showing one of the ambulances being crashed into a brick wall.

Q. Okay.

MR. SIMON: And, Jason, 130-142.

(Video played.)

A. So there you see the ambulance hitting the brick wall. You also see basically right in the middle of the screen there, if you play it again, you'll see that's a dummy moving through that windowpane. And there's a camera right there, but you also see through some of the other windows. There's dummies in the back. And we're really interested in the dummies in the back and how the restraints they are wearing perform.

Q. Okay. So, Mr. Sicher, in a general sense what's a seat belt for?

A. A seat belt is designed to what we call couple your body to the vehicle you're in. You want it to hold you into that position.

Q. Okay. And can we -- let's take a look, please, at Exhibit 36, page 1-10. Okay. And this is -- what is this? What are we looking at, Mr. Sicher?

A. This is a page from the owner's manual on the 2003 GMC Savanna van owner's manual.

Q. Okay. And you see the part that's highlighted there.

What does it say?

A.    It says, "You can hit things inside the vehicle or be ejected from it."

Q.    Okay.  And maybe we should take it in context.  Why don't you go ahead and read that and tell us why you have it here in the slide.

A.    You probably should read the sentence before there. "If you are in a crash and you're not wearing a safety belt, your injuries can be much worse.  You can hit things inside the vehicle or be ejected from it."

Q.    And this is from the manual that accompanied the van, the 610, it's from a 610, correct?

A.    Correct.

Q.    Okay.  And this is -- is this consistent with your understanding of the purpose of a seat belt?

A.    Right.  You want the seat belt -- the seat belt is going to hold you in that position, which will prevent ejection.  It's designed to try and prevent you from hitting other objects inside the van.

Q.    Okay.  Are there any articles or publication or literature that supports that position, in other words, defines the purpose of a seat belt?

A.    Yes.

Q.    And can we go to Exhibit 285, please.  And what is this?

A.   This is a technical article written by myself and some colleagues discussing some what we call inverted drop testing.

Q.   And what's the name of this article?

A.   Performance of Automotive Seat Belts During Inverted (-Gz) Rollover Drop Tests.

Q.   And you were one of the coauthors, right?

A.   Yes.

Q.   When was it written?

A.   2006.

Q.   Okay.  And where was it published?

A.   It was published at an organization called ICrash.

Q.   What's that?

A.   It's an organization that basically publishes articles and brings research related to crashes.

Q.   Okay.

     MR. SIMON:  And could we go to the second page, please, Jason.

Q.   And what do we have under the highlighted section? Could you read that to the jury, please?

A.   It's giving you some background and discussing specifics about restraint systems.

Q.   Okay.  And what does it say and how does that support your opinion?

A.   I mean, simply stated:  "The goal of an effective

occupant restraint system is to control occupant motion during a crash event so as to eliminate injurious impact with interior components of the vehicle. For a restraint system to be effective in a rollover event, then, it must control the relative motion of the occupant's head so as to eliminate injurious head impacts."

Q. And what does it say further?

A. "One way to eliminate injurious impacts to an occupant's head is to design a system that eliminates the impacts themselves. No injurious impact, no injury. This objective can be expressed in the simple mathematical terms as a function of the occupant, the restraint system, and the interior geometry of the vehicle as illustrated in Figure 1."

Q. And that's your article, correct?

A. Correct.

MR. SIMON: We can take that down, Jason.

Q. I want to talk to you about federal standards. And the jury, we've heard a little bit, maybe a lot about Federal Motor Vehicle Safety Standards. You know what those are, right?

A. Yes.

Q. Are there any Federal Motor Vehicle Safety Standards that relate to seat belts?

A. Yes.

Q. Can tell the jury which ones those are and sort of

generally what each one is or what it's about?

A.   Okay.  There's three primary ones.  And we call -- we refer to them as numbers.  There is something called 208, there's 209, and 210.  208 really deals more with crashes and not -- the seat belt is part of a crash, but deals with the crash side of things.  But 209 and 210 deal with specifics related to seat belt systems.

I'm going to have to refer to them real quick.  One of them refers more to -- I believe it's 209 refers to the performance of the individual components of the seat belt system, like the webbing is only allowed to have so much stretch.  The anchor bolts have to be rust corrosion resistant.  They have to be able to withstand so much -- lock up at a certain time.

