UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LAURETTA ROBERTS,                         )
                                          )
                Plaintiff,        )
                                          )
    VS.                           ) No. 4:13-CV-00541(CAS)
                                          )
GENERAL MOTORS, LLC,                      )
                                          )
                Defendant.        )
_____)


TRIAL PROCEEDINGS -- VOLUME 5-B
BEFORE THE HONORABLE CHARLES A. SHAW
APRIL 1, 2016
ST. LOUIS, MISSOURI

FOR THE PLAINTIFF:


    JOHN G. SIMON
    KEVIN M. CARNIE
    THE SIMON LAW FIRM, PC
    800 Market Street, Suite 1700
    St. Louis, MO   63101
    (314) 241-2929

    GARY K. BURGER, JR.
    BURGER LAW, LLC
    500 N. Broadway, Suite 1350
    St. Louis, MO   63102
    (314) 542-2222

FOR THE DEFENDANT:


    KENT B. HANSON
    MICKEY W. GREENE
    HANSON, BOLKCOM LAW GROUP, LTD
    527 Marquette Avenue, Suite 2300
    Minneapolis, MN   55402
    (612) 342-2880

Proceedings recorded by mechanical stenography; transcript produced by computer.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

I N D E X

APRIL 1, 2016; VOLUME 5-B

| Plaintiff's Witnesses: | Direct | Continued Cross | Redirect | Recross |
|---|---|---|---|---|
| LARRY SICHER | | 4 | 74 | 78 |
| DR. DAVID KENNEDY | 80 | 111 | | |

(Proceedings commenced at 1:30 PM.)

THE COURT:  Good afternoon, Ladies and Gentlemen of the Jury.

THE JURY:  Good afternoon.

THE COURT:  Go ahead, Mr. Hanson.

MR. HANSON:  Thank you.

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. HANSON:

Q    Mr. Sicher, it's true, is it not, that there is no Federal Motor Vehicle Safety Standard that calls for eliminating injurious impacts in any context?

A    That's true.

Q    There are standards that deal with trying to manage or control but none that purport to say you should eliminate or even can eliminate injurious contacts.  Isn't that true?

A    Right.  There's parameters related to impact, and we know what the impact forces are and where the injuries -- injurious levels are.  So the federal standard ---

Q    Thank you.  You've answered my question.

The paper that made the statement we were referring to this morning to the effect that that's what they're supposed to do is Exhibit 285, right?

We're going to come back to that later when I talk about your testing because Exhibit 285 is a paper that was written with respect to one of the two series of tests that

you told this jury that you had participated in.  Isn't that right?

A    Yes.

Q    And just by way of remainder, there's two things you did.  First, there was the Humvee project.

A    Yes.

Q    And then later you did something to compare a Ford all-belts-to-seat system that you had modified.  Isn't that right?

A    The Ford all-belts-to-seat including a pretensioner, if that's what you're referring to as the modification.

Q    And, in fact, the Ford system that you tested, we're going to talk about how you tested it.  It didn't just test the Ford all-belts-to-seat.  It tested the Ford all-belts-to-seat with the seat belt precinched and locked.  Isn't that right?

A    To simulate the pretensioner, yes.

Q    So it did not purport to simulate a seat belt that was available when you did that test for rollover.  Isn't that right?

A    In this timeframe there were rollover-activated pretensioners available, yes.

Q    When did you do the test, the ---

A    I believe ---

Q    Let me -- Let me back up.  Let's put it this way:  The

two series of tests you did, in the Humvee test and in the --
the Ford ABTS seat test, every single test you ran had the
seat belt pretightened and the retractor locked before you
started the test.  Isn't that right?

A    Well, in the Humvee testing, we used a
five-and-a-half-pound tension to simulate -- with a live
retractor still to simulate what our test surrogates were
finding in the lab when they were adjusting towards the
manual.

       For the Ford test, we prelocked the retractor, used
the pretensioner, and got a pretensioner level consistent with
pretensioner data that we had available.

Q    But you did not run any series of tests.  None of the
testing you've told the jury involved just having somebody put
on a seat belt.  They all pretightened the belt to some
degree.  Isn't that right?

A    For the test series we did, yes.

Q    And we're going to have a look in a little bit at exactly
how that testing was -- was conducted.

       Now you cited a variety of papers that people have
published in the course of your testimony, but there wasn't
much discussion -- in fact, there wasn't any discussion about
the actual methodology of those papers.  I'd like to touch on
that just a little bit here.

       One of the -- What you do know, though, from all of

these together, there was a paper -- There was a study, rather, internal at GM by Garry Bahling. There was a study by Jim Pywell and others that were connected with GM, and then there were studies; there are papers that you referred to by a fellow named Arndt, another one named Herbst, another one named Meyer and then, of course, Eddie Cooper who the jury will hear from probably later in this trial.

A    Yes.

Q    Would you agree with me that one thing we can say is that a number of people have looked into the question of whether and to what extent you can control occupant excursion in rollover?

A    I agree.

Q    It would be flatly incorrect to suggest that after General Motors did Malibu, that they just threw their hands up and said, "Whoops; there's nothing we can do." You got documentation from GM that shows that's not what happened, don't you?

A    GM has continued to study it. GM has not studied it with this van, though.

Q    The fact of the matter is that in the 1990s, you can tell because you were testifying from these very documents this morning that General Motors was, in fact, looking into whether changing seat belt configurations, whether changing seat configurations would make a meaningful difference in rollover

excursion. Isn't that true?

A    I agree.

Q    And one of the things that Garry Bahling did -- And by the way, to make this clear, Garry Bahling was one of the principal authors of Malibu. Isn't that right?

A    I know he was one of the authors on that -- one of the Malibu series. I'm not sure which one.

Q    Malibu II, if you care to look.

A    I'll believe you.

Q    And you mentioned that you found a document; I think it was marked as Exhibit 25-5 that is an internal -- it's a report of some internal analysis that -- that he did along with a couple others, right?

A    Yes.

Q    So one thing we know is that the analysis you were testifying about was done by one of the people who was a primary author of the Malibu paper and a participant in that study.

A    Yes.

Q    It compared four kinds of seat configurations. You talked about that. First, they did some kind of just static inversion, and then they did a drop of some form.

A    Yes.

Q    Now you do understand that that was an internal kind of "what if" look. It was not intended for publication. It was

never published; true?

A    I know it was not published.  I'm not sure what their intent was initially.

Q    Well, one thing you know for sure is that you can't -- you just plain flat out can't put an F16 fighter harness in a passenger vehicle, correct?

A    I agree.

Q    It would be illegal.

A    In a passenger car it would be.

Q    Yeah.  So -- So you know they weren't looking at the F16 fighter harness because they were thinking about putting it in a car.  That much you can agree with, can't you?

A    I'm not sure why they were testing the F16.

Q    Did you know that Garry Bahling was an F16 fighter pilot?

A    I knew Garry Bahling was in the Air Force.  I'm not sure -- didn't know he was a pilot.

Q    You mentioned yesterday, I think, something about the funny way that people walk when they're wearing the fighter jet harnesses, going all the way back to when you were working in the military, right?

A    Navy harnesses, yes.

Q    But fighter jet harnesses are -- You know what they look like in general, don't you?

A    Yes.

Q    You know what an F16 harness looks like?

A    Yes.

Q    It's a five-point restraint.

A    Some are four; some are five.

Q    It's got a crouch strap?

A    On the ones that are five-point, yes.

Q    Comes over both shoulders.

A    Yes.

Q    Attaches into a belt.

A    Yes.

Q    And then they cinch the pilot down.  They try to cinch him down so his back can't straighten up.

A    Yes.

Q    That, obviously, is not something anybody would even consider putting in a passenger vehicle.  Wouldn't you agree with me?

A    I agree.

Q    Then the other two -- the other two things that you know were tested, you know that they looked at a production J car seat belt.

A    Yes.

Q    Now this, obviously, would have been an old one back in the '90s, a '90s vintage J car.

A    I have to assume that, yes.

Q    Do you know what kind of latch plate was on the J car seat belt?

A    I do not.

Q    And then they looked at a Mercedes all-belts-to-seat and an experimental GM all-belts-to-seat, correct?

A    Yes.

Q    Now the Mercedes that they looked at says it was an SL300, isn't it?

A    Yes.

Q    It's a convertible, isn't it?

A    I'm not positive of that, but I have to assume it is.

Q    So you know that Garry Bahling and his colleagues were at least doing some work where they're looking at what happens if you turn it upside-down, what happens if you drop it, you know; did some analysis like that.

A    Yes.

Q    And you understand, do you not, Mr. Sicher, that the jury heard Jim White testify by video deposition yesterday about that document?

A    I -- I know they heard Jim White testify.  I'm not sure about what they heard.

Q    And your group did a similar kind of an analysis as part of your Humvee project, right?

        Part of that was looking at what happens with different seat configurations when you turn people upside-down.

A    Yes.

Q    And it's not just a matter -- What -- What Mr. Bahling did wasn't just a matter of looking at different seat and seat belt configurations.  It was looking at different-sized occupants as well, correct?

A    Yes.

Q    And your Humvee study looked at different sized occupants, too, did it not?

A    Yes.

        MR. HANSON:  First, if we could have Exhibit 25-5. Go to the next page.

Q    (By Mr. Hanson)  What I'm interested in is in the data and the numbers because that's what you were keying in on, isn't it?

A    Yes.

Q    All right.  So what we've got up here now -- And I just put a little caption on it to make it clear where this came from.  It's a table from the data you got in your Humvee study, isn't it?

A    This is, yes.

Q    And what this particular page is doing is comparing a heavier, taller occupant on top, right?

A    Yes.

Q    To a smaller lighter occupant on the bottom.

A    Yes.

Q    The first line in this one here, these are at 5.5 pounds,

right?

A     Yes.

Q     And then you did the same occupants at ten pounds?

A     Yes.

Q     And then you rotated them clockwise and counterclockwise. What's not explained is whether "clockwise" means toward the shoulder anchor or away from it.  Can you explain that?

A     I -- To be sure, I have to go back and look at the videos.  This is 15 years ago.  My recollection is it was as you were sitting in the seat.  So it would be the point of view of the -- of the tester.  So "clockwise" for me as a tester is going to be going towards -- from wearing a driver's belt, it's going to be away from the belt.

Q     Well, this is not a driver's seat, right?

A     That is a driver's seat.

Q     Oh, it is.  I'm sorry.  I'm standing behind it.  Okay. So your shoulder belt would be across here if I put it on.

A     Correct.

Q     This is actually locked, so I can't.  You can't pull the belt out?

A     Well, if you have the battery hooked up, you can.

Q     Well, it's not important for this.  But if you took the belt out, it would come across like that, right?

A     Yes.

Q     So the shoulder belt would come this way.  You would

expect it to make some difference in excursion if you rotated me toward the anchor or away from it, wouldn't you?

A    I expect it to make a difference going towards the anchor, yes.

Q    Well, I mean if you're going to compare how much excursion you get, it's hardly surprising that it's a little bit different when you locate it -- when you rotate the occupant toward the shoulder anchor versus away from it, correct?

A    That's not -- That was not a surprising finding, no.

Q    But, again, ---

     MR. HANSON:  If we can put that back up.

Q    (By Mr. Hanson)  What's interesting is -- And we're going to show the jury what your apparatus was on this -- this test set-up.  But if we look at this tall guy at 180 degrees counterclock -- clockwise, it made no difference, none, between the 5.5 and 10 pounds in terms of how much he was displaced, did it?

A    Virtually none, no.

Q    And if we look at -- look at rotation in the other direction, now we're looking at 180 degrees counterclockwise?

A    Right.  I was looking at them both together.  I'm sorry.

Q    Well, I'm talking about the one that I circled.  So let's go back and make sure we're clear here.

     In these, they're literally the same; one and an

eighth-inch both times.

A    Correct.

Q    And that's regardless of whether you had five pounds of tension already in the lap belt or if you put ten pounds of tension in the lap belt.

A    Agreed.

Q    And you told us that you -- this ten-pound number comes from -- that's the point at which your employees told you this hurts.

A    That's the point we said at what -- at what level would you still be willing to drive?

Q    And by the way, the way you got the 55-pound number was by telling your own employees, "Read the owner's manual and then adjust the seat belt as far as you're comfortable." Isn't that right?

A    We said, "Here's the owner's manual.  Sit in the seat as you would according to the owner's manual."

Q    Do you think most people, before they put their seat belt on, pull out an owner's manual and read what it tells them to do?

A    I -- I would hope at some point they read their owner's manuals.

Q    But you did not just say, "Hey, get in there and put this seat belt on."

A    We did not, no.

Q    But at any rate, what you found was, whether it was doing what you had told them in advance to do at five-and-a-half pounds or whether it was an additional cinching it down to the point where they were getting uncomfortable, it didn't make any difference for this tall guy.

A    In that direction, no.

Q    And when you went in the other direction, the extra tension, he actually had more excursion, didn't he?

A    Yes.

Q    So the tighter seat belt, he ended up going farther with the tighter seat belt than he did with a less tight one, right?

A    And that's why I said early on when you're dealing with wide subjects ---

Q    The answer to that is, "Yes," isn't it?

A    Yes, when you're dealing with these subjects.

Q    If we look then at the light person, the smaller lighter person down below, again, we've got the same amount of seat belt tension that you're putting in to begin with and in this case, when they went with the less tension, you have three-and-a-half inches and with more tension, two-and-three-quarter, correct?

A    Correct.

Q    Then when they went the opposite way, you had two-and-one-eighth and three?

A    Correct.

Q    If we look then at the light person, the smaller, lighter person down below, again, we've got the same amount of seat belt tension that you're putting in to begin with.  And in this case, when they went with the less tension, you have three-and-a-half inches and with more tension, two-and-three-quarter, correct?

A    Correct.

Q    Then they went the opposite way.  You had two-and-one-eighth and three.

A    Correct.

Q    So one of the interesting things when you look at this, and let me touch on a piece of physics here first because you've commented on this in part.