FMVSS, Federal Motor Vehicle Safety Standard 210 refers to -- more to the anchorages.  The anchorages are how the seat belt is secured into the vehicle.  So the bolt holding it in place has to be so strong.  The anchorage itself has to be so strong.  It has to be in a certain location.  It has to be oriented in a certain way.

So primarily we're dealing with 209 and 210 when we're talking about seat belt components.

Q.   Okay.  And so let me ask you this.  As far as -- we heard something in opening from General Motors about the geometry of the anchorage -- what's the anchorage point of

the belt?

A. The anchorage points are normally defined as basically where you have bolts. You have an attachment to the vehicle on -- if you're a driver, I'm doing it from a driver's perspective.

Q. Okay.

A. On the left side on a traditional seat belt you have a lower anchor by your left hip. You have a buckle, which is an anchor on your right hip. And then you have a D-ring anchor up over your left shoulder, and then it goes down to a retractor, if there's a retractor that's down low. Some people have retractors up high. So that really becomes the third point in a three-point seat belt. And those are your anchorage points as related to 210.

Q. Okay. And as far as are there any particular provisions, you said some of them have to do with like the webbing strength and how secure the anchorage points are, some of the provisions in 210 and 209 pertain to those type of things?

A. Yes.

Q. Are there any of those provisions in 209 or 210 that deal more specifically with the designing of the system, how the system is set up?

A. Right. FMVSS 210 requires that the angle for the lap belt, when you put a belt across you it's at an angle, it's

not straight, horizontal, or vertical.  It's at an angle.
And that angle has to be between 30 and 75 degrees.  So you
can't be straight upright; you can't be flat; you have to be
between 30 and 75 degrees.  And they provide the explanation
of how to measure that.  But essentially you measure the belt
on if you're looking at it from a profile view on the left
hip and the right hip.

Q.    Okay.  And I want to try to have you explain that in a
little more detail.  So you're limited with the angle of the
anchorage from 30 to 75 degrees, correct?

A.    You're limited to the angle that the belt can form
coming from the anchorage to the body.

Q.    Okay.  And so 90 degrees would be straight up, correct,
as you're seated I guess?

A.    Correct.

Q.    Straight up like this, correct?

A.    Correct.

Q.    Okay.  And so if you're seated and the anchorage point
is straight up, that would be 90, right?

A.    Correct.

Q.    Okay.  And so would a little more this way would be to
be more like 75, right?

A.    Correct.

Q.    So basically if what I'm understanding, the angle can
be anywhere from, say, 75 to what, say, 30?

A.    To 30.

Q.    So about from here to here, right?  About right there?

A.    Roughly, yes.

Q.    So about 30 to 75, right?

A.    Yes.

Q.    Okay.  And so a manufacturer can decide what angle as long as it's between 30 and 75?

A.    Yes.

Q.    All right.  Let's talk now about your understanding of the accident in this case.  Can you tell the members of the jury what that is, please?

A.    Yes.  My understanding is that Dr. Roberts was exiting on an exit ramp and lost control of the van, and the van went into what we call a passenger side leading roll.  So if you're the driver, the right side is what's going to be heading towards the ground first in a rollover.  The van completed two revolutions, so it went from wheels over, wheels once and then over one more time to wheels again and landed on its wheels after doing two rolls.

Q.    And did you review any information about the speed at wheel lift?

A.    I've reviewed the information from the reconstructionist, yes.

Q.    And that would be Mr. Green and also Mr. Tandy, correct?

A.     Yes.

Q.     And is it your understanding the average range between the two is --

          MR. HANSON:  Objection, leading.

Q.     What's your understanding of the expert's range of speed?

A.     My understanding is Mr. Tandy has it leaving when we call wheel lift, when the wheels start lifting off the ground between 31 and 39 miles an hour, so roughly 35 miles an hour. And Mr. Green has it a little bit slower than that.

Q.     Okay.  Now, let me ask you this.  Did you -- what's your understanding about whether or not Dr. Roberts was belted?

A.     All indications are Dr. Roberts was --

          MR. HANSON:  Your Honor, we stipulate that she was belted.

Q.     Okay.  Based on what you've seen, Mr. Sicher, did the belts operate in this accident the way they were designed by General Motors?

A.     The belts operated as designed by General Motors, yes.

Q.     In other words, nothing on the belt broke or anything like that, right?

A.     Right, there was no breakage, there was no ripping or anything like that.

Q.     Nothing came loose or popped out, right?

A.   Correct.

Q.   The belt, you know, operated the way they intended it to, correct?

          MR. HANSON:  Objection, repetitious.