     There are laws of physics, a fellow named "Newton," right?

A    Yes.

Q    You're familiar with Newton's Laws of Motion, are you not?

A    Yes.

Q    There are how many of them?

A    Three.

Q    You mentioned one of them, I think, in your Direct testimony.  In fact, there's three.  One of them is:  For every action, there is an equal and opposite reaction,

correct?

A    Right.

Q    That means that if I'm pushing my hand onto this table, however hard I am, the table's experiencing the same force as my hand.

A    It's pushing back.

Q    It's not literally pushing back, but the force on each surface is the same.

A    Correct.

Q    One of the other ones is that:  An object in motion will continue in motion until acted upon by an opposing force.  Isn't that right?

A    Yes.

Q    And the converse of that, to state that same law the other way is:  An object at rest will remain at rest until acted upon by a force to place it in motion.

A    Yes.

Q    So if something's moving, it wants to keep moving unless you stop it.  If something's still, it's going to stay still until you make it move.

A    Yes.

Q    And then the third one is:  F = MA; Force = Mass x Acceleration.

A    Yes.

Q    And then the third one is F = MA; Force = Mass x

Acceleration.

A    Right.

Q    All objects have mass, correct?

A    Correct.

Q    Mass is what gives weight.  My -- My weight standing here is a function of my body mass.

A    Yes.

Q    But it's because I'm in the presence of gravity that we call it "weight," not just mass.

A    Right, in U.S. metrics or U.S. system.

Q    So, again, if I don't tell you how much I weigh, I just weigh what I do, when I'm just standing here on my body weight, but if you put an acceleration on me so F = MA, then there's going to be more than my body weight on the ground, right?

A    If you apply it in the right direction, yes.

Q    Well, if I do that, for example, when my feet hit the ground, that's more than my body weight.

A    Yes.

Q    Now you mentioned yesterday, I think, that in rollovers your experience has shown that there's four to six G's at the ground strikes.  Do you recall that?

A    Typical for the vertical motion, for the vertical acceleration, yes.

Q    Yeah.  But the vertical acceleration is only part of the

story.  Isn't that true?

A    There are resultants that are left and right and what we call pitch.

Q    But the acceleration that occurs upon the impact with the ground is not the only acceleration that is happening during the course of a rollover event, is it?

A    Well, you're dealing with centrifugal forces, and at times when the vehicle is rotating, it's centrifugal forces. When the vehicle has a ground impact, it's often that the centrifugal forces have stopped, but you have the ground impact force.  But is there a combination at times?  Yes.

Q    You've got to account for every place from which an acceleration will come if you want to get the outcome right. Wouldn't you agree?

A    Right.  And the data I'm using is coming from testing of vehicles with an accelerometer in there, so it's accounting for all the accelerations in that vehicle.

Q    If you want to know what the accelerations actually are either on a vehicle or on the occupants or both, it's not that hard to do if you run a test.  You just put an accelerometer on it and you look at the data, true?

A    Agreed.

Q    But if you're looking at a crash that actually happened out in the real world, you're not going to have that kind of data.  You have to approach it other ways, true?

A    Yes.

Q    Now you haven't done any analysis like that in this case.

A    I have not in this case, no.

Q    Your tall occupant -- Your tall, heavy occupant and your smaller shorter person in your -- in your Humvee study, their weight did not change, depending upon how tight you made the belt.

A    That's correct.

Q    Their weight did not change depending upon whether you rotated them to the left or to the right.

A    That's correct.

Q    So consequently -- And the test apparatus, the setup was the same.  You had the -- You had these people and the same piece of equipment subjected to what was supposed to be the same procedure.

A    Yes.

Q    So you would think, would you not, that it would be the big occupant that would have more excursion, the big, heavy guy would have more excursion than the smaller, lighter one because the heavier person is -- has a greater body mass and, therefore, when you invert them at 1 G, the acceleration is 1 G, there should be more force exerted on the belt, and they should go farther, right?

A    In a perfect world, that's true, but with live subjects, as I mentioned before, live subjects all tend to sit a little

differently, and you -- that's why we tend to use a live subject. We use -- try and use a larger variety of them, use averages. I mean Mr. Bahling found something very similar with his live subjects.

Q    I was going to go there in a minute. If you'll just answer my questions, it will maybe move it along faster.

A    I thought I did answer your question, sir.

Q    You would expect that. You're going to get variability just because that happens when you're doing live subjects, right?

A    Agree.

Q    So you got to be careful what kind of conclusions you draw from the simple fact that you get a little difference comparing one to another when what you're doing is working with live human beings.

A    Well, I thought our averages were -- They speak for themselves. They're the averages. The numbers are what they are.

Q    But when you look at the Bahling date, if we could, that's -- I thought that was 25-5. What exhibit is the -- is the ---

A    Bahling is 25-5. The Humvee testing is 275-5.

Q    Okay.

        MR. HANSON: It's 25-5 is what I want now, please. And, again, I'll tell you what, Kyle, would you, please go to

the -- Instead of doing it from there because we don't have to fish our way through, will you go to Slide 6?

Q    (By Mr. Hanson)  Now this is an appendix that talks about the height of the people in the Bahling study, isn't it?

A    Yes.

Q    So what's circled right there, Subject No. 3, this is another tall guy, right?

A    Yes.

Q    199 pounds; standing height:  96th percentile; normal seated height:  98th percentile.  98th percentile means -- Let me back up.

"Standing height:  96th percentile" means that he is taller than 96 out of 100 people standing.

A    Correct.

Q    When he's sitting, he's taller than 98 out of 100 people.

A    Yes.

Q    So this is a big guy.

A    Yes.

Q    Okay.

MR. HANSON:  Back out of that.  Go to the next slide, please.  Well, hold on just a minute.

Q    (By Mr. Hanson)  We can see that there were subjects of other sizes and weights as well, correct?

A    Yes.

MR. HANSON:  If we could go on to the next page,

please.

Q    (By Mr. Hanson)  You talked in your Direct testimony about what the averages were for all of the occupants.  Do you remember that?

A    Yes.

Q    All the test subjects.  But what we find here when we look, ---

A    The heaviest guy of Projection J has the least vertical excursion.

Q    Right, exactly.  We've got the same thing again.  The largest, heaviest person has less excursion which sort of you scratch your head and you think:  That's not what you would predict if you were just applying the laws of physics.  Isn't that true?

A    But look back at experimental.  At experimental, he has the largest excursion.  So, again, it's live subjects. There's some variability there.  You take the averages.

Q    Well, there's so much variability there, it's hard to know what you can make of it.  Wouldn't you agree?

A    I disagree.

Q    But what you're finding with some of these at least is that you just can't predict from -- from one to another whether it's going to benefit them or be a detriment to them.

A    And that's why you use averages.  You have to look at the whole of the population you're dealing with and the whole of

the restraint system and draw your conclusions from the data you have available.

Q    And would you agree with me that it would be a bad idea for you to optimize a seat belt design for one size, shape or configuration of occupant without trying to make it be the best overall balance you can do for everybody?

A    I believe you should optimize for the balance of the largest population you can.

Q    Now we talked earlier about --

MR. HANSON:  You can take that down.

Q    -- about the principle that a good study should vary one variable.

A    Yes.

Q    Not multiple variables.

If you look at what Mr. Bahling did, even though it was a limited study in Exhibit -- in his analysis of those subjects, they varied one variable at a time, didn't they?

A    They varied the seating and restraint system.

Q    But they did it one variable at a time.  So you could look for the heavy guy.  You change one thing; what difference does it make.  For the light guy, you change one thing; what difference does it make.  They didn't do two things together at one time, did they?

A    I disagree.

Q    All right.  Well, let's look at what Mr. Pywell did.

A    Okay.

Q    In Exhibit 223, which you commented on earlier, let's make -- make it clear here.  This study, Exhibit 223 that you quoted from, what they were doing was specifically trying to craft a new test procedure to see if it would add some additional insights into what happens in rollover, correct?

A    They were looking for repeatable tests for rollover testing, yes.

Q    And this was done -- When did we say this was done?  Nineteen ninety ---

A    It was published in 1997.

Q    1997.  So the work, obviously, was done prior to the publication.

A    Yes.

Q    So, again, this is another example that people at GM and its seat belt supplier, Delphi, were looking at whether there was anything further we can do to reduce excursion.  They were specifically looking at that.

A    Yes.

Q    Studying that was a good thing.  It's not a bad thing.

A    I agree.  Studying it is a good thing.  Finding the results are a good thing.  Implementing it -- Not implementing it is the problem.

Q    Well, what they suggested at the end was -- This, again, ultimately is a paper about the possible future benefits of

pretensioning.  Isn't that true?

A    There's a lot of work in here about pretensioning, yes.

Q    And that you have told the jury already is not part of your claim in this case.

A    I have said that it is an alternative available.  It is not my alternative I have brought forth in this case for this occupant, no.

Q    Didn't you tell us this morning that you were not going to tell this jury that the vehicle is defective because it didn't have one?

A    I agree.

Q    And you do know, do you not, sir, that a tremendous amount of effort has been put into research and effort into developing reliable systems that will be able to detect when a vehicle is about to roll over so that it can predict and deploy a pretensioner and/or a roof rail air bag?

A    I agree.

Q    And that, in fact, is what was going on when that GM 610 rollover test was done that you testified about earlier today. That was specifically being done for the development of the signature to make the algorithm that will predict rollover so you could deploy side curtain air bags.  Isn't that right?

A    Well, that was four years after they were on the market, but that's what GM is saying they were for.

Q    You know that was not a test of the seat belt, don't you?

A    I agree that was not a test of the seat belt.

Q    The Arndt paper, Exhibit 249, --

A    Yes.

Q    -- turned people upside-down and used the seat belt angle that would be illegal in a passenger car.

A    That's one of their conditions, yes.

Q    Well, obviously, we can't use his proposal then, can we?

A    Again, it goes to show at the extremes that there are differences with belt angle alone.

Q    The Herbst and Meyer papers, Exhibits 314 and 323, those are two more that were looking into the potential benefits of pretensioners.

A    They were primarily focused on pretensioners, yes.

Q    And so is Exhibit 257, wasn't it?  The Cooper paper?

A    257 examined a lot of different items.  Pretensioners were a part of it, but they also did a lot of tests that were not pretensioners.

Q    All right.  Now let's come back then to -- But pretensioning was certainly part of it.  Mr. Cooper will be here, so we can ask him what he was doing and why.

Would you agree, Mr. Sicher, that a seat belt system, if you're talking about what a manufacturer should do in design and development, it should be tested and evaluated as a part of the system in which it will be used?

A    Ultimately you do want to do a systems test, yes.

Q      And that same criteria would apply to you, would it not? When you come into a courtroom and criticize the design, that the design you are proposing should also be tested and evaluated in the environment in which you propose it should be used?

A      If the environment is a stand-alone environment and you have the clearances that we're dealing with in this case, I don't feel it's necessary.

Q      Well, let's look into what you did then.  And in particular, let's look at the Humvee project.  Now we looked at the data already.

MR. HANSON:  That's Exhibit 275-5.  And if you could -- That's Slide 1, I think; if you could put that back up.

Q      (By Mr. Hanson)  We already talked about this is at least part of the data you got.

A      That is part of it, yes.

Q      Yes.  So now we can put that down.  We'll talk about just a couple of other things here.

MR. HANSON:  If you'd go to Slide 9.

Q      (By Mr. Hanson)  This is from -- Let's be clear what this is.  You -- You made a video.  There's a video demo.  I believe it was Exhibit 19 to your deposition, and I'll just show you that now so you see what I have in my hand.

A      Yes.

Q      We've marked this as Exhibit 75 -- 7512-19.  This is a

demo tape.  It's a tape that you -- It says on it 1980 -- 1998

SAE.  That's Society of Automotive Engineers.

A     Yes.

Q     International Expo Demo Tape.

A     Yes.

Q     So this is something you made for presentation to the

SAE.  Your company made, not you personally.

A     Right.  I believe they had a booth or an exhibit or

something like that, and that was playing on a screen.

Q     Okay.  Now what we have up on the screen here right now,

that's a Humvee, right?

A     Yes.

Q     So when you're talking about the kind of vehicle you were

evaluating, this is what it looks like.

A     Yes.

Q     And part of the reason that your company was looking at

Humvees was to see whether there were things about that

vehicle environment that were presenting injury risks to

soldiers and occupants that might be improvable, right?

A     That might be -- I'm sorry -- what?

Q     That might be improvable.

A     Yes.

Q     You can improve on them.

A     Yes.

Q     Okay.  So just to get a flavor, if we can do this quickly

of what a Humvee is like and how it compares -- a military Humvee and how it compares to a passenger vehicle.

MR. HANSON:  Can I have the next slide, please?

Q    (By Mr. Hanson)  Now that's the steering wheel in a Humvee, and -- and it shows you the dashboard, too, doesn't it?

A    Yes.

Q    There's no energy-absorbing capability.  It doesn't have anything to mitigate injury if you slam into that steering wheel, right?

A    The steering wheel became -- In the timeframe we were dealing with a collapsible steering wheel, but there's no knee bolsters, if you will.

MR. HANSON:  Go to the next slide.

Q    (By Mr. Hanson)  And the B-pillar where we have the -- on a car, this is exposed metal.  There's nothing padding it. There's nothing guarding it, true?

A    That's correct.

MR. HANSON:  Next slide, please.

Q    (By Mr. Hanson)  And then there's a gun turret, at least in this iteration of it, because this is after all a military vehicle.

A    Some of them had gun turrets, yes.

MR. HANSON:  Go to the next slide, please.

Q    (By Mr. Hanson)  And this gives us a look at what the

interior of this occupant compartment looks like, what kinds and shapes of materials are used. Will you agree with me that that is a much, much less friendly occupant environment than any passenger car you're going to find?

A   I would agree with that.

        MR. HANSON:  Could we go to the next slide, please?

Q   (By Mr. Hanson)  Now this is a photograph of what, sir?