          MR. SIMON:  I'll withdraw, Your Honor.

BY MR. SIMON:

Q.   Okay.  Mr. Sicher, what I'd like to do now is we've been talking about belt system and kind of throwing terms around, "pillar" and "anchorage points."  I'd like to go through and put a photo up, and hopefully it will help, and just to help you explain to the jury the different components of the belt system in the subject van.

A.   Okay.

Q.   Could we do that?

A.   Yes.

Q.   All right.

          MR. SIMON:  Let's put up, Jason, Exhibit 130-51. Okay.  And could we blow that up a little bit, Jason?  Okay.

Q.   And there's already arrows in here, but I think, Mr. Sicher, if you touch your screen you can kind of put a line on it if you want as you're explaining.  But generally what are we looking at here?  What are we looking at?

A.   This is an interior view of a van taken from the right front door, from the passenger side door.

Q.   Okay.  And this is a van similar to the Roberts van,

correct?

A.    Yes.

Q.    Okay.  And why don't you just go through and however you want, and what I'd like you to do is go through each component that we see in this photo, specifically the belt system, explain what it is and generally how it works.

A.    Okay.  It might be easier.  Can I have that van right there, please?

Q.    You bet.

A.    We'll start with as you see here, there's an A-pillar and B-pillar listed.  Thank you.  And essentially what the A-pillar, B-pillar, C-pillar, you'll hear those terms a lot. The A-pillar on a vehicle is the first one, the one that holds the windshield.  That's the A-pillar.  And then you just, not count, but alphabetically go back, A, B, C, D.  So on a van, most vans have -- go all the way back to a D because they are back here.  If this would be a sedan, like a four-door sedan and have a trunk area, you wouldn't have a D, you'd have an A, a B in the middle, and then a C where the rear window is.  So those are the pillars.  They are the vertical pieces you see above that hold the glass for the passenger windows.  That's what we call the pillars, so A, B, C, D.

And for a driver's position, the seat belt in this van is mounted on the B-pillar.  So this is the interior view

of this pillar right here. And on that is you have what we call the D-ring, which is the loop that hangs -- the belt hangs from right there. And then if you're pulling on that metal piece that you plug in, that's what we call that the latch plate. So let's pretend you're driving in your car. You pull in the latch plate to buckle in. You pull the latch plate out of the D-ring, you buckle into the buckle. The buckle on the vans and on cars are down here by your right hip if you're the driver. Here is the buckle showing for the passenger side, which is their left hip. And the latch plate you can't really see in this photo, but it's that metal piece, plastic covered metal that's hanging there. And then you have the webbing. And then there's a retractor. The retractors you cannot usually see on a vehicle, but they are what lets you pull in and out webbing. It lets you pull it out and they will retract it back automatically. The retractors are usually behind trim pieces or hidden in some fashion.

So those are the basic components of the seat belt system and where they are at in the vehicle.

Q. Okay. And there's also something called a latch plate, correct?

A. Yes.

Q. And what generally is a latch plate?

A. The latch plate is also called a tongue by some people.

It's the piece that, it's hanging on the belt and you plug it into the buckle. So it's the piece that the webbing passes through that moves. The D-ring has webbing passing through it but it always stays up here. The latch plate is a piece along the webbing that moves and you plug it into the buckle to form your connection.

Q. Okay. Now, Mr. Sicher, what is a retractor?

A. A retractor is, it's essentially a little spool with a spring on it that holds the webbing so that it's out of the way when you let go of it. And also when you want to move and adjust the radio and you want to move forward, it lets you move forward. But in a crash it will lock up so that you do not move, so you do not -- so that the seat belt does not move on you.

Q. Okay. And how is a retractor activated?

A. There are a number of different ways they are activated. This van has the two most common ways, and one we call vehicle sensing, and that means as soon as the vehicle has hard braking, hard cornering, hits something, there is a little pendulum or ball that will lock in and kick out and lock the spool so the spool can't turn outward anymore. So if you've ever hit your brakes really hard and you kind of lean forward, you felt the shoulder belt lock on you, that's because you have a vehicle sensing retractor.

The other form for this belt is it's web sensing.