A   The right front lap belt-only seat belt.

Q   This is what was in the Humvee in terms of the seat and seat belt. This is what you were evaluating, isn't it?

A   Well -- Okay. In the timeframe we were -- We got the contract in '97. And in the '96-'97 timeframe the Army had issued a mod to replace the lap belt-onlys with the three-point. So the testing we did was on the three-point system.

Q   Okay. So the Army had already done that. That wasn't your company's doing. So they added a shoulder belt as well.

A   Correct.

Q   But the seat remained like this.

A   That seat remained like that, yes.

Q   Okay.

        MR. HANSON:  Next slide, please.

Q   (By Mr. Hanson)  And these B-pillars, easily within head-strike range?

A   Yes.

Q    And that's a bad thing, according to you, right?

A    Agree.

Q    Yeah.

       MR. HANSON:  Next slide, please.  Next one.

Q    (By Mr. Hanson)  And the gun turret.

A    Yes.

       MR. HANSON:  Go to the next slide.

Q    (By Mr. Hanson)  Easily where a driver's head can get to it.

       MR. HANSON:  Just back up again one slide.

Q    (By Mr. Hanson)  Now the driver, this fellow that was put in your promotional material here, seated there, had to straighten up, didn't he, to get his head to that there?

A    A little he was stretching, yes.

Q    Okay.  And, of course ---

       MR. HANSON:  Next slide.

Q    (By Mr. Hanson)  And if you do that, if you straighten up and stretch, he'd -- he'd hit that.  In other words, he could hit that gun turret.

A    Yes.

Q    People in regular passenger cars do the same thing, don't they?  They straighten up and stretch and lean?

A    They can, yes.

       MR. HANSON:  Go to the next slide, please.  One more.  There we go.

Q    (By Mr. Hanson)  Now this is a shot that shows just the seat without a seat belt.  Is that true?

A    For the right front, yes.

Q    It's -- What's this?  Is this -- What's that made out of it?

A    It's sheet metal.

Q    And then this is a cushion.  It's just kind of a little cushion that sits on top of sheet metal.

A    Yes.

Q    And that's the seat back.  These are what kind of material?  Do you know?

A    I mean it's canvass covering some foam.

Q    Yeah.  There's -- It's -- It's a pretty rudimentary seat.  Would you agree?

A    I -- We agree.

Q    So these were all things that were part of what actually were evaluated and commented upon in your report, were they not?

A    These were commented on, yes.

MR. HANSON:  Go to the next slide, please.

Q    (By Mr. Hanson)  Now what I've got here, this is from Exhibit 7512-20.  This is your inversion test apparatus video, isn't it?

A    This is the inversion test photograph, so yes.

Q    What we have here is a series of stills and a video clip

from -- taken from this video exhibit.  This shows the set-up
that was used in the Humvee testing, doesn't it?

A    Yes.

Q    We can see that we have a dummy in a seat sitting there.
We've got this cage apparatus.  And you see these lines?
Grids?

A    Yes.

Q    Those were placed there so that you could have a visual
target to see what was going on when you looked at this,
weren't they?

A    Well, they were placed there so we could measure
excursion.  We would draw a line back from the top of the head
and mark the board and then mark between -- measure -- measure
between the two points.

Q    What's the size of the grid?

A    I don't remember offhand.  It appears to be 2 x 2.

Q    Yeah.  They look about 2 x 2, but it's not documented
that I can see in the video, and it's not mentioned in the
report.  That's true, isn't it?

A    I -- I'm not sure.  Again, we use it to draw lines, and
then we just measure -- we draw two dots and measure between
the two dots with a ruler.

Q    But you would agree with me?  You believe that these are
two-inch increments?

A    Looking at it now, it appears to be two inches.

Q    And this right here is a camera, isn't it?

A    Yes.

Q    And that camera, it's a video camera.

A    Yes.

Q    So that camera remains in the same orientation to this test apparatus.

A    Yes.

Q    And when you turn the subject over, whether it's a dummy or a real person or whatever it is, the camera will stay in the same orientation.

A    Yes.

Q    Okay.  And that's how the test was done.

A    Yes.

      MR. HANSON:  If you'd go to the next slide, please. Can you throw up Exhibit 7512-1 for just a moment?  That's not what I meant.  That's -- I got the number wrong.  We'll fix that later.  I apologize.  The test report itself we'll get back to.  There we go.  We'll continue from here.

Q    (By Mr. Hanson)  One of the things we notice about this test apparatus is that it's a big square structure, correct?

A    Rectangular, yes.

Q    There is no roof or occupant compartment here.

A    Agreed.

Q    It doesn't have the shape that a real vehicle occupant compartment would have, does it?

A     No.

Q     A real vehicle occupant compartment would have a curved shape, wouldn't it, on one side or the other, depending upon which side is the outside?  So let me fix that.

A     Yeah, I'm confused.

Q     It would be curved like that at some height.  There's a curvature.  It doesn't go out straight.

A     Most vehicles have a curvature in the corner, yes.

Q     Now if you're right, we have -- each one of these represents two inches.  So would you agree with me that this fellow starts off quite a ways away from either of these side structures?

A     Yes.

Q     And, of course, there's no roof as a reference, but the idea would be to have a roof up here somewhere, right, for a real vehicle?

A     We're testing overall excursion, so we don't want to have interference from a roof.  If you hit a roof, you're going to have stoppage.  So that doesn't really tell you the effects of the restraint system.

Q     Well, what this isn't telling you is what would happen if you put this same seat and belt in a vehicle that did have a roof.

A     It tells you if, you know, the clearance to the roof is less than what he moves, you're going to hit the roof.  If the

clearance is more to the roof than what he moves, you're not going to have contact. So it tells you a lot about what's going on in a vehicle.

MR. HANSON: Could we have 7512-19? Okay. Never mind.

Q    (By Mr. Hanson)  What is the report number for this? Your final report.

A    For the data?

Q    Yeah -- No; for your Humvee final report. I'm just trying to get it so I know what exhibit number your written report is.

A    130-22. Oh, that's -- We'll see if that's it.

Q    Okay. So this is what you did at the end.

A    Yes. This is the final -- This is the report.

Q    And you made some recommendations in the report, didn't you --

A    Yes.

Q    -- when all was said and done?

A    Yes.

Q    And isn't it true that at the end of the report, the proposal that you made was simply that the Army should have performance goals?

A    That was one of our recommendations, yes.

Q    But you didn't tell them what you thought those performance goals should be, did you?

A    I believe we mentioned some particular items about the seat belt system, but did we mention specific goals?  No, I don't believe so.

Q    So you told the -- told the Army to have goals, but you didn't tell them what would be an appropriate goal or a recommended goal.

A    We gave them some recommended designs, but we did not give them -- we did not establish all of their design goals, no.

Q    Right.  What you did was you went through a series of things that you then tested and said here at the end of this report -- or at the end of the work rather you came up with a suggested alternative design.

A    Yes.

Q    And that suggested alternative design, I think as we established earlier, is what became the subject of the patent that you have.

A    A lot of the elements are, yes.

        MR. HANSON:  Let's go back to Slide 23, if we can, please.

Q    (By Mr. Hanson)  And all of that comes out of this testing that we're looking at now, doesn't it?

A    Well, I mean there's this testing.  We ran computer simulations.  We ran hazard analysis.  We ran mishap data.

Q    I meant this project.

A    This is all part of this project.

Q    But this that we're looking at now is the physical testing that you did.

A    Yes.

Q    All right.  So what you're going to do with this fellow, this is a guy that's just sitting in the seat.  This is at the very beginning of your -- of the video.  This is a taller occupant, right?

A    Yes.

MR. HANSON:  And if you'd go to the next slide, 24.

Q    (By Mr. Hanson)  Now you see this guy over here?  You see this?

A    Yes.

Q    What you're doing there is you're pretightening the seat belt.

A    We're applying the 5.5 pounds, yes.

Q    So you're making sure that it's been tightened before you start the rotation of the vehicle.

A    Right.  This still has a live retractor, but we're making sure there's no -- a controlled amount of no slack in the system.

MR. HANSON:  And if you could do the next slide, please.

Q    (By Mr. Hanson)  So now we're just going through.  What you see him doing here is trying to adjust the seat belt.

That's after -- This comes after the lap belt that you have pretensioned it.

A    We're asking him to make sure that the red belt, which is the safety belt, is not interfering with the seat belt.

Q    Because you've added this extra thing here.  What's that for?

A    The red belt's a safety belt.

Q    Safety belt.  What -- What's it for?  Why do you need it?

A    Well, these are prototype systems, and in case -- when we turn him upside-down, we didn't want him dropping to the ground in case the belt failed or the seat failed.  So we ran a safety belt around him to the fixture itself.

          MR. HANSON:  Would you go to the next slide, please?

Q    (By Mr. Hanson)  Now this shows him in the process of being rotated.

A    Yes.

Q    We can see ---

          MR. HANSON:  Go back two slides, please.

Q    (By Mr. Hanson)  Okay.  You can see where his head is when he starts off seated upright.

          MR. HANSON:  Now go forward two again.

Q    (By Mr. Hanson)  He has moved substantially by the time you've put him just sideways.  He's not upside-down.  He's just rotated sideways now, correct?

A    It looks like it, yes.

Q    And -- Okay.

MR. HANSON:  Keep going.  Next slide.

Q    (By Mr. Hanson)  Now we have him upside-down, do we not?

A    Yes

Q    And we can see that his head now has come up to there.

A    Yes.

Q    So he's moved at least four inches.  Wouldn't you agree?

A    Well, if the grid's two inches, he's moved two inches.

Q    He's moved two squares.  That's four inches.

A    I saw him move one square, so.  But, again, there's going to be some parallax issues with this camera.  There's hair in the way.  We take a device, a T-square.  We had a T-square laying against the board in the back, and then the other squares goes onto his head.  We mark on the board where the point is, draw a little "x," and we have a starting point and ending point.  And at the end of the test we measure between Points 1 and 2.

Q    All of the marks that you make, that's all happening behind the camera, so you can't see it from the video camera. You can tell that you're doing it, but nobody can tell where you put the marks.  Would you agree with me?

A    I would -- In most cases the head is going to block that position, yes.

Q    But we do throughout this entire test series have the benefit of this video camera showing us where the occupants

are.

A    Yes.

Q    Okay.

MR. HANSON:  If you'd go to the next slide, please.

Q    (By Mr. Hanson)  Would you agree with me that that is affecting the motion of this occupant?

A    I don't believe that's tight, no.

Q    You don't think that's under tension?

A    No.

Q    Okay.

MR. HANSON:  Next slide.  Next one.

Q    (By Mr. Hanson)  Now he's back right side up.

A    Yes.

Q    By the way, this is you over here, isn't it?

A    Yes.  I mean I can't tell from that picture, --

Q    Yeah.  That's not -- That's not the best angle.

A    -- but I know from other pictures.

Q    I agree.

A    Other pictures I'm in the left rear corner on these tests.

Q    Okay.

MR. HANSON:  So would you go to the next slide, please?

Q    (By Mr. Hanson)  Okay.  Now he's completed that series, has he not?  That first one where he's just using the

three-point belt.

A     Yes.

Q     And just so we're clear here because we haven't really -- in case the jury doesn't understand.  The seat that he's sitting in is half a seat like this, plus the half of the one that would be the passenger side seat put together.

A     Yes.

Q     And what we've just seen, he was using only the shoulder belt and lap belt the way it's supposed to be but with the belt pretightened.

A     With the belt with the slack taken out, yes, with the five-and-a-half pounds of tension.

Q     And now what we're going to see is this second shoulder belt added, the one that would come off of here.

A     I know we did that test series, yes.

Q     So I asked earlier this morning about if you're trying to put this belt on, if the -- where the belt comes out, is it behind my shoulder, and it is, right?

A     Yes.

Q     So if I had two belts, they'd both be behind my shoulders.

A     Yes.

Q     One behind each shoulder.  So once I've got this one in, I somehow have to get behind my other shoulder to put the other one on.

A    Yeah.  The occupants had no trouble doing this.

MR. HANSON:  Oh, excuse me.

THE WITNESS:  Careful.

MR. HANSON:  Next slide, please.

Q   (By Mr. Hanson)  I'm sorry.  I'm out of sequence.  This is just rotating in the other direction now.

A    It appears to be, yes.

Q    Yeah.  Now we're going in the direction toward his shoulder belt, and he gets pretty close to that structure. Wouldn't you agree?

A    Yes.

MR. HANSON:  Go back one and forward one.

Q   (By Mr. Hanson)  That's a lot of inches of movement that happened right there.  Wouldn't you agree?

A    Well, I mean we have the measurement.  We can -- We don't have to speculate about "a lot."

Q    Now he's upside-down, and this is going in the second direction.

A    Okay.

MR. HANSON:  Next slide.

Q   (By Mr. Hanson)  He's on his way back down to being straightened up.

A    Okay.

MR. HANSON:  Next slide.  Next slide.

Q   (By Mr. Hanson)  Okay.  Now we can see that he's taking

the belt off after he's done, right?

A     Yes.  And you can see me in the corner.

        MR. HANSON:  Next ---

Q     (By Mr. Hanson)  Yeah, this ---

        MR. HANSON:  Okay.  Back up.

A     With hair.

        MR. HANSON:  Next one.

Q     (By Mr. Hanson)  That's you.

A     That's me, correct.

Q     Okay.

        MR. HANSON:  Next slide.  Keep going until we get to it.  All right.  There we go.

Q     (By Mr. Hanson)  Now this is at the end after he's been put back right side up.

A     Yes.

Q     Before he's -- had the second belt put on, correct?

A     It's at -- He's right side up.  I'm not sure where it is in the sequence.

Q     Well, these were done in order --

A     Okay.

Q     -- if we go back and look at your video.

        MR. HANSON:  Give me the next slide, please.

Q     (By Mr. Hanson)  So there he is.  This is at the end.  He's got his shoulder belt on after he's been turned back down.  Do you see his position?