If you try and pull it out really quick, it will lock up also. So in a crash if you start really moving a lot, it's going to lock up automatically. Sometimes that happens when you're in a hurry, you jump in your car, and you go to yank your belt on and you pull it too quick it locks on you and you say a few choice words, that's web sensing.

Q. Is that sometimes called dual sensing?

A. When a retractor has both of those it's called dual sensing, yes.

Q. Just so everybody is clear, one has to do with the motion of the vehicle?

A. Correct.

Q. Okay. A sudden movement, stop, acceleration will lock the belt?

A. Correct.

Q. And the other one has to do with motion of the --

A. Pulling webbing out.

Q. Okay. And in either case, whatever it takes to lock it up, it will lock up, correct?

A. Correct.

Q. And the belt doesn't let any more slack out, correct?

A. Until it's allowed to retract, it will not let any more slack out.

Q. All right.

MR. SIMON: And could we go to Exhibit 130-7,

please.

Q.   And, by the way, the retractor in -- well, let me ask you this, what are we looking at here, 130-17?

A.   Here's a seat belt system, so it's got the retractor here, it's got a latch plate right here, and it's got a buckle system right here from one of the GMT 610 vans, one of the vans we're talking about today.

Q.   I'm not sure if this one is it, I'll see.  I think it is.  Okay.

        MR. SIMON:  May I approach, Your Honor?

        THE COURT:  Go right ahead.

BY MR. SIMON:

Q.   Okay.  And, Mr. Sicher, I'm going to hand you -- yes, there's a sticker.  I couldn't find a sticker on it.

        I'm going to hand you two items that have both been marked 130-16.  All right.  And what I'd like you to do, first of all, what is that?  What are we looking at?

A.   This is the buckle and the seat belt system that you see in that photograph.

Q.   Okay.  And where is this from?  What kind of vehicle did this come from?

A.   It's from a 2003 GMT 610.

Q.   Okay.  Like the van, same van in this case?

A.   Same platform as this case, yes.

Q.   And can you show the jury what it is, how it works, how

it's set up, please?

A. Well, unfortunately in most of these you can't see it but there's going to be a pendulum or ball under this cover right here. And as you move it -- like if I hold it in the right direction, I can pull -- I can pull webbing and it will pull it back on me. But if I tilt it this way, it won't. Or I tilt it any other direction, because that little pendulum or that ball will lock. That's what's sensing acceleration.

Q. That's for the vehicle, right, the vehicle movement?

A. That's the vehicle sensing. So normally it's installed in a van like this, works just like you would think it would. But if you tilt it, which is effectively giving it acceleration, it will lock. And once you have it locked you can't pull it out until two things, you have to have it neutral, and you have to let webbing off it because it's under tension. If it's under tension, even if it's neutral it won't allow webbing back out. So that's the retractor. That's the vehicle sensing portion.

And it's really hard to demonstrate web sensing when you're holding it in one hand because you always move it relative to each other. But if you pulled this out really quick, the web sensing would activate. I can't tell you right now whether web sensing or the pendulum is moving right now, but that's how web sensing works is by pulling it really fast, it will lock up.

Q.    So let me ask this, Mr. Sicher.  What you've got in your hand, your left hand, where is that in the vehicle?  Where is that at?

A.    In our van this is tucked down low by your left hip under behind some trim pieces, a plastic piece of trim.

Q.    Okay.  And the other piece that you have up there of Exhibit 130-16, what is that?

A.    This is the buckle side, and this is in our van bolted to the seat itself on the right side.

Q.    Is that an anchor?

A.    This is an anchor point, yes.

Q.    Okay.  And is that what we were talking before about the angle?

A.    Correct.

Q.    Okay.

A.    This would be at between 75 and 30 degrees.

Q.    Okay.  All right.  And 90 straight up again, down to 30?

A.    Correct.

Q.    Thank you.

A.    While I have this up here, I'm sorry, this is the latch plate, what we call the metal tongue some people call it, but that's the latch plate.

Q.    So are there different kinds of latch plates?

A.    Yes.

Q.   And the latch plate that you have in front of you, what kind is that?

A.   This is generally referred to as a single slotted free sliding latch plate.

Q.   And how does that work?

A.   Well, it has one slot for webbing, and it is not -- it does not catch the webbing in any way, so it's free sliding. So the latch plate is free to slide in any way.