A     Yes.

Q     He's a lot closer to the top than he started off.  Don't you agree?

A     He appears to be, yes.

MR. HANSON:  Next slide, please.

Q     (By Mr. Hanson)  Now we can see that he's in the process of putting his other belt on, is he not?

A     Yes.

MR. HANSON:  Where do we have the one that shows the two together?  The two slides together?

Q     (By Mr. Hanson)  Okay.  What we have here, Mr. Sicher, this gentleman's the same man.  He's in the same seat.  The one on the left is where he was positioned when the belt was being tightened on him.  The one on the right is just something where he was at the end of the whole test.  You'd agree with me that his head is at least two inches higher in the right photo than on the left.

A     Well, I mean, again, assuming the parallax isn't there, but, yeah, he's gotten in a different position because during the excursion, your body moves.  We saw him move left and right.  So things shift, and you get in a different position post-test.

Q     But he's right side up in both cases.

A     Yes, he is.

Q     In fact, it looks like he's just straightened up a little

bit, hasn't he?  Just shifted his posture a little bit.

A    It looks to me like he's -- I'm not sure what he's doing.

Q    Well, if you were to measure him over here and measure him over here, you'd end up with different conclusions about his head clearance is, wouldn't you?

A    Again, we started with a pretest measurement, the max excursion.  At the end of the test we did not measure where his excursion was at the end of the test back upright.

Q    Okay.

          MR. HANSON:  Next slide, please.  Back to the -- This would be ---

Q    (By Mr. Hanson)  We can see that he is now -- He's got no belts on right now.  He's got them in his hands.  So he's not wearing any belts now, right, on this slide?

A    Correct.

Q    Okay.

          MR. HANSON:  Next one, please.

Q    (By Mr. Hanson)  Now you said that they didn't have any trouble putting the belt on.  Do you recall saying that?

A    I recall saying no one -- yeah, no one complained about it.

Q    Okay.

          MR. HANSON:  Would you just run the video, please?

Q    (By Mr. Hanson)  The belt's off now.

A    Yes.  Well, he's taking it off.

Q    Yep.  Now he's going to start putting things on.  You're helping him.

A    Yep.  In fact, I think he had them in the wrong order, so that's what we're telling him.

Q    Now he's having trouble getting it to latch.  He's got a lot of slack in that second belt at this point, wouldn't you agree?

A    I agree.

Q    And now -- now they're going to put tension on the belt again.

A    Right.  We put the five pounds on, take the slack out.  That way it's consistent test to test to test.  We take the five pounds out.

Q    So what we're about to see is the alternative you proposed to the Army, isn't it?

A    One of the alternatives, yes.  See, that just took the slack out.  The retractors are still operating right now, so that was just to make sure the slack was out of the system.

Q    Okay.  Now he's got these two belts across his shoulders.  Now you're not suggesting that anybody would actually use that seat belt in a passenger vehicle, are you?

A    Well, we have not recommended that, but other manufacturers right now have talked about it.

Q    Nobody uses that kind of design, do they?

A    No one uses that design now, no.

MR. HANSON:  If we'd go back, please, to Slide 43.

Q    (By Mr. Hanson)  Now we're just going to watch what happens to this fellow when you turn him over with the two belts on.  Now it's being tightened up.

MR. HANSON:  Next slide, please.  Okay.  Keep going.

Q    (By Mr. Hanson)  Now this is excursion that is happening even though -- and just hold it there for a minute -- even though he has both belts on and it was pretightened.  Isn't that right?

A    Yes.

Q    And if we look at the seat, the seat's moved, too, hasn't it?

A    I -- I don't recall ever having a problem with the seat moving in this test.

Q    Well, I'm not talking about if they had a problem.  I'm talking about whether, in fact, when you tipped this thing, the seat didn't lean, too.

A    I don't recall ever having that finding.

Q    Well, whether you found it or not, it might be in the data and you didn't notice.  Wouldn't you agree with me?

A    Is it possible to see him move a little bit because of his loading?  It's possible.  Again, I didn't look for it and didn't see it, so I can't say it didn't happen.

MR. HANSON:  Next slide, please.

Q    (By Mr. Hanson)  Now we have him upside-down.

A     Yes.

Q     And he's in the same place he was when he had the three belts on.  He's not any further away.  This didn't reduce his excursion at all, did it?

A     I mean, again, we have the data, and the data shows that there was a slight reduction in vertical excursion for the -- the average occupants.

Q     But if there was a roof on this apparatus, he'd be on it. Isn't that true?

A     If the roof were within two inches of his head, he'd be on the roof, yes.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Now this shows him getting pretty close over here, too.  Wouldn't you agree?

A     I agree.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Even closer now.

A     Yes.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Now he's upside-down again.

A     Yes.

Q     Now he's even higher.  He's above this line now, isn't he?

A     Well, his hair is for sure.

Q     Okay.

MR. HANSON:  Next slide.

Q   (By Mr. Hanson)  Now we have a different subject.  This guy is much smaller.

A   Yes.

Q   And by the way, both of the people, the person who I just showed before and this gentleman here, some of these photographs appear in your published paper, don't they?

A   I would imagine they do.  Well, photo -- Probably not video captioning but photographs of this testing.

Q   Yeah.  Well, we're going to -- You go through the same sequence with this smaller man and then with other subjects, true?

A   Yes.

Q   We're certainly not going to go through all of them.  But this person starts off.  If we can get a reference point, there's a grid line that's a little bit below your cage here.  Would you agree with that?  This -- This one's a little below where the cage is?

A   Yes.

Q   And then there's another one and then there's another one.  So he's -- It looks to me like he's about four inches below the bottom of this cage.  Would you agree with that, roughly?

A   Yes.

Q   Okay.

MR. HANSON:  Then if you would give me the next slide, please.

Q   (By Mr. Hanson)  This shows how far he moved when you rotated him.  That'd be away from the shoulder anchor.

A   Correct.

Q   And by the way, that's the motion that would be happening if you were the far side occupant, isn't it, in a rollover?

A   Far side occupant for initial trip, yes.

Q   Sure.  If this -- If this vehicle was -- If this were an overturning vehicle that way, this is the way he would move, right?

A   For a trip -- For a trip, that's the way he would move in a trip.  Once centrifugal forces take over, he's going up and out.

Q   And that reminds me of something I forgot to mention, so I'll do it now.  In the 208 dolly, the part of that that actually has to do with a rollover, we talked this morning of how it calls for using an unbelted occupant and it's looking at ejection, right?

A   Yes.

Q   At partial ejection?

Do you recall where the standard requires that dummy to be replaced -- to be placed?  On the near side or the far side of the roll?

A   I do not recall if they specify near side or far side for

the dummies.

Q   Well, we can look it up.  It says -- Would you dispute that it says near side?  You can have them on the near side, low side of the roll?

A   I'm not in dispute it has a certain side to it.

Q   Well, if the standard calls for putting the dummy on the low side of the roll, it's another reason why it's not -- It's not looking at torso augmentation, is it?

A   The standard itself is not.  I agree.

Q   Okay.

        MR. HANSON:  Now next slide here, please.

Q   (By Mr. Hanson)  We now have this much more smaller man inverted, true?

A   Yes.

Q   He's gone at least four inches, hasn't he?

A   I mean trying to read between the hair and the lines he started out with, he'd be on the order of that with this parallax, yes.

        MR. HANSON:  Next slide.

Q   (By Mr. Hanson)  By the way, "parallax," what you're talking about there is the effect of a camera lens when it looks at something in perspective, correct?

A   Right.  It's coming out as a cone, so, you know, depending on where it's positioned, if you're -- if you're dead on, you're dead center of the cone.  But as you get

farther from the center of the cone, you're having an angle effect from the camera lenses.

Q   Well, it can also be affected by your focal length of lens as if a 50 millimeters is a 35 millimeters or what is it, correct?

A   The lenses can affect the amount of parallax, yes.

Q   But this was supposed to represent what the eye sees, wasn't it?

A   Supposed to represent the what?

Q   What the eye sees.  That's why you put the camera there.

A   This was putting a camera in a stationary spot and basically in line with the occupant's head.

Q   Speaking of lens parallax, that would be true when taking a photograph of anything, including a crashed vehicle, right?

A   Yes.

Q   So depending upon where you position the camera, how far away you are, whether you're at an angle, you can distort the appearance of what you're looking at.

A   There can be distortion at times, yes.  And, again, this goes back to why we use measurements as much as we try to.

      MR. HANSON:  Next slide, please.

Q   (By Mr. Hanson)  Now we have this smaller man being put in the two belts.

A   Yes.

      MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Now you're tightening him up in the two belts.

A     Yes.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Now you're turning him over again.

A     Yes.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson) So now we have him upside-down with both belts.  He's up above -- wrong place -- up above the line at the base of those pillars.  Wouldn't you agree?

A     Well, I think his hair is just barely touching that line.

Q     Okay.

A     So his head's going to be a little less than that.

Q     Okay.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Now we have him getting pretty close to the side structure.  Wouldn't you agree?

A     Yes.

Q     If there were a structure.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Now he's upside-down.

          MR. HANSON:  Next slide.

Q     (By Mr. Hanson)  Okay.  We've gone through -- That gives the jury a flavor of how you did the testing for this Humvee data, correct?

A     Yes.

Q     And you used this to craft suggestions to the Government, did you not?

A     Recommendations, yes.

Q     And I'd like to look at the other study that you actually participated in.  This is Exhibit 285, your published paper about your Ford all-belts-to-seat testing.  All right?

A     Okay.

Q     Do I understand you to say that this -- this report purports to duplicate the Malibu drop tests?

A     This report represents that the -- the test set-up we had resulted in -- in -- We tried to replicate the Malibu drop test as closely as we could and to show that we got the same results that Malibu did in their drop test.  And then we were able to take that test process and apply it to an alternate design.

          MR. HANSON:  Could I have Exhibit 285, please?

Q     (By Mr. Hanson)  So this is -- is your -- the report of your testing, right?

A     Yes.

          MR. HANSON:  Go to Page 5.  Can you zoom in on that, please?

Q     (By Mr. Hanson)  This is a really grainy, poor quality copy, but this is all that there is in -- in the exhibit.  This shows the apparatus that you were using for these drop

tests, doesn't it?

A     Yes.

Q     General Motors used actual vehicles.

A     Yes.

Q     So that's one difference for sure.

A     Yes.

MR. HANSON:  Go to the next page, please, and zoom in on those.

Q     (By Mr. Hanson)  Now, again, they're not very good quality, but that's what there is.  So this looks like the same apparatus you were rotating or something quite similar; is it?

A     Well, I mean they're -- they're different.  This is a rectangular -- a steel box, a steel rectangle that was welded together; whereas, the other one we used what we call "speed rails."  They were aluminum rails with little set screws that we could tighten in a lot of the joints to square off and make our shape, what we needed it, whatever shape we needed it to.

Q     Do you recall when I asked you earlier whether -- isn't it true that a good study documents clearly what it did, what the methodology was and what all the test conditions were?

A     That's what you try and do, yes.

Q     And the Malibu study, in fact, documented in detail what the belt configuration was, what the test set-up was, and so forth.  You know exactly what it was testing.

A    And then we try to replicate that exact same set-up, yes.

Q    So what did you do?  You took a Malibu seat and stuck it in this apparatus?  Is that what you did?

A    Took a Malibu seat, fastened it to the floor of the apparatus, took the geometry from a Malibu seat belt; used a Malibu seat belt, built a B-pillar, built the floor anchors, and we basically had the geometry and the seat that was out of the Malibu in the same geometry and seat that Malibu had.

Q    And then you did it in this apparatus, not in a real vehicle, and compared it to something that you had adapted from a Ford F150.

A    Well, we did because in Malibu, the dummy was on the roof.  So if we would do the same test here, the dummy would be on the roof.  We wanted to show in multiple tests how the dummy's interaction with the roof occurred and then with the F150 to show whether it was occurring or not.

Q    Okay.

A    So we were doing multiple tests.  So we wanted a test fixture that was -- we could use that repeatedly.

Q    All right.

     MR. HANSON:  Down here under "Alternative Configuration," could you zoom in on that, please?

Q    (By Mr. Hanson)  Your "Alternative Configuration" says it was a seat and restraint system from a production Ford F150 extended cab pickup truck equipped with integrated restraints,

otherwise known as "all-belts-to-seat."

A    Yes.

Q    Doesn't say what model year.

A    No.

Q    So if somebody else wanted to go check your data to try to replicate your test, they'd have to guess about what seat you were using.

A    Well, I mean as far as I know in this timeframe, there was only one design that carried over a number of production years.  But, yeah, we do not say it.

Q    It says it was from an extended cab pickup truck.

A    Yes.

Q    And as we talked about before, there's a reason why you might use an all-belts-to-seat in an extended cab because it makes it a lot easier to get into the back seat.

A    That's one reason to use them, yes.

Q    And then does it say anywhere here what kind of latch plate you were using?

A    For Malibu, you might talk about the latch plate there. For the F150, it's the stock latch plate.  It does not mention that, but it's a sliding latch plate.

Q    And it doesn't mention anything about what kind of retractors are in this seat either, right?

A    It's all one system.  It comes with the -- The retractor that's in there is the retractor we tested.

Q    But the Malibu comes as one system.  I mean a Malibu system is what it is, but they still called out and made it very clear exactly what components were involved in the test apparatus.  You didn't do likewise; true?

A    For the Malibu we, I believe, identified exactly what we were using for Malibu.  And for the F150, we took a production F150 seat as it was.

MR. HANSON:  Then go to the next page, please.  Now can you give me that paragraph, please?

Q    (By Mr. Hanson)  What you did ---

MR. HANSON:  Right here, if you could just highlight beginning at "The retractor."

Q    (By Mr. Hanson)  You prelocked the retractor.  Let's make sure we understand what that is.  You didn't invert the vehicle.  You prelocked it, so it was already latched.  It couldn't pay out any -- any webbing, correct?

A    Correct.