Q.   Okay.  So the van in this case had a free sliding latch plate, correct?

A.   Yes.

Q.   And a dual sensing retractor?

A.   Yes.

Q.   All right.  I'll take those back from you.  Now, Mr. Sicher, have you reviewed any General Motors safety policies relating to their seat belt systems?

A.   Yes.

Q.   Okay.  And let's put up, please, what we've had marked as Exhibit 30-5.  Okay.  And go to -- what is this generally?

A.   This is -- it's the table of contents to basically a GM book or pamphlet related to occupant performance.

Q.   Okay.  And so the document itself, is it related to belts or other aspects of cars?

A.   It's generally related to how to protect an occupant. A large percentage of that is the seat belts, but it also

deals with air bags and things like that.

Q.    Okay.

MR. SIMON:  Could we go, please, to page 006 of Exhibit 30-5.  Okay.  And let's blow up the part that's highlighted, please.

Q.    Okay.  Can you read that to the jury, please, Mr. Sicher?

A.    Yes.  "It is the policy of General Motors to improve the safety of its vehicles with each new vehicle design program."

Q.    And this relates to the belts, that's your understanding?

MR. HANSON:  Objection, leading.

THE COURT:  Refrain from the leading, please.

Q.    What is your understanding of what this relates to?

A.    This relates to what we call occupant protection, how to protect an occupant in a crash.

Q.    And what model year was the vehicle in this case?

A.    The model year we have was a 2004.

Q.    And when did the 610 begin?

A.    The six --

MR. HANSON:  Objection, cumulative.

MR. SIMON:  Your Honor, I'm asking a question to see whether or not this provision applied to the van.

THE COURT:  You know, this ground has been trod.

BY MR. SIMON:

Q.    Did this provision apply to the 2003 model change?

A.    Yes, 2003 was a model change for GM.

Q.    Okay.  All right.

MR. SIMON:  Now, you can take that down, Jason.

Q.    At the time the van, the subject van was manufactured and designed by General Motors were there other designs that would have reduced or lessened the amount of excursion Dr. Roberts experienced?

A.    Yes.

MR. HANSON:  Objection, there's no foundation.

THE COURT:  Sustained.

MR. SIMON:  Yes.  I'll rephrase, Your Honor.

BY MR. SIMON:

Q.    Doctor -- or, Mr. Sicher, have you conducted testing that has demonstrated that there are restraint systems that can reduce an occupant's motion in rollovers?

A.    Yes.

Q.    Have you reviewed the work of others in the automotive community that tested methods of reducing an occupant's motion in a rollover?

A.    Yes.

Q.    Have you reviewed the work that General Motors has done testing to reduce an occupant's motion in a rollover?

A.    Yes.

Q.   Have you reviewed testing done by General Motors'
experts in this case to reduce an occupant's motion in
rollover?

A.   Yes.

Q.   Okay.  And based upon all that information, Mr. Sicher,
at the time the subject van was manufactured, were there
alternative designs that would have reduced the amount of
excursion that Dr. Roberts experienced in this rollover?

A.   Yes.

Q.   And are you prepared to talk about those designs?

A.   Yes.

MR. SIMON:  Your Honor, would this be a good time
for a break?

THE COURT:  Well, any time is a good time for a
break.

Well, ladies and gentlemen of the jury, have a
pleasant evening.  Recall the admonition.  9:30 tomorrow in
your jury room.

(The following proceedings were held outside the
hearing of the jury:)

THE COURT:  Gentlemen, my concern is I don't want
any delay with that piece of equipment coming in here.

MR. HANSON:  We'll do our best to make sure that
doesn't happen.  I have just a couple of logistical
questions.

THE COURT: Sure.

MR. HANSON: One of them is some judges, it's really important that you stand when you object, some don't care. I want to know what your reference is so I do it the way you prefer.

THE COURT: I prefer you to stand.

MR. HANSON: I will try to remember that. And the other thing is I'd just ask counsel if you can give me exhibits or at least the numbers that you're going to do next, we might be able to speed up some parts of this process.

MR. SIMON: Will do.

THE COURT: Let's please try to. I don't know what these jurors may or may not have planned, but we've told them two weeks. And it's always good to come in, you know, under the time we've told them.

MR. HANSON: We're trying to do our part here.

THE COURT: Very well.

MR. SIMON: Thank you, Your Honor.

THE COURT: Okay.

(Court in recess at 4:58 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 61 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 31st day of March, 2016.

_____
/s/ Susan R. Moran
Registered Merit Reporter