Q    And then you tightened it down to 67 newtons; 58 to 67 newtons?

A    Yeah.  13 to 15 pounds, yes.

Q    So this was precinched 13 to 15 pounds.

A    Based on what pretensioners typically have as residual tension, yes.

Q    But the Ford ABTS seat, the Ford F150 all-belts-to-seat did not have a pretensioner, did it?

A    It did not have a rollover-activated pretensioner, no.

Q    So what you were testing, in fact, in this comparison was not a Malibu-type seat compared to a Ford F150 seat.  It was a Malibu-type seat compared to a Ford F150 that had been modified to be pretightened.

A    Well, the seat itself wasn't modified.  The test procedures for the alternative included a tightening of the seat belt to simulate a pretensioner.

Q    But the point I'm getting at here is:  There is no way to tell me when you do two changes at once whether any changes that you noticed are the result of it being all-belts-to-seat or if they're all because of the pretensioning.  You can't parse that out, can you?

A    In this testing right here, I have not tried to parse it out.  This is a test -- If I were using this as an alternative, it would be a rollover-activated pretensioner with all-belts-to-seat as it is.  I -- From this testing you cannot parse out what benefit you get from one versus the other.  I agree.

Q    So this test in no way, shape or form supports your opinion to this jury that if you take an all-belts-to-seat and a cinching latch plate, you're going to have a benefit, does it?

A    This testing goes to show you that there were alternatives on the market in this timeframe that would have

prevented Dr. Roberts' excursion and injury. It is not proving my alternative that I proposed here. That comes from the other testing.

Q   Well, I don't know if that's "yes" or "no."

The fact of the matter is this testing does not support your opinion to this jury that if you just took an all-belts-to-seat and used a cinching latch plate, that that would give you better performance. You can't conclude that from that testing, can you?

A   This data right here does not involve that opinion at all, no.

Q   Right. So it does not support the opinion that you offered the jury, does it, sir?

A   It supports the opinion that there were methods available to protect Dr. Roberts. It does not support the opinion of the alt. design I proposed here.

Q   I want to take a quick look at something, changing subjects a little bit here, because you were commenting earlier on the Exhibit 46, the rollover test that was done in 2007. The jury has seen the outside view of that video. They've seen the -- the far side occupant view. They haven't seen the driver side view. I'd like to run that quickly, if we could here, because there were two dummies inside, correct?

A   Yes.

MR. HANSON: And before you run that, just hold it.

Q     (By Mr. Hanson)  We established earlier that you know this was actually a project being done to develop the algorithm for advanced rollover protection, true?

A     I know that the objective was involving side air curtains.  I'm not sure if it's for the algorithm development or deployment of the curtains.

Q     Well, if we look at the test, you'll see that the curtains are already there.  They're in place before the test begins, so it can't very well be to deploy them, right?

A     Well, again, I know it's related to the side curtains, but I don't know the algorithm issue.

Q     Okay.

        MR. HANSON:  Go ahead and run this.

Q     (By Mr. Hanson)  We're not going to be looking at the other side dummy.  And, again, --

        MR. HANSON:  Stop it for just a moment.

Q     -- what we're seeing here is right side up because it hasn't tipped yet, right?

A     Well, it's at the 23-degree angle, yes.

Q     But when it goes over, most of the tests we're going to see, it's actually -- you have to turn it upside-down to see how it's happening in the real world, right?

A     Yes.

Q     Now one of the things, though, I want to draw your attention to is right here.  Do you see that?

A    Yes.

Q    These things had -- These tests were done with a high-speed camera, right?

A    Yes.

Q    So we got a time signature.  We know what the timeline is at any given point.

A    Yes.

Q    Okay.  And then if you want to, you can match it up to other views.

A    Yes.

Q    Okay.

          MR. HANSON:  Would you, please, run it?

          (Pause)

          Stop it right there.

Q    (By Mr. Hanson)  This would be -- If this vehicle's going to overturn, it's going to overturn in this direction because we're now on the driver's side, correct?

A    Correct.

Q    So this is the near side occupant now, not the far side occupant.

A    Correct.

Q    This is not the one that's at the higher risk of sustaining a torso augmentation injury, correct?

A    Well, I mean the higher risk, generally speaking, the -- the more severe impacts are to the far side.

Q    Right.  But what we can tell here is that at this point in time, if this curtain is not here, that head is going out the window.

A    I would agree.

        MR. HANSON:  All right.  That's enough.  We don't have to run it through all the way.  Could you give me Slide 5, please?

Q    (By Mr. Hanson)  What we have now are stills of the passenger and driver's side dummies at the same moment in time.

A    Yes.

Q    So these two things that we're seeing here are happening at exactly the same time.

A    Yes.

Q    Again, like right down to the millisecond.

A    To the millisecond, yes.

Q    A thousandth of a second.

A    Yes.  That's, by the way, one of the advantages of digital video.

Q    You were critical of the belt coming off this dummy even though you know that's not what happened in the Roberts crash, right?

A    I'm saying this is indicative of seat belt performance in a rollover, and had GM seen this when they did the -- if they had done this testing prior to that, they might have

acknowledged this and done something to try and fix this problem.

Q    Well, unfortunately, we got this big light right there, so it's obscuring it.  But if we look through that whole video again, we can see it, but there's a force transducer attached at that point on the seat belt.  Do you know what a "force transducer" is?

A    Yes.

Q    And these lines, those are the -- those are the lines that are running to it to be able to retrieve the data?

A    The instrumentation lines, yes.

Q    The forced transducer is measuring tension on the seat belt, right?

A    Yes.

Q    So you do know -- If you're interested in knowing whether that belt was under tension at this point, you could find out, right?

A    I -- I believe the belt's under tension at this point, but I could find out, yes.

Q    But here's the point, too.  Look at this shoulder.  Do you see that dummy's shoulder?

A    Yes.

Q    It's not very human-like at that shoulder joint.  Would you agree?

A    I agree.

Q     Humans don't have a big ridge with an articulated joint in between.

A     Agree.

Q     And if you go back and look at this video, what actually happens is this belt catches on the edge of his shoulder. Isn't that why it comes off?

A     Well, actually that's probably why it stays on better than it does.  Normally they slide right off.

Q     We can look at that again later and see whether that's right or if it isn't, in fact, being influenced by the dummy's shoulder, but the important point that I wanted to make here is:  At the point where that's happening is exactly the same point where the dummy's head would be going out the window.

A     Yes.

Q     And this is exactly the kind of information that would be really useful in developing an algorithm to predict when rollover is going to occur and the timing involved so that you can get a bag out in time to keep that head inside.  Wouldn't you agree?

A     That's very useful for that.  It's useful for other items, too.

Q     Now if we can, please, I want to look at what you actually recommended to the Army.

        MR. HANSON:  If we could have Slide 62.

Q     (By Mr. Hanson)  This is your report to the Army from the

Humvee study.

A    Yes.

MR. HANSON:  Next slide, please.

Q    (By Mr. Hanson)  It's that same apparatus we saw before, right?

A    Yes.

Q    And this is a figure that you published in the paper.

A    I -- It's a figure from a testing.  I'm not sure where it was published or not.

Q    Well, do you have the report in front of you?

A    The Army report?

Q    Yep.

A    Yes.

Q    Take a look at it because I don't want to represent anything to you that you don't agree with.

A    It does appear to be Figure 1.

Q    Okay.

MR. HANSON:  Then can I have the next slide, please?

Q    (By Mr. Hanson)  All right.  Now this is a compilation of several figures that were illustrated about things that you were looking at and had concern with about the Humvee, correct?

A    Yes.

Q    And the one that I'm -- I'm only -- I'm particularly interested in one, not all of them, but there were several

things you were looking at, true?

A    Yes.

Q    Okay.

MR. HANSON:  Let's move on to the next slide.

Q    (By Mr. Hanson)  One of them was that this roll bar creates a risk of head impact injury.

A    Yes.

Q    And it says, "No head restraint."  What you mean by that is nothing that comes up behind the driver's head.

A    Correct.  This was a low seat back.

Q    This is a head restraint.

A    Yes.

Q    And the Roberts van has a head restraint.

A    Yes.

Q    Okay.

MR. HANSON:  Next slide.

Q    (By Mr. Hanson)  So you came up with a series of suggestions for things that could be done to improve this seating environment; true?

A    Yes.

MR. HANSON:  Next slide.

Q    (By Mr. Hanson)  And this zooms in on it a little bit. You suggested to the Army that they use a second shoulder belt.

A    Yes.

Q     You suggested an anti-submarining ram.  In other words, you're making an angle on it and not having it flat.

A     Correct.

Q     The Roberts van already has that, doesn't it?

A     Yes.

Q     Rate dependent seat bottom cushion, the Roberts van already has that.

A     It's probably not rate dependent, but it has a seat bottom.

Q     Then you say "passive lateral restraint."  You're talking about these.  They're kind of the contours on the side of the seat that would keep you ---

A     Correct.  Side -- Side wings, side bolsters.

Q     The Roberts van has that, doesn't it?

A     I don't recall right now, but it probably does.

Q     And then you're recommending that this should be all-belts-to-seat and should use a cinching latch plate.

A     Yes.

Q     This says "cinching latch plate."  You're not saying this is actually a cinching sliding latch plate that doesn't cinch the same way as a true cinching plate; true?

A     Well, again, this is showing a cinching sliding latch plate, and it is not spelled out as a cinching sliding, but it is the Sebring latch plate.

Q     Okay.

MR. HANSON:  Give me the next slide, please.

Q     (By Mr. Hanson)  This shows your proposed alternative design, what you suggested to the military, with a man sitting in it.

A     Yes.

Q     No way is that going to keep his head away from the roll bar.  And if this thing had a roof, no way is that going to keep his head off it if it turns over.  Isn't that true?

A     I agree.

MR. HANSON:  You can take that down.

Q     (By Mr. Hanson)  So if we can summarize, you have no data, sir, that you can show the jury wherein you tested only all-belts-to-seat with this kind of a latch plate and inverted it, do you?

A     I do.  The Humvee data has that.

Q     Okay.  You didn't test this, right?

A     Yes.

Q     You did not test this seat, a real seat.

A     We tested a Sebring seat that was an inch narrower, yes.

Q     But in the Humvee data, you didn't just test the seat and this kind of latch plate because you also put a pretightening load on the belts every single time.  Isn't that right?

A     That took the snug -- That -- That just established the amount of -- took out the slack that was there on a consistent basis.  It was at the time a live retractor, so it was there,

and then we had the test.  So I completely disagree with what you're saying.

Q    You are -- You're -- What you're telling the jury here is that we have to have a seat belt which is capable somehow of keeping the occupant's head from ever hitting the roof in a rollover.

A    I'm saying foreseeable level rollovers with an occupant that has the clearance that Dr. Roberts has.  There are alternatives out there that will keep her head off of the roof, off of the roof rail, and prior to any ground contacts. The Humvee alternative, I showed you data that just had one of the GM guys switching a latch plate which gave them almost an inch less in his exact same belt set-up.  So there are alternatives there.  That's what I'm telling you.

Q    You've proposed a particular alternative that itself was not tested ever in a van of any kind, true?

A    It was tested as a stand-alone item, and the clearance measures ---

Q    It was never tested in a van.

A    That's true.

Q    It was never tested in any vehicle.

A    That's true.

        MR. HANSON:  Thank you.

        THE COURT:  You got much?

        MR. SIMON:  About ten minutes.

THE COURT:  Okay.  Let's see.  Let's take our afternoon recess.

MR. SIMON:  All right.

THE COURT:  Recall the admonition.  Come back here at quarter after.  Come back at 20 minutes after.

(Court recessed from 2:55 PM until 3:25 PM.)

THE COURT:  You may proceed.

MR. SIMON:  Thank you, Your Honor.

REDIRECT EXAMINATION

QUESTIONS BY MR. SIMON:

Q    Mr. Sicher, there's just a few points I want to -- I wan to cover with you.

MR. SIMON:  Let's put up Exhibit 275-5, please, Jason.

Q    (By Mr. Simon) Now this is the document, right, Mr. Sicher, that -- that we used this morning?  You went over it with the jury, explaining the test results from your Humvee testing, correct?

A    Yes.

Q    Okay.  And ---

THE COURT:  Counsel?  Counsel, approach.

(Bench conference on the record with counsel and the Court:)

THE COURT:  You got another witness?

MR. SIMON:  Yes, Dr. Kennedy.  He's here.

THE COURT:  How long?

MR. SIMON:  We'll finish him before the end of the day; about an hour.

THE COURT:  Why don't you not do any Redirect?  All he did was just a glancing blow, so he ain't did nothing.

MR. SIMON:  It's -- I agree with you, but I want to make it just -- Judge, ten minutes.  I'm going to get it done in ten minutes.  I ask for your patience.

THE COURT:  Enough.

MR. SIMON:  Okay.

THE COURT:  You all don't know when to stop.

MR. SIMON:  I'm not repeating anything.  This is different.  This is -- You'll see when it comes out.

THE COURT:  Please.

MR. SIMON:  Not -- Not this time I'm not repeating anything.

(End of discussion at side bar.)

Q    (By Mr. Simon)  Okay.  Mr. Sicher, you were -- you were shown photos and video of the testing you did in the Humvee with the two shoulder belts, correct?

A    Yes.

Q    Okay.  Are you relying on the testing with the two shoulder belts for your opinions in this case?

A    Not with the two shoulder belts, no.

Q    Okay.  Does -- Does the two-shoulder belt testing that

you spent 20 minutes on have anything to do with your opinions in this case?

A    No, sir.

Q    Okay.

MR. SIMON:  As a matter of fact, 275-5, please.

Q    (By Mr. Simon)  And I'm going to get through this real quick.  The highlighted portion is the part we talked about, right?

A    Yes.

Q    And it says "three-point restraint attached."  And below it says "three-point restraint optional shoulder belt," right?

A    Correct.

Q    So this document has results from the double-shoulder belt and just the three-point lap belt like the Sebring seat, right?

A    Correct.

Q    Okay.  And that's what we talked about this morning.

A    Just the ---

Q    Got it.

A    Just the single three-point belt.

Q    Very good.

MR. SIMON:  You can take that down.

Q    (By Mr. Simon)  So let me show you one other thing here. Let me have you take a look at what's been marked as Exhibit 130-50.  Okay?  And what is this?

A    This is a photograph from the Malibu II test documentation that -- We talked about earlier Malibu II.  This is -- When they're doing inverted, they're at 180 -- at 180 degrees with a camera looking at the occupant's face.

Q    Okay.  And just real quick, this is the -- a photograph of the testing that General Motors did that we're calling "Malibu," the Malibu testing.

A    Malibu II, yes.

Q    Okay.  There's two different -- What are the belts on there?  What are we looking at?

A    We have the standard -- the Malibu three-point belt, and then they have a safety belt there.  Again, they are testing it because they don't have a roof on this vehicle, so they don't want -- if there's a belt failure, they don't want the occupant to drop out of the -- out of the vehicle.  So they use a safety belt.

Q    So in other words, you used a safety belt and they used a safety belt, right?

A    Yes, sir.

Q    Okay.  Nothing wrong with that, right?

A    No.

Q    Okay, perfect.  And then Mr. Hanson asked you about rollover sensors.  When did they become available in production vehicles?

A    2002 was the first model year that had a for sale vehicle

in the U.S. with rollover sensors.

MR. SIMON:  Thank you.

No further questions, Your Honor.

MR. HANSON:  Just two real quick ones.

THE COURT:  Good.

RECROSS EXAMINATION

QUESTIONS BY MR. HANSON:

Q    You have to have a rollover sensor before you can talk about a pretensioner that's going to do you any good whatsoever in a rollover, don't you?

A    If there -- If the event only involves a rollover, yes.

Q    The very, very first ones were in 2002, but most of the them didn't come in until later.  Isn't that true?

A    Well, you started in 2002 and then you got more and more as the years went on.

Q    Did you see any testing about how well that first 2002 one did?

A    I have not.

Q    And by the criterion that you are telling this jury, a very, very large proportion of the vehicles that were on the road in 2004 would be defective, wouldn't they?

A    Again, I haven't looked at whether each vehicle let's the occupant get to the roof or not, so I can't answer that question.

Q    You answered it in your deposition, didn't you?

A      I -- I don't remember.  I just know that ---

Q    Just answer one question.

THE COURT:  One more.

MR. SIMON:  Your Honor, that's outside the scope, also.  That was not brought up on Redirect.

THE COURT:  It's fine.  You should have objected.

So then are you objecting now?

Are you still outside the scope?

MR. HANSON:  Am I?  I don't know.

THE COURT:  You don't know.  Well then, you're outside the scope if you don't know what you're doing.  That's enough.  You said two questions.  You did five.

MR. HANSON:  Okay, it's more than two.  I'll agree on that ground.  I'm done.

THE COURT:  I thought you were going to stop at four.

MR. SIMON:  No further questions, Your Honor.

THE COURT:  Very well.

Thank you, Mr. Sicher.

THE WITNESS:  Thank you.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. BURGER:  Your Honor, Plaintiff calls David Kennedy to the stand.

THE COURT:  Very well.

DIRECT EXAMINATION

QUESTIONS BY MR. BURGER:

Q   Can you state your name, please?

A   David Kennedy.

Q   And what's your business or occupation?

A   I'm a physician specializing in Neurosurgery.

Q   Where did you go to medical school?

A   St. Louis University.

Q   When did you graduate?

A   1979.

Q   What did you do after that professionally to train yourself?

A   My first year of training was with the Air Force at Wilford Hall United States Air Force Medical Center, and that was from 1979 to '80.  And then I returned back to St. Louis for training at the --

Q   You can move this, too, if you want.

A   -- at St. Louis University Medical Center from '80 to '85, and I then returned to active duty in the Air Force from '85 to '88 as a -- as a neurosurgeon.

Q   Okay.  And so your fellowship was in?

A   Microsurgery.

Q   And for what area of the body?

A   Brain and spine.

Q   Okay.  And then you went and acted as a neurosurgeon,

brain and spine surgeon, with the Air Force?

A    Yes.  I was in the Air Force for three years, and then I returned to private practice in the St. Louis Area as of 1988, and I've been in private practice in the St. Louis Area since then.

Q    Since then, can you describe to us generally what your practice is?

A    Well, Neurosurgery deals with injuries and disease processes involving the brain, the spinal cord and the nerves. And so I've taken care of all different kinds of issues related to those structures.

Q    Okay.  Do you -- Do you have your own private practice?

A    Yes.  My practice is located at Missouri Baptist Medical Center.

Q    Do you also have admitting privileges at other area hospitals?

A    Yes, at St. Luke's Hospital and then I have courtesy privileges at Cardinal Glennon.

Q    And I see on your curriculum vitae, your professional resume, there's other surgery centers that you perform procedures at?

A    Right.  There's a couple of outpatient surgery centers that I'm affiliated with.

Q    All right.  And then day to day, how much of your time is spent treating patients and surgeries?

A    Virtually all of it.

Q    Okay.  Do you do surgery weekly?

A    I operate basically every day of the week.

Q    What did you do this morning?

A    I did a posterior cervical fusion.

Q    Okay.  And are you board certified in any medical discipline?

A    Yes.  I'm board certified in Neurological Surgery as of September of 1987.

Q    What's the significance of board certification?

A    To obtain board certification, you have to complete an accredited training program.  You have to pass a written examination during training covering the Neurosurgery and related disciplines.  And then after you've been in practice for at least two years, you take an oral examination from a board of senior neurosurgeons who basically review your caseload and also quiz you with various scenarios in terms of how you would manage things.  And if you complete all three of those phases, then you're afforded board certification.

Q    And that occurred with you in 1987?

A    Yes.

Q    Is that current and up to date, sir?

A    It is.

Q    You're a member, also, of various other spine and Neurology associations?

A    Right.  The main -- there's two main Neurosurgical organizations, the American Association of Neurological Surgeons, which I'm a member of, and then since I do mostly spine these days, I'm also a member of the North American Spine Society and a couple of other groups that focus predominantly on spine issues.

Q    Thank you.  Are you a licensed medical doctor in Missouri?

A    Yes.

Q    Illinois as well?

A    Yes.  I have also a licensure in Illinois.

Q    All right.  And did we -- did we ask you to do something in this case?

A    Yes.  I was asked to --

Q    What did we ask you to do?

A    -- to examine Dr. Roberts and review the medical records and assess her degree of her injuries and current status.

Q    Okay.  Did you review any documents in association with that?

A    Yes.  There are a number of documents having to do with her -- her care immediately after the accident and then subsequent care at numerous facilities.

Q    Did you -- Did we provide you those medical records and you reviewed those?

A    Yes, I did.

Q    Did you also have diagnostic studies or imaging relating to her injuries?

A    Yes.

Q    All right.  And then did you see her and examine her like you would a patient?

A    I did.  I saw her in my office on February 25th of 2014.

Q    And did you issue a report as well?

A    I did.

Q    All right.  So -- And can you describe -- Did you take a history from her?

A    I did.

Q    Can you describe to us what was significant in that history, Doctor?

A    Well, she was involved in a motor vehicle accident on February 23rd of 2012.  What happened was that the vehicle that she was driving in rolled over, and she had sustained a severe spinal cord injury as a result.

Q    Okay.  And when you took this history, how did you get it?  Was it from her?  Was it from the documents?  What did you do?

A    Well, it was a combination.  She was able to describe her recollection of the events which is pretty complete, but it was just supplemented by evaluation of the records in terms of specifically what they found as far as the spinal cord injury and structural abnormalities regarding the spinal area as well

as all the other care that had been rendered following that.

Q    Can you keep taking us through what else was significant for you in this history, Doctor?

A    Well, the main thing was that, you know, she had immediate paralysis in relationship to that event.  There were -- did not appear to be at the time of the evaluation any other major life-threatening injuries that occurred which can occur often in injuries of this nature, but the -- the very severe injury really was limited to the spinal cord which rendered her paralyzed at the time.

Q    Okay.  And so -- And did you take a history of what her immediate post-incident medical care was as well?

A    Well, the major problem was that -- and this often occurs in people who have spinal cord injuries of this nature.  Her blood pressure was very low, and that's due to the fact that part of the injury -- When the spinal cord is injured in the fashion that it was, normally maintaining adequate blood pressure is -- is an automatic function that in part is controlled by the spinal cord.  And so when, especially in the early going, after an injury like this, that automatic control of blood pressure is lost, and there's a tendency for the blood pressure to be very low.

Why it's a major concern in the early phases of the injury is that oftentimes following an injury of this nature, there can be severe blood loss from ruptured blood vessels,

ruptured spleen, things like that.  So all of those potential other injuries had to be looked for.  Fortunately, there were no other major life-threatening injuries present, but that's one of the immediate challenges in the -- in the early evaluation of patients in this condition.

Q    Is that called your "autonomous nervous system"?

A    Yes.

Q    Things that we don't consciously control but it's automatically regulated by our brain and our -- and our neurologic system.

A    Right.  And the key switchboard, so to speak, is the -- is the spinal cord.

Q    Doctor, do you have experience -- Well, I know you're a spine surgeon, so let me ask you maybe a better question.

Do you have experience treating patients with paralysis, this type of spinal cord injury and paralysis as a sequela or as a result from that?

A    Yes.  I mean both as part of my residency training and also in practice.  This is not a rare condition, unfortunately.  I did have the opportunity when I was a resident to spend several months out at the spinal cord injury unit at Jefferson Barracks out in South County where they were providing follow-on treatment.  So my initial experience was with the -- with the Emergency Room in relatively short term management, but I was interested in the longer term care and

treatment of these patients.  So I had the opportunity to rotate into that facility and come to understand what the longer term challenges were.  And, of course, I've been closely involved with this type of injury, you know, in practice over the years.

Q    Thank you, Doctor.  Can you describe to the Ladies and Gentlemen of the Jury -- Well, you've also -- Have you had an opportunity to review the diagnostic imaging studies done by Shands Hospital shortly after this incident?

A    Yes.

Q    All right.  That's referenced on Page 3 of your report?

A    Yes.

Q    All right.  And did you review the -- the -- the treatment that day, February 23rd, 2012?

A    Yes.

Q    Can you kind of describe to the Ladies and Gentlemen of the Jury the -- the injury that -- that Dr. Roberts sustained and the immediate post-injury care she received at that location?

A    Well, she has a particular type of fracture of the neck.  And if you can imagine, if the neck -- if the bones in the neck are supposed to be lined up one on top of the other like bricks on a wall, what happened is that there was some sort of forward flexion type of component to the injury to the -- during the course of the event.  And what happens is the

joints that hold the neck ---

Q   Can I -- Would an image of this or a model assist you in describing this to the jury?

A    The model would be helpful actually.

Q    All right.  Let me -- Thanks.

This is marked as Exhibit 404.  And so can you describe to us what 404 is?

A    Yes.  This is a -- a model of the spinal column.  So the white structures up and down are the bones.  And then these tan structures in between are the disks which are the shock absorbers between the bones.  And then you can see starting -- up at the top here, you can see that a little bit better through the back here.  Running down the center of that column is the spinal cord.  And so the spinal cord ---

Q    Is the spinal cord differentiated between cervical, thoracic and lumbar?

A    Right.  In each area -- Cervical are neck.  Thoracic is basically the chest area, and lumbar is pretty much the lower back area.  Each part of the spine controls certain segments of the body, including arm and hand, leg motion, automatic functions like bowel and bladder, and then other automatic functions like blood pressure.

MR. BURGER:  Can you pull up 405?

Q    (By Mr. Burger)  I have another diagram of this and ask you:  Would this assist in describing what you were just about

to talk about with the jury as well?

A    Right.  Well, the -- the main area we're concerned with in respect to this ---

Q    And feel free to either use that or this or whatever you like to describe this to us, please.

A    Okay.  Well, if we're looking at the red area, that is the area of the spine that we're concerned with in terms of this injury.  And I'll direct your attention to C6 and 7 which is where the fracture occurred.  And as I mentioned earlier, normally the -- the vertebral bodies, the bones in the neck, line up one on top of the other like bricks on a wall.  But what happened in this injury is that there was a bending movement with the neck forward, such that the joints in the back of the neck here, instead of lining up on top of one another, is what we call "jump" where they actually move so far forward over the -- over themselves that it creates severe disruption.  So if the spinal canal is supposed to be like this and one vertebral body winds up way in front of the other, you can see that for all intensive purposes, the spinal cord is sheared.

So, you know, the problem with what we call "jump facets" and that was the particular situation here, that always causes severe trauma to the spinal cord.  Unfortunately, in many cases it can be permanent, as it was in this situation, just because the force of the injury is such

that the spinal cord is devastated really from the impact.

Q    And we're starting to go with some opinions, and I'm going to ask you more as we go along.  Would you agree with me to only provide opinions you have in this case to a reasonable degree of medical certainty?

A    Yes.

Q    Then if you don't hold an opinion to that degree, don't tell us.  Okay?

A    Okay.

Q    All right.  And how did you conclude -- How did you learn or conclude that that was the injury Dr. Roberts suffered?

A    Well, I mean in terms of the locked facets and the radiographic studies were very, very impressive and very clear with respect to that.  And, of course, her -- her neurologic deficits, her degree of paralysis was documented extensively in -- in -- throughout the hospital course.

Q    What -- What did they do for her at Shands Hospital?

A    Well, what they did was that they, in essence, tried to get things lined back up.

Q    Okay.

A    So, you know, they removed excess bone, tried to restore normal alignment.  And then because that type of injury is very unstable, the -- not only are the bones fractured but all the ligaments and soft tissues that tend to hold things in place or provide additional support are severely disrupted.

So what they had to do is place hardware in there to -- to lock things back down so that there wouldn't be any further slippage.

Q    How did they put that hardware?  Is that plates and screws or rods?

A    Yes.

Q    Those are screwed into the bones?

A    Right.

Q    All right.  And so she -- And is that a permanent -- a permanent repair in her?

A    Yes.

Q    So she has -- now has -- From what level to what level does she have this metal hardware?

A    From C4 to C7.

Q    Okay.

A    So if we go back to that, from about there to there.

Q    Okay.  It says -- Your -- Your report says ---

A    I'm sorry; C4 to T1.  It's T1 which is just one segment lower than that.

Q    You go to C8 and then to T1.  Is that fair?

A    Right.

Q    All right.  What is it called -- What do you call it when they do morselized autograph bone?  What's that?

A    Well, "morselized" means with the bone that they take, you know, as they remove bone, they process it into small

bits, so really morsels essentially.  And that is placed in along the joints in the neck, and ultimately we want that to grow solid, and that provides long-term stability.  The purpose of the instrumentation is to stabilize the spine until such time as adequate bony growth takes place, and that provides long-term stability.

Q    Did they do an assessment immediately prior to the operative intervention assessing her sensation levels and where -- what function she had?

A    Yes.  It looked like -- that she had no feeling from approximately the nipples down.

Q    Okay.

A    And then also there was some loss in the -- in the upper extremities and also really had no strength; in other words, very little movement in the arms.

Q    Okay.  And how do we know -- Why does -- Why would an injury here at the C7 level affect the arms?

A    Well, because the nerves that control movement at each level of the -- and this is true throughout the spine, but at each level individual nerve roots branch out from the spinal cord.  So if you think of the brain as the main command center and the spinal cord is the switchboard, then these are individual cables that go out to specific muscles.

So when you injure a certain level of the spinal cord, everything below that -- because, in essence, the spinal

cord is sheared, everything below that level is lost.  The things that are above it generally are preserved.  There can be some exceptions to that.  Sometimes that -- that injury can evolve and include higher segments, but generally there's a -- what we call a level at which the cord is injured, and below that level there's little or no function, and above it it's generally preserved.

Q    Did you find that -- Did she have some use of her arms but also some numbness of her arms?  Is it kind of right at that level?

A    There's -- There's a little bit of sensation, but functionally, in terms of muscle strength, ability to do things, it definitely is severely impaired.

Q    Why -- Have you seen that her hands are -- What's going on with her hands and why?

A    Well, the spinal cord has two functions.  One is to make things go, you know, when the brain sends signals down.  The other is to stop certain things.  So that there's a tendency when there's not normal muscle tone just for the -- the muscles to contract that aren't being used, and there's nothing from the spinal cord to tell them not to do that.  So that there's a tendency for those -- what we call "contractures" gradually to take over.  And once they get to a certain point, the -- the ligaments tend to get locked in place with calcium and, you know, it's essentially

irreversible.

Q   As part of your history, did you learn that she does hand therapy and had a hand surgery as well to try to ameliorate some of that?

A   Right.  Sometimes what you can do is muscles that are working, you can take the ends of those muscles and attach them at different sites, and that can give you a little bit of function to try to substitute for what's lost.  Of course, it isn't -- it's not anywhere near normal, obviously.

Q   You said in your report they put in a vena cava filter into her.  Why did they do that?

A   Well, one of the major problems when you can't move, especially in the lower extremities, there's a tendency for blood to pool in the veins in the legs.  And as it pools, it can clot.  And then the problem is those clots can migrate up into the lung area.  The technical term for that is "pulmonary embolus," but how people commonly understand it is it's a blood clot in the lung which can be fatal.  So to prevent that -- In other words, you don't want to wait for it to happen before you start treatment.  Patients in this condition are very high risk for the development of that.  So most of the time they put in a -- It's actually what looks like the way you would open up an umbrella.  If you think of an umbrella without the fabric, it's the little metal struts that go into the -- the main vein and filter out those clots, and

they -- they reduce the chances of a severe clot in the lungs. It doesn't eliminate all of them, but it vastly reduces the chances of fatal embolus.

Q    Can those emboluses also come from what's called "deep vein thrombosis"?

A    Well, that's what happens because the ---

Q    Does she have that condition?

A    Yes, because there's no muscle movement that keeps those veins squeezed down at times, let say as you walk or as you otherwise move your leg muscles.  So they tend -- blood tends to pool down there, and over time the valves that are supposed to close off that stop that.  There's just too much pressure, and so there tends to be over time, you know, expansion of those veins because of the, you know, the inability to move.

Q    Was her treatment course post-operatively complicated by anything?

A    It was significantly complicated.

Q    Can you describe to us the major ways?

A    Well, number one, bladder function has been lost.  Okay? So that, again, is a -- is an automatic function of the spinal cord or at least something that can be trained to become essentially automatic.  So that required drainage.  In other words, you have to put -- If you can't normally squeeze down on the bladder, then you have to have tubes in place to keep it empty.  Otherwise, infections can develop.  And, of course,

the problem is even when you keep it drained with those tubes, there's still a tendency for infections to take place because when urine pools, it's a great place for bacteria to grow.  So that's a constant struggle, keeping the bladder emptied and keeping it sterile.  And there's been problems with that all along.

Q    Can you describe those problems to us?  Let's talk about that and we can move on.

A    She's required several operative procedures to establish drainage of the bladder, but even those require ongoing care and treatment because the drain needs to be changed at intervals.  Sometimes it will get clogged.  And there have been multiple episodes of urinary tract infections because even though they're keeping it -- the volume low, it's not -- it's not a sterile environment by virtue of having the drains in place, but the problem is you don't have any other choice. If you don't put those drains in place, then what happens is eventually the urine will overflow.  It will leak, and that's tremendously irritating to skin and can cause pressure sores which have been a problem, anyway.  So urinary leakage has to be controlled as much as you can, and this is the best available way under the circumstances.

Q    It's a -- That -- Controlling that is a condition she has to deal with to date?

A    Yes, and will continue.  And it is one of the major, I

guess you could say, maintenance issues that you have to contend with in situations like this.

Q   You mentioned decubitus ulcers.  What has her experience been with that?

A   Well, she's had -- developed early a significant -- what they call a Stage 4 bed sore which is where there's loss of tissue all the way down to the bone, and that develops for a couple of reasons.  One is that when you don't have sensation in an area of skin and you place -- you're lying on your back, let's say, most people after a period of time will get uncomfortable and automatically move.  So in a situation like this where you don't have feeling and you can't move and there's also a tendency for blood to pool because of the lack of movement, ---

Q   Is that part of the clotting mechanism?

A   Well, it's a little -- it's a little different, but it's just a pooling problem, and over time the skin will break down fairly rapidly.  And so, again, one of the things that -- one of the ongoing maintenance issues is that patients in this condition have to be moved frequently so that -- what some people call "pressure reliefs" where they're actually physically moved so that you're not keeping pressure on a given area of skin over a prolonged period of time.  The problem is once you develop a bed sore like that, there's -- you know, the skin doesn't heal up completely well.  It's not

mobile. The blood supply is reduced by virtue of scarring. So they tend to build on themselves, although because of the very good care that she's had and that she, you know, sees, that she gets, that has been minimized but, of course, it's an ongoing risk.

Q    Have you -- In reading the records and talking with her, how vigilant do you consider her to be in taking care of her skin issues?

A    Extraordinarily vigilant.

Q    Despite that, did she have to have a surgery or debridement procedure for at least one ulcer?

A    Right, but that was in the early stages, and that was because of all the other issues going on. Sometimes that -- even despite great efforts, those can occur.

Q    That was before she was maybe able to ---

A    Well, that was before the extensive rehab program. This was really in the early going after the injury.

Q    Do -- Do those conditions include the risk of severe infection, sepsis, MRSA, that type of stuff?

A    She's actually had MRSA as a result of that. That's what we call Methicillin-resistant Staph which is the "Super bug" that you hear about. And they -- That particular organism really has a tendency to get into those kind of wounds, and they're very difficult to treat once that becomes established.

Q    I note in your report you talk about neurogenic shock and

pulmonary edema.  Have you already told us -- and a neurogenic bladder.  Have you already told us about those things in different language?

A    Well, the neurogenic bladder is the idea that because the spinal cord is not functioning, then the automatic mechanisms of the bladder, that is, when you -- as you get trained past childhood, when your bladder feels full, you are able to determine when you urinate and how much and how often, and generally people don't have issues with leakage between times.

The problem with this issue in this case here is that that ability to sense a full bladder and the ability then to voluntarily begin urination and voluntarily end it and not have issues in between, that's completely lost.

And, you know, there's two problems posed by the neurogenic bladder.  One is that if you're not able to empty the bladder and keep it empty, it's a -- it's a great environment for bacteria to grow.

And secondly, you know, if you -- again, if you don't keep it drained, it will eventually overflow.  It won't empty completely, but it will get so big that it will just leak out. And the urine, in particular, tends to be extremely irritating to skin.  So, again, it complicates issues of adequate skin care in these settings.

And then the issue of neurogenic -- or the pulmonary edema, once again, is a response to the injury.  So, again, in

the early phases, until the body adjusts to the loss of function, that can -- In other words, what happens is, again, the blood vessels and the lungs seem to lose automatic control. The mechanism for that is not real clear, but it's definitely a known complication especially in the early phases of this injury.

Q   So you talk about with the bladder she's had a suprapubic catheter, a suprapubic sling procedure done. Is that right? And an urethral catheter as well?

A   Right.

Q   Different surgeries to try to deal with the -- the problems of urination as you've described; is that fair?

A   Yes.

Q   All right. And then what are the -- You mentioned something about -- What are "brachialis transfers"?

A   Well, what it is is where there was some -- The brachialis is a muscle in the forearm, and there was some -- some function preserved in that. And you can attach the end of that muscle to another area because if you get a little bit of contraction, a little bit of motion to that muscle, you can attach it at a place where it doesn't normally go and provide a little bit of extra function. But, of course, it's never -- never an adequate substitute for -- for the normal function.

Q   Did you conduct a physical examination of Dr. Roberts?

A   Yes.

Q    And what was significant -- What did you find that was significant in your physical examination?

A    Well, the main thing was that she has pretty good strength in the shoulders and a little bit, not bad, in the biceps.  But really below that, there's no tricep movement.  So in other words, the ability to extend your arm like that.

And probably most -- The biggest problem is the fingers don't work because that -- those -- that part of the spinal cord that has the most to do with that area, you know, was severely injured.

So from a functional standpoint, you know, that makes a huge difference in terms of patient independence really.  So when the triceps -- If you don't have triceps, you can't get out of a chair on your own.  If you have intact triceps, you can at least assist yourself in getting in and out of a chair.  And obviously, if you don't have hand function, then all sorts of routine activities, be it dialing a phone or holding a spoon, is, you know, not really feasible.  There are various aids that will use different kinds of braces and things like that that can help with that a little bit, but the essential function of the hand, of course, is so critical, and that -- that's been severely damaged here.

Q    Did you note any grip strength in her hand at all?

A    No.

Q    Did you note any motor activity in her lower extremities

at all?

A    No.

Q    Does she have any -- Did she -- either you find or see in the records or did she report to you any pain or any problems in using her upper extremities other than --

A    Well, she ---

Q    -- other than what you've described to us?

A    There's still some abnormal sensation at times in the arms.  You know, I think that's a combination of possibly, you know, at the upper levels above C7 some residual cord injury.  Some of it, I think, is due to just mechanical dysfunction, you know, because of the contractures and weakness and so on.

Q    Did you notice, in particular, a left arm condition that still affected her substantially?  If you get to the end of your "History" section, above "Current Medications," Doctor.  I think it's ---

A    Yes, in the left arm and shoulder, in particular.  Again, I think a lot of that is mechanical stress across the shoulder joint because of weakness.

Q    Based on your examination and history, review of the medical records and the diagnostic studies, did you form an opinion to a reasonable degree of medical certainty of her condition?

A    Yes.

Q    And what is that, Doctor?

A    That she sustained a fracture and dislocation at C6-7 with severe neurologic deficit characterized as complete paraplegia in the lower extremities and severe functional loss of strength in the upper extremities.

Q    And you talked -- And did you -- The people who have those conditions, do they have complications that typically go with those conditions into the future?

A    Yes, because a lot of it gets back to the idea that the automatic functions of the body are severely impaired over and above the obvious deficit in terms of being able to get in and out of a chair on their own, things like that.  Again, the problems with bowel and bladder function, because those -- those functions are no longer automatically undertaken.  So on the one hand you have to have some sort of urinary drainage of the bladder.  In terms of bowel control, they generally have to be placed on a bowel program with periodic enemas and things like that to initiate emptying which, again, is not ---

Q    Do you have the same loss of that as you do with the urinary --

A    Right.

Q    -- issues?

A    Yes.

Q    It's the same deal?

A    Yes.

Q    And so what protocols or what do you have to do for that?

A    Well, it varies a little bit, but basically people have to have -- If they're put on a program where they're evacuating their bowel on a regular basis sometimes with the assistance of enemas and things like that, they can get to sort of a pattern with that.  And so at least you have some established program to assure that the bowels are properly evacuated at intervals.  But, again, much like the bladder, it's an automatic function that is -- that is lost.

Q    Okay.

A    In addition, because of the loss of sensation and the tendency for blood pooling, decubitus or skin sores are always something you have to monitor very carefully.  A lot of people will develop calcification in joints.  I think that may be why some of the shoulder pain is there because when she's unable to move, there's a problem called "heterotopic calcification" which -- in other words, where you develop calcium laid down where you're not supposed to because of inactivity, and that further reduces mobility.

Q    Does she have to be leery about -- You talk about calcification.  What about the reverse?  What about osteoporosis or osteopenia?  Is that a concern?

A    Well, that is a problem because bone is a living tissue, and it does better when it's under stress, so.

Q    What about the lack of innervation of it?  Does that affect it as well?

A    Well, it really gets back to the muscle function.  If the muscle is not contracting, then the bone is not being stressed.  And it's sort of like being in a zero gravity environment, more or less.  So that there is a tendency for bone to get weaker over the years.  So you can have too much or too little at the same time.

Q    What have you seen Dr. Roberts do to address that?

A    Well, she's got an extremely conscientious program of exercise and rehabilitation in an effort to minimize the complications and to maximize what function that there is.  And just in reviewing the records, I'd say it's a -- a heroic effort on her part and the part of her caregiver and other -- other helpers.

Q    Have you seen other folks do the -- to the same level of effort that you see Dr. Roberts?

A    Well, some do and some don't.  I mean I think it's -- it's a very devastating injury.  And some people, they give up, you know.  They just can't carry on the battle over the years.  So not that I'm judging it.  I'm just saying it's just such a physically and mentally debilitating situation.  It's hard for them to really invest fully in the time and effort.  And I must emphasize there's a tremendous amount of time involved in this day to day or many, many hours.  So, you know, I think it's -- She's to be commended and, again, all of her helpers for really minimizing, you know, the adverse

effects that can take place here.

Q   Are one of the -- another one of the complications inherent to this condition is lung function or lung infections and lung issues?

A   Right.  Well, again, there's several --

Q   Can you describe that to us?

A   -- there's several parts to that.  Again, a lot of it has to do with the fact that there's not normal muscle movement. And just routine movement, you know, if you think about when people are in the hospital, they make you get up; they make you deep breathe.  You can't do the motion that keeps the lungs healthy.  So there is a tendency, you know, a common cold in a situation like this could easily develop into pneumonia because people aren't able to clear their secretions as well.  They aren't able to deep breathe.  They aren't able to move around into different positions easily as we normally would.  So what -- what, otherwise, might be a not very serious respiratory condition, in someone with her condition it could transform into something much more serious pretty easily.

Q   Has that occurred Dr. Roberts?

A   It has.  She described to me last summer an episode where she had some nasal drainage.  I'm not sure if it was sinus or hay fever or whatever, but that pretty rapidly developed into a severe pneumonia that required intubation and ventilator

support.  Again, she got through that and was able to be
extubated which in and of itself is nearly ---

Q    Exactly.  What does "extubated" mean?

A    To breathe on her own which is nearly miraculous.  So --
But, again, it shows you that even a -- what would, otherwise,
be thought of as not a very serious respiratory issue can
develop rapidly into something that's life threatening here.

Q    Are regulating your blood pressure or your body
temperature part of your autonomous nervous system?

A    It is.

Q    And how is that affected generally in people or maybe in
Dr. Roberts?

A    Well, when you ---

Q    We see her -- We see her with a blanket on her.

A    Right.  It's like when you're in a -- in a -- you go from
a cold or I should say a very hot to a very cold environment,
you know, you'll shiver.  Again, those sort of automatic
functions that have to do with temperature control are
impaired.  And they're not completely lost, but they're
impaired, so it doesn't operate as efficiently.

     Same thing with blood pressure, you know.  When
you -- Sometimes if you're lying down flat and you get up
rapidly, you can get dizzy.  Well, that's exaggerated in a
situation like this.  So there has to be careful and
oftentimes slow movements so that there's a chance for the

body to regulate its blood pressure, but instead of it being automatic, you have to let the body accommodate to it.

Q    Doctor, do you have an opinion as to whether Dr. Roberts will have any further recovery neurologically beyond where she is now?

A    Unfortunately, I don't think there will be.  I think this is really from the moment of impact, this was determined, unfortunately.  The degree of injury was so severe, recovery is not in the picture.

Q    Has any occurred in the four years since?

A    No.

Q    Is her -- Do you believe there can be any functional recovery in her?

A    No.  You know, the problem is that there's scarring that develops in the spinal cord over time.  In fact, in many cases there can be loss of tissue so that functional recovery is generally -- is not really possible to be honest.

Q    Does -- Is there any further treatment that -- acute medical treatment she needs now?

A    No.  In terms of the spine stability and the function, it's at a pretty steady state.  So I don't anticipate any -- any intervention in that respect.  Most of what we're looking at would probably be issues related to the automatic functions that we talked about for the most part.

Q    What about ongoing care for her bladder?

A    Well, that is -- that is being routinely monitored.  The drain has to be changed at intervals and also flushed out at certain intervals.  So that will be an ongoing struggle really.

Q    And you say this, and I want to make sure I ask it the right way, but is there any treatment with her -- We talked about different parts of your body, and this may have been subsumed in what you said before.  But is there any surgical treatment in her neck that can be done to give her any further function?

A    No.

Q    Do you have an opinion as to what caused her neck fracture, dislocation and spine injury?

MR. KLEIN:  Objection, Your Honor.  This is outside the scope.

MR. BURGER:  It was put in his report two years ago, Your Honor, and they've deposed him on this.

THE COURT:  You have some medical -- something that you're about to say as opposed to this incident with the -- with the -- that we're looking at here relative --

MR. BURGER:  No.

THE COURT:  -- to the roof and the seat belts?

MR. BURGER:  No.

Q    (By Mr. Burger)  Do you have an opinion as to whether this car crash caused her neck fracture and paralysis injury?

MR. KLEIN:  I don't think that's in dispute.

THE COURT:  Yeah.  No; move on from that.  Yeah, please.  We don't need to go there with him.

Q   (By Mr. Burger)  You wrote that as the last thing in your report.

THE COURT:  You all just want more, more, more. There's no reason for that.

A   I did.

Q   (By Mr. Burger)  You wrote that -- You wrote a comment about that as the last sentence in your report.  Is that fair?

A   Right.

Q   We understand now that there's no dispute, so I won't ask you about that.

THE COURT:  Yeah.

Q   (By Mr. Burger)  Do you believe that the medical care that you've seen in the medical records and as you've described to us was reasonably necessary because of this condition?

A   Oh, it definitely was.

Q   Did we ask you to take a look at a Life Care Plan?

A   Yes.

Q   All right.  And who did that Life Care Plan?

A   That was conducted by Nancy Bond.

Q   And you have it there with you, correct?

A   I do.

Q    And have you had an opportunity to look at all the care described in there?

A    Yes.

Q    Is the care described in there -- Do you have an opinion as to whether that would be reasonably -- reasonable and necessary for Dr. Roberts' future care and treatment?

A    It will be, yes.

Q    All right.

MR. BURGER:  And thank you.  That's all questions I have.

THE COURT:  Cross Examination?

MR. KLEIN:  Thank you, Your Honor.

CROSS EXAMINATION

QUESTIONS BY MR. KLEIN:

Q    Good afternoon, Dr. Kennedy.  I have just a few questions.

I thought I heard you say, and I just want to make sure, that based on your review and your meeting with Dr. Roberts, that she has had very good care.  Is that true?

A    Yes.

Q    Okay.  You also mentioned that you have seen some patients who have a spinal cord injury at this level who give up, but Dr. Roberts is not one of those, correct?

A    Correct.

Q    All right.  Now let me just kind of briefly go through

just to put this in context.  You saw her in your office on February 25th of 2014, correct?

A    Yes.

Q    That was almost exactly two years after this crash.

A    Right.

Q    And that was the first time you saw her.

A    Correct.

Q    Have you seen her since October -- Excuse me.

Have you seen her since February 25th, 2014, up to today?

A    No.

Q    So you saw her again today.

A    Right.

Q    And spoke with her briefly today.

A    I did.

Q    But did not do any kind of medical -- formal medical examination today.

A    Correct.

Q    All right.  When you saw her back on February 25th, 2014, is it accurate to say she did not have any acute issues at that time?

A    Yes.

Q    So, for example, she did not have any skin breakdowns, sometimes called "bed sores" or decubitus ulcers.

A    Well, that's the one thing I wasn't able to check for

because of the logistics of making that complete examination. But based on what she told me and her caregiver, as far as I could tell, that was not an active problem.

Q    So she did not report any issue with skin breakdown.

A    Right.

Q    Okay.  And you didn't see any issues when you saw her with urinary tract infections, correct?

A    Right.

Q    No pulmonary breathing problems?

A    Correct.

Q    And no circulatory problems.

A    Right.

Q    And now we've covered kind of the four big areas of things you really have to watch out for with a spinal cord injury, correct?

A    Yes.

Q    All right.  Now you're a neurosurgeon.  You've already explained that to us.  Is it correct you kind of focus on acute medical care?

A    That's my focus, yes.

Q    Sure.  So if somebody comes in with this kind of injury, you would be a person who could do the surgery to do the spinal fusion necessary, for example.

A    Right.

Q    Or if somebody has complaints of back pain to the point

where they need a lower back fusion, that's the kind of treatment you can provide, right?

A    Right.

Q    Now there is another specialty of a Physical Medicine And Rehabilitation specialist, correct?

A    Right.

Q    And they're sometimes referred to as "physiatrists," right?

A    Correct.

Q    And that specialty looks at more the long-term care for people, including people with spinal cord injuries, correct?

A    In some cases.  Sometimes neurosurgeons manage that as well --

Q    Okay.

A    -- or neurologists.

Q    Okay.  Dr. Roberts, however, sees a physiatrist.  Did you understand that?

A    Yes.

Q    A Dr. Juknis, J-U-K-N-I-S.

A    Right.

Q    Do you know Dr. Juknis?

A    No.

Q    Do you know why the -- Well, let me step back.  The Plaintiffs actually hired you to have -- do this examination of Dr. Roberts, correct?

A     Right.

Q     Do you know why they hired you, an acute care neurosurgeon, to look at the Life Care Plan as opposed to Dr. Roberts' physiatrist?

A     Not specifically, no, but I've been involved, you know, as a provider for long-term care to patients in similar conditions.

Q     Okay.  All right, fair enough.  Can -- Do you know what doctor besides Dr. Juknis that Dr. Roberts is seeing now?

A     That is contained in the records that I reviewed.  I don't recall the names at this moment.

Q     Okay.  Do you know what rehabilitation she's receiving now?

A     Yes.  It was outlined to some extent in the care plan.

Q     Okay.  Okay.  And she's receiving 11 hours of attendant care a day now?  You understand that?

A     Right.

Q     All right.  And it's Dr. Roberts and Virginia Stolley who have arranged for that.  They're actually managing the care providers, correct?

A     Yes.

Q     And appear to be doing a good job.

A     Yes.

Q     Okay.

        MR. KLEIN:  Those are all the questions I have.

Thank you, Your Honor.

MR. BURGER:  I have no further questions, Your Honor.

THE COURT:  Excellent.

Thank you, Dr. Kennedy.

THE WITNESS:  Thank you.

THE COURT:  Ladies and Gentlemen of the Jury, we're going home or some place.  We're leaving here.  So the weekend is here.  You won't be back till Monday at 9:30.  So the admonition:  "The Judge told me not to discuss that with you."  Okay?

You can discuss this case as fully and freely with anyone you choose when it is over.  Have a pleasant weekend.  See you Monday morning at 9:30.

(Jury excused from the courtroom; whereupon, the following proceedings were had:)

MR. HANSON:  Judge, just to complete the record, I offer Exhibit 7512-19 and 7512-20.  They were used with Mr. Sicher.

THE COURT:  I don't believe there's any objection.  They will be received.

MR. HANSON:  Okay.

MR. CARNIE:  And I've got a bunch of other exhibits to go through.  Is that okay?  You want to do that right now real quick?

MR. HANSON:  Is it quick?

THE COURT: Fine.

MR. CARNIE: Should be pretty quick. It depends on how much you object.

THE COURT: I mean is there anything that hasn't been used? Is there anything that's objected to?

MR. CARNIE: No. It should all -- It should all come right in except I think they'll say some of them are for illustrative purposes only. That's, I think, the only objection.

MR. HANSON: It's a fairly long list. It might work better if we do something separately and then just put it in because I'm not sure what all you got.

MR. CARNIE: Okay.

THE COURT: You show them to them. The Court will receive them subject to objection. Okay?

MR. BURGER: Last housekeeping point is I'd like to move to admit the medical records only in this case, and I have them denominated here.

THE COURT: Fine.

MR. BURGER: Would you like me to do each one on the record or you want me ---

THE COURT: No. You moved to admit the medical records. They will be received unless there's -- Subject to objection. Okay?

MR. BURGER: Thank you, Your Honor. I can ---

THE COURT:  I miss it quick, okay?  You give her the ---

MR. BURGER:  Can I give her the list and work it out?

THE COURT:  You give her the list, yes.

Mr. Klein?

MR. KLEIN:  Just for the record, our objection to the medical records is hearsay and there's also irrelevant stuff in there.

THE COURT:  Well, the Court will receive them.  You know, if something is going back, if the jury is asking for something, that will be a whole another thing, particularly as to irrelevant things in there in the medical records.  That won't go back, you know.  It will have to be redacted or whatever.

MR. KLEIN:  I understand.  All of them have -- I don't think there's hearsay.  All of them have declarations to get them in as business records, Your Honor, but I get what you're -- I get you're not going to show them to the jury.

THE COURT:  Please.  You're going to ask the Doctor to "cause" an accident.  I mean come on.  I mean Ray Charles could have told you that.  I mean you don't need to do that.  You all are just getting in too much, you know.  Please.  It's unnecessary.  You're all just thinking more is better.

See, you notice how good that last expert was?  He was quick.

MR. BURGER:  Because I did it.

THE COURT:  "I agree."  "I agree."  "No;" boom, boom. That's the way you roll, see?  Because the jury can grasp that real quick.  See, all that long stuff, please, they don't know what you're talking about, you know.

MR. SIMON:  It went smoother.

THE COURT:  Yeah.

MR. SIMON:  It went smoother.

THE COURT:  Once you see what I was talking about.

MR. SIMON:  There you are.  Tell them what you need to tell them and go.

THE COURT:  He's quick.

MR. SIMON:  Yep.

THE COURT:  And he kind of punched what he needed to. He was pretty good.

(Court adjourned at 4:25 PM.)

CERTIFICATE OF OFFICIAL REPORTER

I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 2nd day of April, 2016.


/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER